Nicholas O. Kennedy (SBN 280504)
nicholas.kennedy@bakermckenzie.com
**BAKER & McKENZIE LLP**
1900 North Pearl Street, Suite 1500
Dallas, TX 75201
Telephone: 214 978 3000
Facsimile: 214 978 3099

Barry Thompson (SBN 150349)
barry.thompson@bakermckenzie.com
Thomas A. D. Tysowsky (SBN 330022)
tom.tysowsky@bakermckenzie.com
Byron R. Tuay (State Bar No. 308049)
byron.tuay@bakermckenzie.com
**BAKER & McKENZIE LLP**
10250 Constellation Blvd., Suite 1850
Los Angeles, CA 90067
Telephone: +1 310 201 4728
Facsimile: +1 310 201 4721

Attorneys for Plaintiff
VITALY IVANOVICH SMAGIN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| VITALY IVANOVICH SMAGIN,<br><br>Plaintiff,<br><br>v.<br><br>NATALIA TSAGOLOVA, an individual;<br><br>Defendant. | **Case No. _____**<br><br>**Date Complaint filed:**<br><br>**COMPLAINT**<br><br>**[CIVIL RICO LIABILITY]**<br><br>**(Civil RICO Liability under 18 U.S.C. §1962(c), §1962(d), and §1964(c))**<br><br>**DEMAND FOR JURY TRIAL** |

## **INTRODUCTION**

1.      Ashot Yegiazaryan ("Mr. Yegiazaryan") is a Russian criminal on the Interpol "Red" list, who fled prosecution in Russia to live in a luxury estate in Beverly Hills and remains on the run.[1]  Mr. Yegiazaryan operates a criminal empire worth hundreds of millions of dollars; his stock in trade is real estate fraud.  He is a master scammer and manipulator who operates behind the scenes and carries out large scale criminal transactions, stealing funds and assets and then using a network of nominees to cover his tracks and to hide and protect the stolen funds.  His nominees—all of whom know that he is a convicted felon, subject to an international arrest warrant, and a syndicate leader—are a "white collar" army of friends, family members, business associates, lawyers, and bankers.

2.      Mr. Yegiazaryan is the subject and centerpiece of a different RICO lawsuit that Smagin filed in December 2020.  *Vitaly Ivanovich Smagin v. Compagnie Monegasque de Banque, et al.*, 2:20-cv-11236-RGK (C.D. Cal Dec. 11, 2020).  That lawsuit lays out in detail the various aspects of Mr. Yegiazaryan's criminal enterprise. This lawsuit asserts claims against an additional member of the same criminal enterprise, who is not a party to the original RICO case—Mr. Yegiazaryan's wife Natalia Tsagolova.[2]  Ms. Tsagolova is central to the enterprise's affairs and its scheme to defraud Plaintiff, as she has made numerous filings in many courts, including the United States, Monaco, and Russia, intended to prevent Mr. Smagin's judgment enforcement efforts.  Specifically, Ms. Tsagolova has succeeded in wrongfully freezing

---

[1] Mr. Yegiazaryan has since fled Beverly Hills, California to France as a result of this Court's increasingly severe contempt orders.

[2] In the separate RICO action Mr. Yegiazaryan and other members of the criminal enterprise, the Court denied Smagin's request to add new parties to an amended complaint but noted that "[Mr. Smagin] is minimally prejudiced by the denial of his request to add new parties, as he is not prevented from filing a separate action against them." (*Smagin v. Compagnie Monegasque de Banque, et al.*, 2:20-cv-11236-RGK, ECF 181, 2, a true and correct copy is attached hereto as **Exhibit 12** (C.D. Cal. Nov. 30, 2023 "the **RICO Action**").

more than $90 million through a legal action in Monaco to prevent Mr. Smagin's collection efforts. She also seeks to use divorce proceedings to split all community assets shared between her and Mr. Yegiazaryan to further encumber the assets against which Mr. Smagin can collect his debt -- all while assigning their debts, including the liability for millions of dollars owed to Plaintiff, solely to Mr. Yegiazaryan. Ms. Tsagolova, however, has colluded with Mr. Yegiazaryan to claim as part of their community property, funds held in a trust worth millions in which neither party holds a legitimate interest. This attempt is just the latest step in Mr. Yegiazaryan's familiar playbook where he seeks to keep his assets in the hands of friends or family members and out of the reach of Mr. Smagin through collusive or otherwise sham legal proceedings.

3.      Mr. Yegiazaryan's cast of nominees follow commands just as the minions of a drug lord or war lord would do. They lie, cheat, steal, and break the law for this criminal enterprise, with a common purpose of supporting Mr. Yegiazaryan's schemes and secreting and protecting his ill-gotten gains, which he shares with them for supporting his enterprise. At times, these conspirators even use legal means, legal instruments, and legal proceedings (*e.g.*, trusts, shell companies, offshore enterprises, lawsuits/litigation and overseas bank accounts) for the improper purpose of stealing, hiding and protecting Mr. Yegiazaryan's ill-gotten gains; they do the requested bidding, whatever that may be, including making false claims and bringing litigations directly for the enterprise (or indirectly for its benefit), in court systems around the world with the goal of sowing confusion, creating chaos and causing delay and frustrating the collection and redress efforts of Mr. Yegiazaryan's victims.

4.      The chaos and delay they create is not random or haphazard. Mr. Yegiazaryan carefully choreographs the actions and events of his nominees. He "pulls the strings" like an international crime boss, and the power of the enterprise is its coordination, international scope, use of seemingly legal means (but for an improper

purpose), willingness to stop at nothing to defraud and collect funds and to then work together to protect the fund by whatever means are necessary, legal and illegal. This type of coordinated syndicate conduct is precisely the type of organized activity that Congress sought to combat when enacting the Racketeer Influenced and Corrupt Organizations Act ("RICO"). *Oscar v. University Students Co-Operative Assn.*, 965 F.2d 783, 786 (9th Cir. 1992). Mr. Yegiazaryan and his nominees must be stopped, the RICO statute is the proper tool for doing so, and this action is the proper vehicle for making it happen.

5.      Accordingly, and as described more fully herein, Plaintiff Vitaly Ivanovich Smagin files this civil RICO action to recover more than $170 million (plus legal interest) of which he has been defrauded, denied, and kept from recovering as a result of the enterprise scheme orchestrated by convicted criminal Mr. Yegiazaryan, Compagnie Monégasque De Banque ("CMB") and their nominees, including Mr. Yegiazaryan's wife Ms. Tsagolova. The enterprise in question involves, at a minimum, material assistance from the following cast of characters: CMB Bank, Mr. Yegiazaryan's family members who have each served as fronts for his fraudulent activities (Suren Yegiazaryan, Artem Yegiazaryan, Stephan Yegiazaryan and Defendant Natalia Tsagolova); a Russian criminal accomplice who has asserted fraudulent and collusive claims to try to encumber, secret, and protect Mr. Yegiazaryan's funds (Vitaly Gogokhia); French, Russian and Luxembourger individuals who have been falsely appointed as trust administrators for the Alpha Trust to interfere with Plaintiff's collection efforts in ways that Mr. Yegiazaryan is barred by court order from doing (Natalia Dozortseva, Murielle Jouniaux, and Alexis Gaston Thielen); a registered agent company (Prestige Trust Company, Ltd.) and its U.S. lawyer agent (H. Edward Ryals) all of whom colluded with the falsely appointed trustees and CMB to fraudulently mislead Courts around the world as to various legal proceedings and dispute between Plaintiff and Mr. Yegiazaryan and thereby hinder

Case No._____
COMPLAINT

Plaintiff's judgment enforcement; a purported "financial manager" who is improperly colluding with Mr. Yegiazaryan concerning Russian bankruptcy cases to derail and deny Plaintiff's collection efforts (Ratnikov Evgeny Nikolaevich); Smagin's largest creditor willing to initiate and abuse Smagin's Russian bankruptcy case to carry out Mr. Yegiazaryan's unlawful plans (Igor Pestrikov) as well as his attorney (Kirill Semenov) and his company capable of carrying out fraudulent transactions (Soyuzinvest LLC); and Mr. Yegiazaryan's company used to carry out fraudulent transactions necessary to manipulate Smagin's bankruptcy proceeding in Russia (Central Transportation Company LLC).

6.     Plaintiff Smagin has been injured in his inability to collect this massive judgment and interest on the judgment; he has incurred millions of dollars in attorney's fees litigating actions around the world against Mr. Yegiazaryan, CMB and their nominees (including hundreds of thousands of dollars in fees for legal proceedings in the Central District of California).  Plaintiff Smagin is entitled to treble damages on these amounts and all other relief as the Court and/or jury may deem just and proper.

## PARTIES

7.     Plaintiff Vitaly Smagin ("**Plaintiff**") is an individual Russian citizen and businessman residing at Desenovskoye settlement, Novovatutinsky Prospect, 10, bldg 1 apt. 44, Moscow, Russia.  Plaintiff obtained an arbitral award in an action against Mr. Yegiazaryan before the London Court of International Arbitration (the "**Arbitration**"). The Arbitration award was confirmed by the Honorable R. Gary Klausner, United States District Judge in the Central District of California and, on March 31, 2016, the Court entered a judgment in favor of Plaintiff and against Mr. Yegiazaryan in the amount of $92,503,652 (the "**California Judgment**").  A true and correct copy of the California Judgment is attached hereto as **Exhibit 1**.

8.     Defendant Natalia Nikolaevna Tsagolova ("**Ms. Tsagolova**") is an individual residing in Russia at bld 1, corp. "I", apt. 91, MGU (Moscow State

University), Leninskiye Gory, Moscow, 119234, Russia.   She is the wife of Mr. Yegiazaryan.  They have been married since around August 1987.  Ms. Tsagolova and Mr. Yegiazaryan have engaged in multiple sham divorce proceedings in California, Liechtenstein, and Russia to divide and dispose of the Alpha Trust's funds in violation of the U.S. District Court's orders and to block Smagin's recovery of the London Award.  Ms. Tsagolova has also intervened in multiple court procedures around the world in an effort to use the fraudulent divorce proceedings as justification to take control over, diminish, or keep sequestered the Alpha Trust's funds, which are held by Savannah Advisors a bank account at CMB.

## **NON-PARTIES**

9.     Ashot Yegiazaryan a/k/a Ashot Egiazaryan ("**Mr. Yegiazaryan**" or "**Ashot Yegiazaryan**"), who previously resided at 655 Endrino Place, Beverly Hills, California 90201.   On information and belief, he has since relocated to France. Mr. Yegiazaryan was the respondent in the Arbitration with Plaintiff and is now a judgment debtor pursuant to this Court's California Judgment as a result of Plaintiff's successful petition to confirm that arbitral award in this Court.  Mr. Yegiazaryan was also criminally convicted in Russia in 2018 for his fraud against Plaintiff, fled to the United States to escape prosecution as a fugitive of Russia and has since relocated to France.

10.     Suren Yegiazaryan a/k/a Suren Egiazarian ("**Suren**"), is an individual residing at 1915 Carla Ridge, Beverly Hills, California 90201.   Suren is Ashot Yegiazaryan's cousin.  Suren is also the nominal owner of Clear Voice, Inc., a Nevada corporation.  Among other things, Suren acts as Mr. Yegiazaryan's "check book."  He accesses and holds the ill-gotten funds from the enterprise for Mr. Yegiazaryan to keep Mr. Yegiazaryan at arms-length from the dirty money.  On information and belief, he is being compensated by Mr. Yegiazaryan to do these things for the criminal enterprise run by Mr. Yegiazaryan.

11.     Artem Yegiazaryan ("**Artem**") is an individual residing in Los Angeles, California at 342 Hauser Blvd 429, Los Angeles, CA, 90036.   Artem is Ashot Yegiazaryan's brother.   Artem was involved in the real estate scam that Mr. Yegiazaryan perpetrated on Plaintiff in Russia.  In 2018, Artem was convicted in Russia for his participation as an accomplice in Ashot Yegiazaryan's fraud.  On information and belief, he is being paid by Mr. Yegiazaryan to do these things for the criminal enterprise run by Mr. Yegiazaryan.

12.     Stephan Yegiazaryan a/k/a Stephan Egiazaryan ("**Stephan**") is an individual residing in Moscow, Russia at ul. Leninskiye Gory, 1, apt. 91, Moscow, 119234.  Stephan is Ashot Yegiazaryan's son.  He has made various misrepresentations in courts in Liechtenstein to encumber assets to which Mr. Yegiazaryan has laid claim. On information and belief, he is being paid by Mr. Yegiazaryan to do these things for the criminal enterprise run by Mr. Yegiazaryan for the purpose of defrauding Plaintiff and preventing his judgment enforcement efforts.

13.     Vitaly Gogokhia ("**Gogokhia**") is an individual residing in London, the United Kingdom at Flat 212 California Building, Deals Gateway, Lewisham, London, SE13 7SF.  He is a longtime nominee of Ashot Yegiazaryan who, among other things, colluded with Mr. Yegiazaryan to create a false and fraudulent "Consent Judgment" in the United Kingdom to compete with Plaintiff Smagin's California Judgment for the funds that Mr. Yegiazaryan fraudulently conveyed into the Alpha Trust.   In 2018, Gogokhia was criminally convicted in Russia for his participation as an accomplice in Mr. Yegiazaryan's fraud against Plaintiff.  On information and belief, he is being paid by Mr. Yegiazaryan to do these things for the criminal enterprise run by Mr. Yegiazaryan.

14.     Natalia Dozortseva ("**Dozortseva**") is a Russian individual residing in France at 9 rue des Etables, 06620 Greolieres.  With no authority to do so, Mr. Yegiazaryan "appointed" Dozortseva as a trustee for the Alpha Trust.  Under this false

color of authority, Dozortseva has attempted to intervene in Plaintiff's legal proceedings in Liechtenstein, Nevis and Monaco.  She has successfully intervened in Monaco and her actions there have substantially delayed Plaintiff's enforcement efforts in each jurisdiction.  On information and belief, she is being paid by Mr. Yegiazaryan to do these things for the criminal syndicate run by Mr. Yegiazaryan.

15.    Murielle Jouniaux ("**Jouniaux**") is an individual residing in France at 108, Avenue St. Lambert, Nice.  Like Dozortseva, Jouniaux was improperly appointed as a trustee for the Alpha Trust and has fraudulently held herself out to be a trustee of the Alpha Trust.  She has similarly opposed Plaintiff's legal and proper attempts to enforce his judgment against the Alpha Trust, has attempted to intervene in Plaintiff's legal proceedings in Monaco, substantially delaying Plaintiff's enforcement efforts.

16.    Ratnikov Evgeny Nikolaevich ("**Ratnikov**") is an individual residing in Russia at Ulitsa Druzhby, 9, apt. 200, town of Lyubertsy, Moscow Region, 140013. Ratnikov has falsely and fraudulently held himself out to be an impartial Russian bankruptcy officer overseeing Plaintiff's bankruptcy filing in Russia.  But, on information and belief, under this false color of authority, Ratnikov has colluded with Mr. Yegiazaryan, and Ratnikov has attempted to intervene in Plaintiff's legal proceedings in the United States, Liechtenstein and Monaco for the purpose of delaying Plaintiff's enforcement efforts in each.  On information and belief, he is being paid by Mr. Yegiazaryan to do these things for the criminal syndicate run by Mr. Yegiazaryan.

17.    Alexis Gaston Thielen ("**Thielen**") is an individual residing in Luxembourg at 10, rue Willy Goergen, L-1636 Luxembourg.  Thielen has fraudulently held himself out to be the "protector" of the Alpha Trust.  Under this false color of authority, Thielen has attempted to remove Plaintiff's lawfully appointed trustees of the Alpha Trust and confirm authority of the fraudulently appointed "trustees" Dozortseva and Jouniaux, substantially delaying Plaintiff's enforcement efforts.  On information

and belief, Thielen is being paid by Mr. Yegiazaryan to do these things for the criminal enterprise run by Mr. Yegiazaryan.

18. Compagnie Monégasque De Banque ("**CMB Bank**") is a private international bank with its principal place of business in the Principality of Monaco at 23, Avenue de la Costa, 98000, Monaco. CMB Bank has correspondent accounts in the United States and has serviced major clients residing in California, including Mr. Yegiazaryan who resided in Beverly Hills, California, with which it regularly conducts business and carries out transactions. On information and belief, CMB Bank is taking direction from and being paid by Mr. Yegiazaryan to act for the criminal syndicate run by Mr. Yegiazaryan, including, but not limited to Mr. Yegiazaryan paying CMB Bank's legal fees in the Monaco proceeding brought by Plaintiff and the Alpha Trustees.

19. Prestige Trust Company, Ltd. ("**Prestige**") is a Nevis company and the registered agent for non-party Savannah Advisors. Prestige's managing director, Stevyn L. Bartlette, is an individual residing in Florida, at 330 N. Lakeview Dr., Apt. 4211, Tampa, FL 33618, U.S. At Mr. Yegiazaryan's request, Prestige drafted two fraudulent letters intended for and used by Dozortseva and CMB to perpetrate a fraud on the Monaco Court proceeding where Plaintiff Smagin is trying to recover funds of the Alpha Trust deposited in a CMB bank account. Prestige is liable for all actions of its employees, officers, and other agents under the doctrine of respondeat superior because (among other things); (1) Prestige benefited from its agents/employees' illegal conduct; (b) the conduct occurred substantially within the time and space limits authorized by the employment; (c) the agents/employees were motivated (wholly or in part) by a purpose to serve Prestige; and (d) the conduct was of the kind that the agents/employees were hired to perform. Further, the conduct is within the scope of the agency/employment in that it is reasonably related to the kinds of tasks that the agents/employees were employed to perform and reasonably foreseeable in light of

8

Prestige's business and the agents/employees' responsibilities. On information and belief, Prestige is being paid by Mr. Yegiazaryan to do these things for the criminal enterprise run by Mr. Yegiazaryan.

20. H. Edward Ryals ("**Ryals**") is an individual residing at 6354 Treeridge Trail, Saint Louis, MO, 63129, U.S. Ryals is an agent and attorney acting on behalf of Prestige. Ryals sent two letters containing fraudulent misrepresentations that were Dozortseva and CMB Bank used to defraud courts and Plaintiff Smagin. On information and belief, Ryals is being paid by Mr. Yegiazaryan to do these things for the criminal syndicate run by Mr. Yegiazaryan.

21. Igor Leonidovich Pestrikov ("**Pestrikov**") is an individual residing in Russia at bld. 22, corp.2, apt. 102, ul. Veernaya, Moscow, 119501, Russia. He is Smagin's largest creditor and joined Mr. Yegiazaryan's syndicate in 2019 to obtain millions of dollars from Smagin as well as payments from Mr. Yegiazaryan for his services. He has helped Mr. Yegiazaryan to carry out a fraudulent scheme in Russia whereby Mr. Yegiazaryan attempted to purchase Smagin's rights to the London Award in Smagin's bankruptcy proceeding at a severely discounted rate in order to prevent Mr. Smagin's collection of the amount due.

22. Kirill Vladimirovich Semenov ("**Semenov**") is an individual residing in Russia at bld 11, apt.15, ul. Shosseynaya, Moscow, 123001, Russia. He is Pestrikov's attorney, and helped carry out Pestrikov's and Mr. Yegiazaryan's plan to place Mr. Smagin in bankruptcy through various means including legal filings and business transactions.

23. Soyuzinvest LLC ("**Soyuzinvest**") is a Russian limited liability company registered at bld. 22, corp.2, Per. Bolshoy Kozikhinsky, Moscow, 123001, Russia. Soyuzinvest is Pestrikov's entity that was used to distribute funds in the web of complex business transactions necessary to carry out Mr. Yegiazaryan and Pestrikov's fraudulent plan to bankrupt Mr. Smagin.

24.    Central Transportation Company LLC ("**CTC**") is a Russian limited liability company registered at bld 1, office 8.E/5th floor, ul. Bolshaya Cheryomushkinskaya, Moscow, 117447, Russia.  CTC is Mr. Yegiazaryan's entity that was used to distribute funds in the web of complex business transactions necessary to carry out Mr. Yegiazaryan's and Pestrikov's fraudulent plan for bankruptcy of Mr. Smagin.

25.    The Alpha Trust ("**Alpha Trust**") is a Liechtenstein trust that was formed by Mr. Yegiazaryan and CTX Treuhand AG in Liechtenstein on May 27, 2015 for the purpose of hiding and secreting away a large arbitration settlement that Mr. Yegiazaryan had received in May 2015 and did not want it subject to collection by Plaintiff Smagin. The Alpha Trust was never disclosed to Plaintiff Smagin, and he learned about it by pure chance.  The Alpha Trust's funds reside in a bank account of CMB Bank, with the funds held in the name of Savannah Advisors, Inc. (an off-the-shelf entity created simultaneously by Mr. Yegiazaryan's nominees).  Mr. Yegiazaryan was initially named as the Alpha Trust's settlor, beneficiary, investment advisor, and "Protector."  As the Protector, Mr. Yegiazaryan had unfettered power to dismiss the trustee for any reason at any time and to appoint a new trustee—including even himself and to make decisions concerning management and dispersion of the funds.  Once Plaintiff Smagin learned of the Alpha Trust, he petitioned the Princely Court in Liechtenstein ("Liechtenstein court"), where the trust had been formed, and as a result the court stripped Mr. Yegiazaryan of his authority as Protector of the Alpha Trust; the Court also rejected Mr. Yegiazaryan's appointment of trustees (Dozortseva and Jouniaux).  The Liechtenstein Court appointed Plaintiff Smagin as Protector, who in turn appointed Rudolf Schächle and Raphael Näscher as trustees for the Alpha Trust.

26.    CTX Treuhand AG ("**CTX Treuhand**") is a stock corporation organized under the laws of Liechtenstein.  CTX Treuhand created the Alpha Trust on behalf of Mr. Yegiazaryan and served as the trustee from the creation of the trust until on or

around March 9, 2020, when CTX Treuhand withdrew following the Liechtenstein court's order authorizing Plaintiff to remove CTX Treuhand and appoint his own trustee.

27.     Savannah Advisors, Inc. ("**Savannah**" or "**Savannah Advisors**") is a Nevis company owned by the Alpha Trust and, thus, beneficially owned by Mr. Yegiazaryan.  In 2021, Savannah was redomiciled to Liechtenstein and changed its name to Savannah Advisors AG.  Savannah Advisors has no assets or operations other than holding the funds of the Alpha Trust that reside in the CMB Bank account.

28.     Clear Voice, Inc. ("**Clear Voice**") is a Nevada company created by Suren Yegiazaryan, but controlled by Ashot Yegiazaryan, for the purpose of sheltering Ashot Yegiazaryan's U.S. assets from his creditors, including specifically Plaintiff.  As noted above, Suren is the funding source for Mr. Yegiazaryan and his criminal enterprise and on information and belief he funds Mr. Yegiazaryan in whole or in part from this entity.

## JURISDICTION AND VENUE

29.     This Court has original subject matter jurisdiction pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 because this action arises under the Federal Racketeer Influenced and Corrupt Organizations Act (Federal RICO).

30.     This Court has personal jurisdiction over Defendant Ms. Tsagolova because, among other contacts, she participated in the scheme to defraud Plaintiff that was centered in and during relevant times directed from California; served the central purpose of frustrating enforcement of the California Judgment; and wrongfully, fraudulently participated directly or indirectly in litigation or legal proceedings in the California, Liechtenstein, Russia and Monaco. Defendant has also taken actions to obstruct and defy post-judgment orders issued by the United States District Court for the Central District of California in Plaintiff's action to enforce the California Judgment. As noted, in furtherance of that scheme, Defendant conducted wrongful activities in California or purposefully directed fraudulent acts at California related to Plaintiff

Smagin's actions to enforcement of the California Judgment. This Court also has personal jurisdiction over Defendant pursuant to 18 U.S.C. 1965(b) because in any action brought pursuant to the Federal RICO statute, the district court may summon other parties to that district where the "ends of justice require."

31.   Venue is appropriate in the Western Division of the Central District of California pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this judicial district. Specifically, Defendant Tsagolova conspired with Ashot Yegiazaryan, Suren Yegiazaryan, Artem Yegiazaryan or any combination of a subset of these individuals, who at relevant periods resided in Los Angeles County, California, and the wrongful acts and plans were devised, initiated, and carried out by Defendant and members of the criminal enterprise through acts and communications initiated in and directed towards Los Angeles County, California. Venue is further proper in this District pursuant to 18 U.S.C. § 1965(a) because Defendant transacts affairs in this District given Defendant's participation in the enterprise, including, but not limited to initiating fraudulent dissolution of marriage proceedings in Los Angeles County Superior Court for the purpose of advancing the enterprise's affairs and interests (LASC Case No. 20STFL03636). Venue is also appropriate in this District pursuant to 28 U.S.C. § 1391(c)(3).

## **RELATED LEGAL ACTIONS**

32.   In October 2010, Plaintiff commenced an arbitration proceeding in the London Court of International Arbitration, against Mr. Yegiazaryan and his holding company Kalken Holdings Limited, entitled *Vitaly Ivanovich Smagin, Claimant, v. Kalken Holdings Limited*[3] *and Ashot Yegiazaryan, Defendants*, LCIA Case No. 101721

---

[3] Kalken Holdings Limited, a company existing under the laws of Cyprus and controlled by Mr. Yegiazaryan, was also a respondent in the Arbitration. The London Award was issued jointly and severally as to both respondents, but confirmation was sought in this Court only as to Mr. Yegiazaryan.

(defined above as the "Arbitration").  The Arbitration was conducted during the periods of September 23 through 27, 2013, January 14, 2014, and April 15, 2014.   On November 11, 2014, the Arbitration panel duly constituted under the Rules of the London Court of International Arbitration rendered a final award in favor of Plaintiff and against Mr. Yegiazaryan in the total amount of **$84,290,064.20** (with interest at the annual rate of eight percent, compounded quarterly, on the amount of $79,142,701.32, from November 11, 2014 until paid) (the "**London Award**").[4]  A true and correct copy of the London Award is attached hereto as **Exhibit 2**.

33.     On December 22, 2014, Plaintiff filed a petition with this Court to confirm the London Award and enter judgment against Mr. Yegiazaryan under the New York Convention.  *Vitaly Ivanovich Smagin v. Ashot Yegiazaryan*, Case No. 2:14-cv-09764-R-PLA (C.D. Cal.), filed Dec. 22, 2014 (the "**Enforcement Action**").  On March 31, 2016, the Court entered a judgment in favor of Plaintiff Smagin and against Mr. Yegiazaryan in the amount of $92,503,652 (defined above as the "California Judgment").

34.     On February 24, 2016, the Liechtenstein Princely Court confirmed the London Award under the New York Convention and attached Mr. Yegiazaryan's beneficial interest in the Alpha Trust to prevent him from receiving a distribution from the Alpha Trust.  A true and correct copy of the German original and English translation of the Liechtenstein Princely Court's confirmation of the London Award is attached hereto as **Exhibit 3**.  All appeals have been exhausted, and the London Award is now fully enforceable as a Liechtenstein judgment ("**Liechtenstein Judgment**").

35.     In a subsequent Liechtenstein enforcement action, Plaintiff filed an action to attach a bundle of Mr. Yegiazaryan's rights as Protector of the Alpha Trust, including his right to appoint and dismiss trustees.  The Liechtenstein trial court ruled that these rights could be attached by Plaintiff to satisfy the Liechtenstein Judgment.   The

---

[4] The London Award is a foreign arbitral award covered by the New York Convention because the place of arbitration and the place of the award is London, U.K.

Liechtenstein Supreme Court and Constitutional Court affirmed this ruling as of October 29, 2019 and all appeals are now exhausted.  A true and correct copy of the German original and English translation of the October 29, 2019 Ruling is attached hereto as **Exhibit 4**.

36.     Following this decision, a third enforcement action was filed in Liechtenstein to permit Plaintiff to seize and exercise Mr. Yegiazaryan's rights as Protector and beneficiary of the Alpha Trust.  Specifically, Plaintiff sought to appoint new trustees to the Alpha Trust to replace CTX Treuhand, the prior trustee that had been appointed by Mr. Yegiazaryan.  On March 2, 2020, the trial court authorized Plaintiff to appoint new trustees and dismiss CTX Treuhand.  A true and correct copy of the German original and English translation of the March 2, 2020 Ruling is attached hereto as **Exhibit 5**.  Mr. Yegiazaryan appealed the March 2 decision, but that appeal was rejected by Court of Appeal on September 15, 2020.  A true and correct copy of the German original and English translation of the September 15, 2020 ruling denying Mr. Yegiazaryan's appeal is attached hereto as **Exhibit 6**.  On October 28, 2020, Mr. Yegiazaryan filed his last remaining appeal to the Liechtenstein Constitutional Court. A true and correct copy of the German original and English translation of the October 28, 2020 Appeal is attached hereto as **Exhibit 7**.  On June 29, 2021, Mr. Yegiazaryan's appeal was denied by the Liechtenstein Constitutional Court.  A true and correct copy of the German original and English translation of the Liechtenstein Constitutional Court's order of June 29, 2021 denying the appeal is attached hereto as **Exhibit 8**.

37.     On July 27, 2020, after the Liechtenstein Court authorized Plaintiff to appoint new trustees to the Alpha Trust to direct payment of debts owed to Plaintiff, Plaintiff's new trustees commenced an action in Monaco against CMB for failure to effect the transfer of assets from Savannah's account at CMB to Savannah's account with a Liechtenstein bank (the "**Monaco Action**").  The new appointees acted through

14

Savannah Advisors, Inc., which by that time was under the control of new directors who are cooperating with the Plaintiff Smagin's lawfully appointed trustees instead of doing Mr. Yegiazaryan's bidding.  This is one of several related cases in Monaco with the same ultimate goal of satisfying the California Judgment by reaching money that Mr. Yegiazaryan concealed and CMB continues to wrongfully withhold.

38.    As a member of the criminal enterprise, Defendant Ms. Tsagolova, agreed to carry out the affairs of the criminal enterprise with the purpose of, among other things, interfering in the above-referenced proceedings and starting new court proceedings in Monaco, Russia and Liechtenstein and making false representations and omitting material truths in order to sow wide-spread legal chaos across multiple jurisdictions.  The end goal of Defendant Ms. Tsagolova, Mr. Yegiazaryan and their nominees and co-conspirators was to prevent Plaintiff's enforcement of the California Judgment keeping hundreds of millions of dollars in Mr. Yegiazaryan's control. Defendant Ms. Tsagolova, like others in Mr. Yegiazaryan's global web of nominees and co-conspirators has carried out the enterprise's affairs in exchange for a significant sum of money.  Indeed, Ms. Tsagolova plays a unique and central role in Mr. Yegiazaryan's multi-faceted plan to defraud Plaintiff because she has attempted to claim an unencumbered interest to Mr. Yegiazaryan's purported assets as community property through divorce proceedings in California, Russia and Liechtenstein.  These divorce proceedings serve the purpose of both delaying Plaintiff Smagin's judgment enforcement efforts and attempt to claw back millions of dollars from the Alpha Trust which Mr. Yegiazaryan no longer controls and which several courts have recognized attach to Plaintiff's London Award and California Judgment.  Ms. Tsagolova's seeks to claim a disproportionate share of the Alpha Trust to obstruct Plaintiff's judgment enforcement efforts and nominally reduce Mr. Yegiazaryan claim to the assets, while retaining tens of millions of dollars to share with Mr. Yegiazaryan.  As described below, these efforts defy this U.S. District Court's post-injunction orders prohibiting Mr.

15

Yegiazaryan and his agents from taking actions to diminish or conceal assets including those held at CMB for the Alpha Trust and Savannah Advisors.

## **GENERAL ALLEGATIONS**

### **Mr. Yegiazaryan, Artem Yegiazaryan and Gogokhia Defraud Plaintiff Out of His Investment in the Europark Business Venture in Russia**

39.     Between 2003 and 2009, Mr. Yegiazaryan perpetrated a fraudulent scheme against Plaintiff to steal his shares (funds) in a joint real estate investment in Moscow, Russia called "Europark."  Mr. Yegiazaryan approached Plaintiff about investing in Europark in 2003.  Plaintiff and Mr. Yegiazaryan subsequently entered into an agreement for the division of profits in the Europark investment.  In 2006, Mr. Yegiazaryan proposed that Europark be used as security for a Deutsche Bank loan to finance the refurbishment of a Moscow hotel (a project in which Plaintiff was not involved).  Plaintiff agreed to Mr. Yegiazaryan's proposal based on his assurances that Plaintiff's interests would be protected and on a series of shareholder and escrow agreements that the parties executed guaranteeing the same.  Instead of making good on any of these agreements or assurances, Mr. Yegiazaryan, with the assistance of his brother Artem Yegiazaryan and nominee Vitaly Gogokhia, concocted an elaborate scheme to steal Plaintiff's shares and profits through a series of fraudulent transactions using offshore nominee companies and nominees to divest Plaintiff of his interests.

40.     As a result of this fraud, on October 26, 2010, Plaintiff commenced arbitration proceedings in London, United Kingdom, against Mr. Yegiazaryan for his misappropriation of Plaintiff's real estate investment and subsequent efforts to conceal his misconduct (defined above as the "Arbitration").  On November 11, 2014, an arbitral tribunal entered a final award in the Arbitration in favor of Plaintiff and against Mr. Yegiazaryan in the total amount of $84,290,064.20 (defined above as the "London Award").

41.     Separately Mr. Yegiazaryan, Artem Yegiazaryan, and Gogokhia were criminally indicted in Russia for their fraud against Plaintiff relating to Europark. Rather than stand trial, Ashot and Artem Yegiazaryan fled to California in 2010, where Ashot Yegiazaryan hid with his cousin Suren in a mansion in Beverley Hills as a fugitive of Russia.

42.     On May 31, 2018, the Russian criminal court convicted Mr. Yegiazaryan of fraud *in absentia* and sentenced him to seven years in prison in connection with the fraud perpetrated against Plaintiff.   Artem and Gogokhia were also convicted *in absentia* for the same fraud and as part of Mr. Yegiazaryan's criminal enterprise.   A true and correct copy of the Russian original and English translation of the Russian Criminal Court Verdict is attached hereto as **Exhibit 9**.   It is incorporated herein by reference as though set forth in full.

**Plaintiff Pursues a Petition to Confirm the London Award in California**

43.     After absconding to the United States, Mr. Yegiazaryan refused to pay the London Award.  Four years later, on December 22, 2014, Plaintiff filed the Enforcement Action in the United States District Court for the Central District of California to confirm and enforce the London Award under the New York Convention.

44.     Plaintiff also sought preliminary injunctive relief in the form of an asset freeze against Mr. Yegiazaryan based on Mr. Yegiazaryan's acknowledged pattern and practice of concealing beneficial ownership of assets by holding them in the name of foreign nominee persons (such as his cousin, Defendant Suren Yegiazaryan, and his brother, Artem Yegiazaryan) or offshore shell companies.  Indeed, much of the basis of the London Award rests upon Mr. Yegiazaryan's past acts to conceal and misappropriate assets from Plaintiff Smagin through the use of entities in foreign jurisdictions, including in Cyprus and the British Virgin Islands.

45.     In his application for injunctive relief, Plaintiff Smagin advised this Court of one asset in particular that was a likely source of enforcement/satisfaction of the

London Award.  Namely, Mr. Yegiazaryan was the recipient of a substantial arbitration award in an unrelated arbitration against fellow Russian businessman Suleyman Kerimov (the "**Kerimov Award**").  When Plaintiff discovered the existence of the Kerimov Award, the award had not yet been paid to Mr. Yegiazaryan, but past experience suggested that once those funds were received, Mr. Yegiazaryan was likely to transfer the proceeds of the Kerimov Award into some nominee relationship or entity in a foreign country in order to avoid his payment obligations to Plaintiff on the London Award.

46.    On December 23, 2014, this Court in the Enforcement Action granted Plaintiff Smagin's application for a temporary protective order freezing Mr. Yegiazaryan's assets in California, finding that, "based on [Plaintiff's] previous dealings with [Mr. Yegiazaryan] and on the evidence submitted with the application, the Court finds that [Plaintiff] will suffer great and irreparable injury if issuance of the orders is delayed until the matter may be heard on notice.  Accordingly, the Court will issue a Temporary Protective Order."  A true and correct copy of the Order Granting in Part Plaintiff's Ex Parte Application for Right to Attach Order and Temporary Protective Order ("**Temporary Protective Order**" or "**TRO**"), Enforcement Action, ECF 9 at 3.) is attached hereto as **Exhibit 14.**

47.    The Temporary Protective Order provided:

> Respondent Ashot Yegiazaryan, his agents, and/or any person or entity acting under his direction and control shall not take any action to transfer, assign, conceal, diminish, or dissipate any property located in California--in an amount up to $84,290,064.20--that may be used to satisfy the foreign-arbitral award payable to Vitaly Smagin, including specifically and without limitation the amounts received or to be received by Respondent Yegiazaryan, his agents or any person or entity acting under his direction and control in

18

payment or satisfaction of an arbitration award from Suleyman Kerimov, as well as any shares in Endrino Corporation or any other entity. (Temporary Protective Order, Enforcement Action, ECF 9 at 3.)

48. On February 3, 2015, by agreement of the parties, the TRO was converted to a preliminary injunction on the same terms. A true and correct copy of the Stipulation and Motion for Stay of Proceedings and Preliminary Injunction Preventing Transfer or Dissipation of Assets, Enforcement Action, ECF 23 is attached hereto as **Exhibit 15.** This injunction again referred specifically to the Kerimov Award proceeds and again enjoined Mr. Yegiazaryan from any actions to diminish or conceal those proceeds.

**Mr. Yegiazaryan Creates a Web of Offshore Entities and a Complex Ownership Structure to Hide the Kerimov Award Settlement Proceeds and Avoid this Court's Reach**

49. Unbeknownst to Plaintiff or this Court, on May 26, 2015, Mr. Yegiazaryan received $198 million dollars as settlement of the Kerimov Award. A true and correct copy of the Kerimov Settlement Agreement is attached hereto as **Exhibit 10**.[5]

50. To conceal the Kerimov Award settlement proceeds from Plaintiff Smagin and to avoid the Court's asset freeze in California, Mr. Yegiazaryan accepted the $198 million settlement through his attorneys in London at the law firm of Gibson, Dunn &

---

[5] The majority of the documents attached as exhibits to this Complaint have been court-filed, produced and/or exchanged in the litigation between Mr. Yegiazaryan and Plaintiff Smagin. Many of the documents that were not obtained directly from Mr. Yegiazaryan were obtained from court files in foreign jurisdictions, or from Plaintiff Smagin's counsel in those foreign jurisdictions. All are true and correct copies of the original documents. Although some of these documents were originally designated by Mr. Yegiazaryan as "Confidential" or "Attorney's Eyes Only", Mr. Yegiazaryan subsequently agreed to remove those protections to allow their public filing in the prior case.

Case No._____
COMPLAINT

Crutcher LLP ("**Gibson Dunn**").  Although Gibson Dunn was fully aware of Plaintiff's arbitration award and this Court's asset freeze—through its representation of Mr. Yegiazaryan in California on these related matters—it accepted the funds into its client trust account in London while Mr. Yegiazaryan made arrangements to promptly move the funds through some to-be-formed nominee entities and an undisclosed bank account.

51.     To hide the Kerimov Award funds, Mr. Yegiazaryan resorted to his usual tactics of creating a complex web of offshore entities to conceal the funds, similar to the scheme he, Artem, and Gogokhia originally employed to defraud Plaintiff Smagin of his investment in Europark.  To accomplish this, Mr. Yegiazaryan deployed CTX Treuhand in Liechtenstein, Defendant CMB Bank in Monaco, and Savannah in Nevis.

52.     First, on May 27, 2015, Mr. Yegiazaryan executed a trust instrument establishing the "Alpha Trust," in Liechtenstein.  The Alpha Trust was established for the sole purpose of holding the proceeds of the Kerimov Award settlement.  A true and correct copy of the Trust Instrument of the Alpha Trust is attached hereto as **Exhibit 11**.  Mr. Yegiazaryan had complete control over the Kerimov Award settlement funds after they had been transferred to the Alpha Trust.  Mr. Yegiazaryan was named as the Alpha Trust's settlor, beneficiary, investment advisor, and "Protector."  As the Protector, he had unfettered power to dismiss and appoint the trustees for any reason.  As such, even though CTX Treuhand was named as the Alpha Trust's initial trustee, Mr. Yegiazaryan retained the power to approve all distributions and other material actions of the Alpha Trust and its trustee.

53.     Second, in addition to forming the Alpha Trust, Mr. Yegiazaryan and CTX Treuhand purchased Savannah Advisors, Inc., an off-the-shelf Nevis corporation that had been previously formed and was used solely to create additional layers of complexity in transactions like this.  Savannah Advisors, which became a wholly-owned entity of the Alpha Trust, was created for the sole purpose of acting as a shell

company that would hold the proceeds of the Kerimov Award settlement, creating another layer of entities that Plaintiff Smagin would have to pierce to recover the California Judgment.

54.    Finally, Mr. Yegiazaryan and CTX Treuhand enlisted CMB Bank to establish a bank account in Monaco in the name of Savannah Advisors, which would hold the Kerimov Award settlement (the "**Monaco Account**").  As was the case with the Alpha Trust, Mr. Yegiazaryan retained control over the Monaco Account and CMB Bank granted him signature authority on behalf of Savannah Advisors, even though he was not an officer or director of that entity.[6]

55.    On June 5, 2015, Mr. Yegiazaryan, CTX Treuhand and Gibson Dunn transferred $188,146,102.08 of the proceeds from the Kerimov Award settlement from Gibson Dunn's client trust account to the Monaco Account held by Savannah Advisors with CMB Bank.  The transfer of funds was performed with the specific intent and for the purpose of hindering, delaying and defrauding Plaintiff Smagin—who was not made aware of any of these machinations—and to prevent him from collecting the London Award and any associated judgment.

56.    The formation of the Alpha Trust and Savannah Advisors, and the transfer of assets to the Monaco Account held with CMB to fund these entities, were not done for legitimate commercial purposes.  Rather, these seemingly legal events and happenings were in fact done with fraudulent intent to cheat and deceive Plaintiff by concealing funds from creditors including Plaintiff.

---

[6] With signatory authority and control over Savannah Advisors, Mr. Yegiazaryan has paid tens of millions of dollars to his other creditors out of the Monaco Account (*e.g.*, his lawyers in Liechtenstein and Cyprus, and criminal accomplice  Gogokhia), but has not paid anything to Plaintiff Smagin.

**This Court Issues a Worldwide Injunction, Confirms the London Award and Enters the California Judgment Against Mr. Yegiazaryan**

57.     Upon learning of the Kerimov Award settlement, Plaintiff Smagin applied to this Court for a worldwide preliminary injunction restraining Mr. Yegiazaryan from concealing or dissipating the proceeds of the Kerimov Award and settlement.   On September 18, 2015, this Court granted Plaintiff's motion for an expanded preliminary injunction accompanied by expedited discovery.   The Court stated: "Plaintiff believes on good authority that Defendant Yegiazaryan has secured a $100 million settlement in an unrelated case.   Afraid that Defendant Yegiazaryan will attempt to conceal the proceeds of the settlement, Plaintiff asks this Court to issue an expanded preliminary injunction to prevent Yegiazaryan's concealment of assets worldwide."   A true and correct copy of the Preliminary Injunction, Enforcement Action, ECF 31 at 2 is attached hereto as **Exhibit 16**.)   This Court concluded: "The evidence demonstrates that Plaintiff Smagin will suffer irreparable harm if the current injunction is not expanded to encompass Defendant Yegiazaryan's worldwide reach. . . . Plaintiff Smagin has provided this Court with testimony from Defendant Yegiazaryan himself where he admits to using nominees and offshore companies to conceal his assets."   (*Id.*)   Accordingly, this Court issued a worldwide injunction enjoining and preventing Yegiazaryan, his agents, and/or any person or entity acting at his direction from transferring, concealing, diminishing or dissipating property in an amount up to $84,290,064.20.   This injunction again included and ***specifically referenced*** the funds received in satisfaction of the Kerimov Award.

58.     Unbeknownst to Plaintiff, however, by the time he filed the September 2015 application to this Court to expand the stipulated preliminary injunction to include worldwide assets, Mr. Yegiazaryan had already settled the Kerimov Award and had illegally taken steps to conceal the proceeds and place them out of reach of Plaintiff

Smagin by transferring them to the Alpha Trust to be deposited in the CMB Bank account in Monaco, as detailed above.

59.     On March 17, 2016, this Court granted Plaintiff's motion for summary judgment on his petition for confirmation of the London Award.  On March 31, 2016, it entered judgment in favor of Plaintiff and against Mr. Yegiazaryan in the amount of $92,503,652, which included interest to the date of judgment (defined above as the "California Judgment").  (*See* **Exhibit 1**.)

60.     The Court also granted a Post-Judgment Injunction on the same terms as before:

> Ashot Yegiazaryan, his agents, and/or any person or entity acting
> under his direction and control shall not take any action to transfer,
> assign, conceal, diminish, encumber, hypothecate, dissipate or in
> any way dispose of any proceeds, in an amount up to and including
> $115,629,565, derived by or held for the benefit of Ashot
> Yegiazaryan, his agents, nominees, trustees or any person or entity
> acting under his direction and control, in payment, settlement or
> satisfaction of an arbitration award obtained in his arbitration with
> Suleyman Kerimov, without prior order of the Court permitting such
> a transfer, including specifically the "Kerimov settlement funds" as
> identified in the Stipulation Re Advance Distribution of Funds
> executed by Petitioner and Respondent on July 6, 2015 and filed
> with the Los Angeles Superior Court and any proceeds of or
> investments made with those funds, including specifically (but not
> limited to) any funds held by CTX Treuhand AG, Vaduz,
> Liechtenstein (under Alpha Trust or otherwise, or any other trustee),
> with Savannah Advisors Inc., c/o Alpenrose Wealth Management
> (or any other investment manager) and/or in an account at

Compagnie Monegasque De Banque or in any other bank or financial institution. (Post-Judgment Injunction, Enforcement Action, ECF 90 at pp. 7-8 (A true and correct copy is attached as **Exhibit 17**))

The London Award and California Judgment are fully due and payable. There are no legal challenges remaining to the substance of the London Award, as Mr. Yegiazaryan's legal challenges have all been rejected. Moreover, while Mr. Yegiazaryan initially appealed this Court's award confirmation and resulting California Judgment to the Ninth Circuit Court of Appeals, he abandoned all legal challenges to the award confirmation.

**Mr. Yegiazaryan and CTX Treuhand Attempt to Block Enforcement of the California Judgment Through Legal Action in Liechtenstein**

61.    In addition to pursuing relief in California, Plaintiff also commenced an enforcement action in Liechtenstein as the Alpha Trust is a Liechtenstein trust and was formed under its laws. On February 24, 2016, the Liechtenstein Princely Court confirmed the London Award under the New York Convention and attached Mr. Yegiazaryan's beneficial interest in the Alpha Trust to prevent him from receiving a distribution from the trust (defined above as the "Liechtenstein Judgment"). All appeals have been exhausted, and the London Award is now a fully enforceable as the Liechtenstein Judgment.

62.    On September 20, 2017, Plaintiff obtained a Turnover Order from this Court requiring that Mr. Yegiazaryan turn over the assets in the Alpha Trust that are under his control to satisfy the California Judgment. A true and correct copy of the Order Granting Petitioners' Motion for Turnover of Respondent's Assets, Enforcement Action, ECF 193 is hereto attached as **Exhibit 18**. In entering the Turnover Order, the Court found:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> There is no dispute that this Court has jurisdiction over Mr.
> Yegiazaryan.  Nor is there any dispute that Mr. Yegiazaryan has not
> paid the Judgment.  The Award was issued nearly three years ago,
> and the Judgment is over a year old.  The assets of the Alpha Trust
> remain within Mr. Yegiazaryan's reach.  Mr. Yegiazaryan has
> retained control over the trust and may appoint and dismiss trustees
> at will and even appoint himself as a trustee.  (*Id.* at 1, 3.)

63.     Instead of complying with court orders, Mr. Yegiazaryan appealed.  The Ninth Circuit held that the Turnover Order was premature on the basis that the District Court should wait for a ruling from the Liechtenstein Supreme Court determining Mr. Yegiazaryan's authority over the Alpha Trust in the Liechtenstein Action.   Mr. Yegiazaryan's delay tactic worked, but only for a short time.  On September 7, 2018, the Liechtenstein Supreme Court ruled in Plaintiff's favor, holding that Mr. Yegiazaryan had unrestricted control and access to the assets held by the Alpha Trust. Accordingly, he could be compelled to turn over the assets of the Alpha Trust to Plaintiff to satisfy his debts.

64.     Despite the ruling in the Liechtenstein Action, Mr. Yegiazaryan again refused to pay the California Judgment from the assets of the Alpha Trust.  On March 4, 2019, Plaintiff asked a second time for a turnover order directing Mr. Yegiazaryan to turn over the assets he had hidden in Liechtenstein.   The Court accepted Mr. Yegiazaryan's argument that he had not exhausted his appellate remedies in Liechtenstein, thus the Court should wait until the Liechtenstein Constitutional Court resolved his limited appeal.

65.     On October 29, 2019, the Liechtenstein Constitutional Court rejected Mr. Yegiazaryan's appeal.  That order, like the one before it, concluded Mr. Yegiazaryan

25

controlled the assets in the Alpha Trust.[7]

**Defendant and Other Members of the Criminal Enterprise Lodge a Coordinated, Multi-Jurisdictional Attack to Encumber the Alpha Trust**

Recognizing that the Liechtenstein Constitutional Court's ruling marked the end of Mr. Yegiazaryan's frivolous legal maneuvers to obstruct Plaintiff's access to the Alpha Trust, Mr. Yegiazaryan hatched a scheme to block Plaintiff's recovery.  The scheme involved lodging various legal actions in different jurisdictions that would ultimately serve to delay Plaintiff's collection efforts.  These coordinated legal actions included the following:

> a. Suren commenced a proceeding against Mr. Yegiazaryan in the Caribbean Island of Nevis for the assets of the Alpha Trust;
>
> b. Gogokhia commenced a legal proceeding against Mr. Yegiazaryan in the United Kingdom for the assets of the Alpha Trust;
>
> c. Dozortseva and Jouniaux sought to seize control of the Alpha Trust by fraudulently holding themselves out as "trustees" to the Courts of Nevis, Liechtenstein and Monaco, transferring shares in Savannah Advisors to

---

[7] Specifically, the Court held:

[Mr. Yegiazaryan]'s position as a protector of the Alpha Trust included partial rights, such as that [Mr. Yegiazaryan] had transferable rights under the trust deed, such as the right to consent as a protector to various rights and actions of the trustee: Termination of the trust by the trustee, to determine the beneficiaries, to delegate all rights of the trustee including its (alleged) discretionary power and to change the provisions of the trust deed. In addition, [Mr. Yegiazaryan] had the sole right to appoint or remove the trustees of the Alpha Trust. In addition, [Mr. Yegiazaryan] even let the trusts of the Alpha Trust (which he controls) act as asset managers of the trust. . . This execution request clearly states the overall rights to be seized, namely those of [Mr. Yegiazaryan]as trustor, protector and beneficiary of the Alpha Trust vis-à-vis the party involved. . . [B]ecause of all of these considerations, [Mr. Yegiazaryan] has been unsuccessful with any of its complaints regarding fundamental rights, so that, according to the assertion, the individual complaint cannot be accepted **(Exhibit 4)**.

themselves as "trustees" and directing replacement of the valid directors of Savannah Advisors with new "directors";

d.  Dozortseva enlisted Ryals and Prestige to sow confusion and give CMB Bank the pretext excuse it needed to refuse to transfer the funds owned by Savannah Advisors and the Alpha Trust;

e.  CMB Bank refused to acknowledge Plaintiff's validly appointed trustees of the Alpha Trust and Directors of Savannah or make any transfer of funds of Savannah as requested by them;

f.  Stephan commenced an action in Liechtenstein seeking to remove Plaintiff's appointed trustees of the Alpha Trust;

g.  Ratnikov, in coordination with Mr. Yegiazaryan, Stephan Yegiazaryan, Pestrikov, Semenov and Dozortseva, have attempted to intervene in the Enforcement Action, Liechtenstein actions and Savannah Advisor's action against CMB Bank in Monaco, asserting false claims that he has the right to control Plaintiff's assets, including his interest in the Alpha Trust;

h.  Thielen has fraudulently held himself out as the new "Protector" of the Alpha Trust and directed the removal of Plaintiff's lawfully appointed trustees and consented to transfer shares in Savannah Advisors to third parties;

i.  Mr. Yegiazaryan and Pestrikov with the assistance from Ratnikov, Semenov, Stephan Yegiazaryan, Souyzinvest and CTC pre-planned, financed and manipulated Smagin's bankruptcy proceedings in Russia and in the US with the purpose of (a) blocking the recovery of the London Award by Smagin out of Savannah Advisors' assets held by CMB Bank in Monaco, and (b) selling the London Award back to Mr. Yegiazaryan (or his agent or affiliate) for a fraction of its real value so as to anull the debt of Mr. Yegiazaryan  to Smagin under the London Award;

j.  Ms. Tsagolova and Mr. Yegiazaryan have started fraudulent divorce proceedings in the United States, Russia and Liechtenstein with the purpose of dividing the Alpha Trust (whereas neither of them has any legal rights to the Alpha Trust and its assets) as well as dividing the debt under the London Award in such a way that Ms. Tsagolova obtains 50% of the assets in the Alpha Trust and none of the debts arising out of or related to the London Award;

k.  Ms. Tsagolova in collusion with Mr. Yegiazaryan has started bankruptcy proceedings in Russia against Mr. Yegiazaryan for the alleged debts arising out of the Russian divorce proceedings in order to appoint a controlled bankruptcy receiver for Mr. Yegiazaryan who would go to the Monaco court and claim an interest in the Savannah Advisors assets even though Mr. Yegiazaryan has no such interest.  This is yet another mechanism employed by the enterprise to prevent Smagin's collection of the California Judgement.

l.  Ms. Tsagolova and Mr. Yegiazaryan have intervened in Savannah Advisor's action against CMB Bank in Monaco and in the exequatur proceedings with respect to the 2020 Liechtenstein Court decision rejecting Stephan Yegiazaryan's claims and confirming the powers of the true trustees of the Alpha Trust, Schächle and Näscher;

m. Ms. Tsagolova has illegally obtained second sequestration (freeze) in Monaco of 50% of Savannah Advisors' assets at CMB bank in order to prevent and further delay transfer of funds of Savannah from CMB Bank; and

n.  Ms. Tsagolova has filed a third-party appeal claim in Monaco court against the true trustees of the Alpha Trust, Schächle and Näscher, to annul the final exequatur decision of the Monaco court of June 1, 2023 which

enforced in Monaco the final decision of the Liechtenstein court of September 12, 2022 confirming the powers of the true trustees of the Alpha Trust, Schächle and Näscher, and ordering Savannah Advisors to pay back to the Alpha Trust the loan in the amount of over $168 million with interest.

**The Court Finds that Mr. Yegiazaryan, Suren, Artem, Gogokhia and Mr. Yegiazaryan's Trustees Were Acting in Concert to Prevent, Hinder or Delay Plaintiff's Judgment, in the Court's Clarifying Order**

66.   On April 1, 2020, in the Enforcement Action, the district court issued its order on Plaintiff's Motion to Clarify the scope of the Court's post-judgment injunction (the "**Clarifying Order**", Enforcement Action, ECF 245, a true and correct copy of which is attached as **Exhibit 19**.)  The Court found that Mr. Yegiazaryan, Artem, Suren, and Gogokhia were acting in concert and must cease their actions to prevent, hinder and delay Plaintiff's ability to collect on the assets of the Alpha Trust:

> Mr. Yegiazaryan, his cousin Suren Yegiazaryan, his brother Artem Yegiazaryan, Vitaly Gogokhia, the trustees of the Alpha Trust and any others acting on behalf of Mr. Yegiazaryan, directly or indirectly, including but not limited to attorneys or nominees for each of these parties must immediately cease all actions in Nevis or any other jurisdiction that would prevent, hinder, or delay Mr. Smagin's ability to collect on the assets of the Alpha Trust pursuant to the current and forthcoming orders of the Liechtenstein Court or this Court.
>
> To the extent any such enforcement actions have already begun, they must be immediately stopped and any funds held by or on behalf of Suren Yegiazaryan or Judgment Debtor Yegiazaryan must be immediately returned to the Monaco Bank Account of Savannah

Advisors, or any other location, from which they came.  (Clarifying Order, Enforcement Action, ECF 245 at 8.)

67.    Based on Ashot's and his enterprise's ongoing violations of the Post-Judgment Injunction, on July 9, 2020 ("**July 2020 Order**", Enforcement Action ECF 296, a true and correct copy of which is attached as **Exhibit 20**) this Court issued another order imposing additional restrictions on Ashot and his trustees, associates, attorneys, or agents, including Defendant Ms. Tsagolova:

> The Court . . . prohibits Defendant, or his trustees, associates, attorneys or agents, from making or attempting to make any further modifications to the Alpha Trust, including but not limited to the addition or substitution of trustees or beneficiaries, without first obtaining this Court's approval. It likewise prohibits Defendant from making any attempt to alter or amend the administration of either the company Savannah Advisors or the Monaco bank account, or from taking any further actions with respect to those entities, without this Court's approval. To the extent that any such acts are in progress, they must be stopped.

**The Court Issues its First Contempt Order Against Mr. Yegiazaryan**

68.    As a result of Dozortseva's attempt to intervene in Nevis, on September 16, 2020, this Court found Mr. Yegiazaryan in contempt of the July 9 and April 1 Orders ("**First Contempt Order**").  (Enforcement Action, ECF 315, a true and correct copy of which is attached as **Exhibit 21**.)  Pursuant to the First Contempt Order, Mr. Yegiazaryan was required to order Dozortseva to withdraw her application and related filings seeking to intervene Nevis "or elsewhere seeking relief related to the Alpha Trust and/or Savannah Advisors." (ECF 315 at 6.)  In the event Dozortseva failed to comply, Mr. Yegiazaryan was required to remove her as a trustee.  Failure to provide

the Court with proof of compliance within seven days would result in the issuance of sanctions in the amount of $2,000 a day.

69.     Following the First Contempt Order, Dozortseva refused to withdraw her action in Nevis and, in violation of the order, Mr. Yegiazaryan did not remove Dozortseva.  Instead, on September 23, 2020, Mr. Yegiazaryan falsely claimed that he was too ill to sign a document removing her.  (Enforcement Action, ECF 320, a true and correct copy of the Statement is attached as **Exhibit 22**.)  In an attempt to bolster this story, on September 29, 2020, Mr. Yegiazaryan submitted to the Court a falsified or altered "doctor's note" from Dr. Julia Sverdlova of Medistar, Inc. purporting to support of his claims of illness.  (Enforcement Action, ECF 326-1, 326-2, true and correct copies of the "doctor's notes" are attached as **Exhibits 23 and 24** respectively.)

70.     Believing that the "doctor's note" was forged, on October 7, 2020, Plaintiff served Mr. Yegiazaryan with notice that Plaintiff would be taking the deposition of Dr. Sverdlova and requesting that she produce documents relating to her purported treatment of Mr. Yegiazaryan's alleged medical emergency pursuant to a deposition subpoena.  Plaintiff believes that Mr. Yegiazaryan, upon receiving notice of the subpoena, knowingly used intimidation, threats, or corrupt persuasion to influence Dr. Sverdlova, a witness residing in California, to avoid service of the subpoena with the intent to delay or prevent her from providing documentary and testimonial evidence in connection with the Enforcement Action.  Sverdlova now claims she has a medical condition that prevents her from being deposed.

71.     Despite apparently no longer suffering from any purported medical emergencies, Mr. Yegiazaryan for nearly three years thereafter failed to remove Dozortseva as a "trustee" of the Alpha Trust, until forced to do so by this Court in the July 18, 2023 hearing.  Dozortseva during all that time has continued to interfere with the proceedings in Nevis and Monaco along with Ratnikov.

72.     On October 30, 2020 Dozortseva and Jouniaux executed the Written Instrument of Share Transfer with respect to transfer of all shares in Savannah Advisors from Mr. Schachle and Mr. Nascher to Dozortseva and Jouniaux, which document was approved by Alexis Gaston Thielen as "Protector" of the Alpha Trust. A true and correct copy of the October 30, 2020 Written Instrument of Share Transfer is attached hereto as **Exhibit 25.**

73.     On November 18, 2020 Dozortseva and Jouniaux as purported shareholders of Savannah Advisors executed Shareholder Resolution of Savannah Advisors replacing the valid directors of Savannah Advisors by Dozortseva and Jouniaux as new "directors" of Savannah Advisors. A true and correct copy of the November 18, 2020 Shareholder Resolution of Savannah Advisors is attached hereto as **Exhibit 26.**

**Mr. Yegiazaryan Purports to Appoint Thielen as "Protector" of the Alpha Trust**

74.     Although Mr. Yegiazaryan represented to the Court on September 23, 2020 that he was too ill to execute a document removing Dozortseva as a trustee, that very same day he executed a Notice of Transfer of Powers of the Alpha Trust purporting to appoint Defendant Alexis Gaston Thielen as Protector of the Alpha Trust, despite having no authority whatsoever to do so.  Thus, not only were his representations to the Court regarding his inability to sign documents removing Dozortseva demonstrably false, but, even in the face of contempt sanctions, he has continued to further his scheme to hinder, delay and defraud Plaintiff.  A true and correct copy of the September 23, 2020 Notice of Transfer of Powers of the Alpha Trust Instrument is attached hereto as **Exhibit 27**.

75.     On October 28, 2020, Defendant Thielen executed an Instrument of Removal, purporting to remove the Trustees Schächle and Näscher for failing to "act unanimously" with Dozortseva and Jouniaux.  A true and correct copy of the Instrument of Removal is attached hereto as **Exhibit 28**.

76.     On October 30, 2020 Defendant Thielen approved the Written Instrument of Share Transfer executed by Dozortseva and Jouniaux with respect to transfer of all shares in Savannah Advisors from Mr. Schachle and Mr. Nascher to Dozortseva and Jouniaux.

**Defendant Stephan Yegiazaryan Asserts a Fraudulent Claim to Remove Plaintiff's Appointed Trustees in Liechtenstein**

77.     On August 5, 2020, well after the Court ordered Suren and Gogokhia to cease their actions, Stephan Yegiazaryan—Ashot Yegiazaryan's son and purported discretionary beneficiary of the Alpha Trust—filed a fraudulent "Report" in the Princely Court of Justice in Liechtenstein seeking to remove Trustees Schächle and Näscher as trustees of the Alpha Trust and prohibit them from transferring any of the assets from the Monaco Account.  A true and correct copy of the German original and English translation of the August 5, 2020 Report is attached hereto as **Exhibit 29**. Stephan's Report was filed in furtherance of the enterprise's scheme to hinder, delay or defraud Mr. Yegiazaryan's creditors.

78.     On August 24, 2020, the Liechtenstein Court rejected Stephan's requests, confirmed the powers of the true Trustees of the Alpha Trust Schächle and Näscher and ordered Stephan to reimburse Plaintiff and Trustees Schächle and Näscher for their costs of litigation.   The August 24, 2020 Liechtenstein Court decision is final and binding. A true and correct copy of the German original and English translation of the August 24, 2020 Ruling is attached hereto as **Exhibit 30**.

79.     Schächle and Näscher filed an exequatur action in Monaco to enforce this decision in that jurisdiction as well.  (*See* Enforcement Action, ECF 400-2 at ¶18.) However, both Mr. Yegiazaryan and Ms. Tsagolova illegally intervened in that exequatur action in Monaco with the sole purpose of delaying and confusing the enforcement of the August 24, 2020 Liechtenstein Court decision in Monaco.

Case No._____
COMPLAINT

**Mr. Yegiazaryan's Fraudulent Bankruptcy Plan for Smagin Comes to Light**

80.     In the beginning of 2020, Mr. Yegiazaryan hatched new plans to further delay and hinder the collection of the London Award when he became increasingly concerned and alarmed at Smagin's success in overcoming his global evasion tactics. Therefore, Mr. Yegiazaryan turned to Pestrikov Igor Leonidovich, Smagin's largest creditor, and welcomed him into his syndicate.  This latest plan was to manufacture and control bankruptcy proceedings of Smagin so that Mr. Yegiazaryan could obtain Smagin's London Award, Smagin's largest asset, at a severe discount.  A detailed account of Mr. Yegiazaryan's fraudulent bankruptcy scheme is provided in the attached witness statement of Evgeny Viktorovich Novichikhin, an attorney who had been instructed by his firm to evaluate the bankruptcy plan in the interests of Mr. Yegiazaryan's business partner and who directly or indirectly dealt with the other players in Mr. Yegiazaryan's schemes.  A true and correct copy of the witness statement of Mr. Novichikhin presented in Liechtenstein proceedings on February 15, 2022 is attached hereto as **Exhibit 31**.  Mr. Novichikhin was himself deceived, and he eventually refused to consult with and carry out the plans and other unlawful activities of Mr. Yegiazaryan, Stephan Yegiazaryan, Semenov and Pestikov once he became aware of the syndicate's true intentions and motives.  He explains, "[i]n my entire career, I have not seen more cynical and illegal exploitation of bankruptcy laws and the entire judicial system as is currently done by Ashot, Stephan, Pestrikov, Ratnikov and Semenov with the assistance from Dozortseva, Jouniaux and CMB."  (**Exhibit 31** at p. 16.)

**Mr. Yegiazaryan and Ms. Tsagolova Seek to Divide the Alpha Trust Through Renewed Sham Divorce Proceedings**

81.     Ms. Tsagolova and Mr. Yegiazaryan have filed multiple sham divorce proceedings since the London Award was issued against Mr. Yegiazaryan.  The purpose of the divorce proceedings was to reduce the assets available for Plaintiff to collect

34

against Mr. Yegiazaryan by claiming half of the assets as community property, most notably, the Alpha Trust funds held in the account of Savannah Advisors at CMB Bank, while attributing all of the debt owed to Plaintiff solely to Mr. Yegiazaryan.  On information and belief, Defendant Ms. Tsagolova and Mr. Yegiazaryan have filed divorce proceedings in multiple jurisdictions to accomplish this goal including in Los Angeles, Russia, and Liechtenstein.

82.    Ms. Tsagolova and Mr. Yegiazaryan initiated divorce proceedings in Los Angeles, California in 2014 immediately after the LCIA issued the London Award against Mr. Yegiazaryan.  (*See* LASC Case No. BD595136).  On February 9, 2016, Smagin successfully intervened in these first divorce proceeding, preventing Ms. Tsagolova and Mr. Yegiazaryan from using it to hide or protect assets that would otherwise be used to pay the London Award.

83.    Upon intervening in the first divorce proceedings filed in Los Angeles, Plaintiff learned of the Alpha Trust on or around February 9, 2016, when Plaintiff was given access to documents improperly filed under seal in the divorce court.  Review of these divorce court documents revealed that Mr. Yegiazaryan settled the Kerimov Award while Plaintiff was pursuing enforcement of the London Award in this Court in May 2015.  (*See Natalia Tsagolova v. Ashot Yegiazaryan*, LASC Case No. BD595136.)

84.    Plaintiff also learned through a declaration filed by Mr. Yegiazaryan's wife Natalia Tsagolova in the divorce proceeding that Mr. Yegiazaryan, Suren and other members of their family had come up with a scheme to hide Ashot's assets in the U.S. by using shell companies owned by Suren and other members of Mr. Yegiazaryan's family.  A true and correct copy of the Declaration of Natalia Tsagolova ("**Tsagolova Decl**.") is attached hereto as **Exhibit 13**.  Specifically, Ms. Tsagolova stated that Mr. Yegiazaryan and Suren were involved in a complex scheme to funnel millions of dollars into the United States through various companies, including specifically Clear Voice, Inc., a company held in Suren's name.  She further explained that, as part of this scheme,

Mr. Yegiazaryan would transfer his assets into Clear Voice's accounts and, in turn, Clear Voice would write a check to Mr. Yegiazaryan and his wife every month to pay for the couple's expenses under the guise of a loan.  Mr. Yegiazaryan's wife also revealed in her sworn declaration that, in late 2014, Mr. Yegiazaryan sold thirteen of the couple's rental properties in the London area for nearly $17 million and had the proceeds of those sales transferred into the U.S. through Clear Voice's bank accounts.

85.    Ms. Tsagolova's testimony is corroborated by Mr. Yegiazaryan's own testimony in a separate litigation.  (Tsagolova Decl. at ¶ 15, Ex. C.)  In a lawsuit involving Ashot Yegiazaryan in the Southern District of New York, *Ashot Egiazaryan v. Peter Zalmayev*, Case No. 11-CV-02670, Mr. Yegiazaryan testified that he transferred $20 million to Suren.  (Tsagolova Decl. at ¶ 15, Ex. C, **Exhibit 13.**)  The federal court in that case noted Ashot's connection to Clear Voice, holding there was "clear evidence that Clear Voice is being used for Ashot's benefit" and that  "Clear Voice is being used by Ashot to move money around." (Tsagolova Decl. at ¶ 17, Ex. E, **Exhibit 13**.)  After Plaintiff foiled Ms. Tsagolova and Mr. Yegiazaryan's efforts to conceal documents in divorce proceedings that revealed Mr. Yegiazaryan's control of nearly 200 million dollars held by Savannah Advisors at CMB bank, the parties agreed to dismiss those divorce proceedings.

86.    Ms. Tsagolova, however, petitioned again for the dissolution of her marriage to Mr. Yegiazaryan in a Los Angeles court on April 21, 2020, which remains pending (LASC Case No. 20STFL03636). Defendant's petition and electronic filings submitted in the divorce proceedings used or caused to be used an interstate or foreign wire communication.  Defendant Tsagolova's second divorce petition in Los Angeles was filed the month after a Liechtenstein court ruled that Plaintiff could appoint new trustees to the Alpha Trust.  Tellingly, in the renewed divorce proceedings in 2020, Ms. Tsagolova and Mr. Yegiazaryan each seek to claim a property interest in the Alpha Trust funds.  A true and correct copy of the Memorandum of Points and Authorities in

Support of Petitioner's Request for Bifurcation of Issues Relating to Division and Distribution of Alpha Trust and Characterization of Smagin Debt is attached hereto as **Exhibit 32.** These acts and misrepresentations demonstrate their brazen disregard for judicial orders as neither of them can claim a legitimate property interest the Alpha Trust following the Liechtenstein's order stripping Mr. Yegiazaryan of his rights as protector of the Alpha Trust in favor of Plaintiff's appointees. Additionally, making such claims in interest to the Alpha Trust were direct violations of the 2016 order issued by this Court enjoining Mr. Yegiazaryan from taking actions to diminish the Alpha Trust assets without first obtaining permission from the Court.

87. Ms. Tsagolova and Mr. Yegiazaryan have used divorce proceedings as a basis to intervene in proceedings around the globe to frustrate the disbursement of the Alpha Trust's funds to the satisfaction of the California Judgment even though no court has acknowledged or ruled that the Alpha Trust assets ought be divided between them.

88. For example, Ms. Tsagolova intervened in a Monaco proceeding whereby Schächle and Näscher, as the lawfully appointed trustees of the Alpha Trust, filed a motion for exequatur of a Liechtenstein court decision to reject Stephan Yegiazaryan's baseless claim against the trustees that he (Stephan) was a beneficiary of the Alpha Trust. On March 16, 2023, Ms. Tsagolova filed an opposition to the motion for exequatur, without seeking permission from the U.S. District Court as ordered in the Enforcement Action. On information and belief each of these actions Ms. Tsagolova took to interfere in Monaco proceedings used or caused to be used foreign wire communications. She did this despite never having contested the creation of the Alpha Trust or its funds in Liechtenstein, the country whose laws govern the Alpha Trust. Attached is a true and correct copy of Ms. Tsagolova's March 16, 2023 opposition hereto as **Exhibit 33**. Ms. Tsagolova's opposition was filed the same day Mr. Yegiazaryan filed his own motion to intervene in that case.

89.     Then, again acting in the interest of Mr. Yegiazaryan and without seeking permission from this Court, Ms. Tsagolova filed an *ex parte* motion in Monaco on September 26, 2022, for the sequestration of 50% of Savannah's assets, *i.e.*, the Alpha Trust funds, arguing that a recent decision in her and Mr. Yegiazaryan's *pending* California divorce proceeding awarded her this amount.  The Monaco court rejected her motion but Ms. Tsagolova prevailed on an appeal, resulting in an order by the Monaco Court of Appeal of January 20, 2023 to sequester over $94 million in Savannah's account with CMB.    This outcome was a direct result of Ms. Tsagolova's misrepresentations and omissions of material truths in order to further her own interests and the interests of the criminal enterprise, which has worked tirelessly to prevent Plaintiff from collecting against the Alpha Trust/Savannah Advisor funds.  A true and correct copy of the Monaco Court's January 20, 2023 sequestration order is attached hereto as **Exhibit 34**.

90.     This is the second sequestration order that enterprise has obtained through misrepresentations and persisting in fraudulent claims to the Alpha Trust, which Savannah Advisors has been forced to oppose.  Ms. Tsagolova also filed an opposition to Savannah Advisors' recent motion to the Monaco court to lift the first sequestration order.  Since Ms. Tsagolova already has a separate second sequestration in her favor in Monaco, she has no basis to contest the lifting of the first sequestration other than to benefit Mr. Yegiazaryan.  Her filing in the first sequestration case underscores that she is acting for Mr. Yegiazaryan in Monaco proceedings.

91.     On June 1, 2023, the true trustees of the Alpha Trust, Schächle and Näscher, succeeded in obtaining the final exequatur decision of the Monaco court.  The June 1, 2023 Monaco court decision enforced the final decision of the Liechtenstein court issued on September 12, 2022 confirmed Schächle and Näscher's powers as the true trustees of the Alpha Trust and ordered Savannah Advisors to pay back to the Alpha Trust the loan in the amount of over $168 million with interest.  A true and correct copy

Case No._____
COMPLAINT

of the June 1, 2023 Monaco court decision is attached hereto as **Exhibit 35**.  A true and correct copy of the September 12, 2022 Liechtenstein court final decision is attached hereto as **Exhibit 36**.  On December 14, 2023,  Ms. Tsagolova, again without seeking permission from the U.S. District Court as ordered in the Enforcement Action, filed a third-party appeal claim to annul that Monaco court decision of June 1, 2023, to prevent the first sequestration from being lifted.  This served the interests of Mr. Yegiazaryan and further delayed the release of the money from the Monaco Account of Savannah. A true and correct copy of Ms. Tsagolova's December 14, 2023 third-party appeal claim in Monaco is attached hereto as **Exhibit 37**.

92.    Of course, all of these interventions have been in direct defiance of the U.S. District Court's Clarification Order in the Enforcement Action requiring that Mr. Yegiazaryan and any others working on his behalf "directly or indirectly ... must immediately cease all actions in Nevis or any other jurisdiction that would prevent, hinder, or delay Smagin's ability to collect on the assets of the Alpha Trust[.]" (Enforcement Action, Doc. 245 at 8, **Exhibit 19**.)

93.    Though it appears at the surface level that Mr. Yegiazaryan and Ms. Tsagolova have diverging interests in their competing claims to the division of their community assets and community liabilities, both Mr. Yegiazaryan and Ms. Tsagolova have apparently acted in concert to prevent Plaintiff Smagin from satisfying his judgment from the Alpha Trust, for example by using the proceedings to fabricate claims to the Alpha Trust and to freeze a significant part of the Alpha Trust funds in Monaco under the falsehood that Ms. Tsagolova is entitled to a distribution as community property.  This is no coincidence and is exactly as the enterprise has intended it because preventing Plaintiff's collection efforts ensures that they would have these assets to divide between themselves in the first place.

94.    Mr. Yegiazaryan continues to use the divorce proceedings as a weapon in his attempts to reclaim and divide the Alpha Trust.  For example, Mr. Yegiazaryan filed

a sworn declaration in the Enforcement Action, on July 18, 2023, indicating that he would carry out a number of actions ordered by the Court's contempt orders against him in the Enforcement Action.  (*See* Order Denying Motion to Show Cause, ECF 466, a true and correct copy of which is attached hereto as **Exhibit 38**.)  One such action was to withdraw any request to divide the Alpha Trust as part of his divorce proceedings in Russia.  Yet, on August 9, 2023, Mr. Yegiazaryan's representative in the Russian divorce proceeding was asked if a pending request to divide the Alpha Trust funds should be revoked, to which Mr. Yegiazaryan's representative replied with a resounding "No."

95.    It is clear that Mr. Yegiazaryan and Ms. Tsagolova have no plans to halt their abuse of the sham divorce proceedings, and the Court in Plaintiff's Enforcement Action has already stated that "[g]iven Yegiazaryan's history of utilizing legal proceedings to dispose of the Alpha Trust's assets, the Court considers it probable—if not likely—that Tsagolova's actions are a coordinated effort with Yegiazaryan to avoid the 2016 Injunction."  (Enforcement Action, ECF 411 at 8, a true and correct copy of which is attached hereto as **Exhibit 39**.)

96.    The fraudulent intent and purpose of Defendant Ms. Tsagolova and Mr. Yegiazaryan's various divorce proceedings are corroborated and detailed in the declaration of Novichikhin.  As noted above, Novichikhin was an attorney who had been instructed by his firm to evaluate the bankruptcy plan in the interests of Mr. Yegiazaryan's business partner and who directly or indirectly dealt with the other players in Mr. Yegiazaryan's schemes.  Novichikhin submitted a declaration in support of Plaintiff's complaint in the RICO action against Mr. Yegiazaryan and other members of his criminal enterprise.  A true and correct copy of Mr. Novichikhin's December 2023 declaration is attached hereto as **Exhibit 40**.

97.    Novichikhin was one of several insiders who assisted Mr. Yegiazaryan's carry out the affairs of the enterprise.  Novichikhin discussed with Mr. Yegiazaryan and

others the scheme to use divorce proceedings to "divide" the property between Mr. Yegiazaryan and Ms. Tsagalova creating yet another "line of defense" against Plaintiff's judgment enforcement efforts.  Mr. Yegiazaryan spoke openly with business partners and advisors, including Novichikhin, about the plan to artificially reduce his assets by seeking orders in divorce proceedings so that Ms. Tsagolova could lay claim to half of the available assets held in the Savannah Advisors account at CMB.  Mr. Yegiazaryan and Ms. Tsagolova did this with the purpose of drastically reducing the assets available for Plaintiff's collection.  Based on Novichkhin's conversations with Mr. Yegiazaryan and others, he understood that Ms. Tsagolova was to be paid approximately $10 million for her role in carrying out the false divorce proceedings, which Ms. Tsagolova would retain from the assets granted to her in any of the divorce proceedings.  Ms. Tsagolova, however, would return any amount in excess of $10 million granted to her in divorce proceedings back to Mr. Yegiazaryan or to a third party designee.

98.    Another reason Mr. Yegiazaryan and Ms. Tsagolova have pursued multiple divorce proceedings is because in Russia, Ms. Tsagalova could obtain an award for monetary compensation against Mr. Yegiazaryan as part of the divorce proceedings in addition to the division of community property.   Such claims for monetary compensation that go unpaid can then be asserted against Mr. Yegiazaryan in Russian bankruptcy proceedings.  Mr. Novichikhin understood based on his discussions with Mr. Yegiazaryan about the execution of this plan, that the bankruptcy proceedings in Russia that Ms. Tsagolova would initiate against Mr. Yegiazaryan allowed her to appoint a bankruptcy trustee who would work at her and Mr. Yegiazaryan's direction. Specifically, this bankruptcy trustee would have the ability to further obstruct Plaintiff's competing creditor claims against Mr. Yegiazaryan to enforce the California Judgment. Further, Mr. Yegiazaryan believed that a bankruptcy trustee could eventually discharge the debts owed to Plaintiff under the California Judgment at the end of the bankruptcy

proceeding. In this way, Ms. Tsagolova's participation in multiple divorce proceedings in coordination with Mr. Yegiazaryan was an essential aspect of the enterprise affairs.

**This Court Issues Its Second Order of Contempt Against Mr. Yegiazaryan**

99. Mr. Yegiazaryan was undeterred by the District Court's First Contempt Order against him, issued on September 16, 2020 in the Enforcement Action.

100. The District Court held Mr. Yegiazaryan in contempt in the Enforcement Action for the second time on May 22, 2023 ("**Second Contempt Order**"). (Enforcement Action, ECF 411, **Exhibit 39**.) The Second Contempt Order discussed a number of Mr. Yegiazaryan's wrongdoings since the court's April 2020 Clarifying Order, its July 2020 Order, and September 16, 2020 First Contempt Order.

101. In its ruling, the Court first acknowledged that Plaintiff Smagin had secured a judgment in Liechtenstein permitting him to recover the Alpha Trust's assets, that the false trustees failed to ever be removed by Mr. Yegiazaryan from their positions with the Alpha Trust and Savannah Advisors, and that they continued to intervene in foreign proceedings to alter the Alpha Trust and Savannah Advisors, and to halt Plaintiff Smagin's collection of the London Award.

102. The court further acknowledged Mr. Yegiazaryan and Ms. Tsagolova's divorce proceedings and their attempts to dispose of the Alpha Trust in violation of the Court's 2016 Injunction against preventing precisely this type of conduct without first seeking this Court's approval. In addition, the Second Contempt Order found that Ms. Tsagolova had moved to sequester 50% of Savannah Advisor's assets, had improperly intervened in foreign proceedings related to the Alpha Trust without this Court's approval, and that Mr. Yegiazaryan improperly intervened and opposed an exequatur motion filed by Schächle and Näscher (the lawfully appointed Alpha Trust Trustees), which sought to enforce a Liechtenstein judgment ruling denying Stephan Yegiazaryan as an Alpha Trust beneficiary, also without first obtaining the Court's approval.

103.   The District Court increased the amount of daily sanctions against Mr. Yegiazaryan for his continued contempt and warned that it would impose "additional sanctions—including incarceration—if Yegiazaryan is not persuaded to comply with its orders based on financial sanctions alone." (Enforcement Action, ECF 411 at 9, **Exhibit 39**.)   The Court also gave Mr. Yegiazaryan seven days to (1) remove Dozortseva, Jouniaux, and Thielen from their roles in the Alpha Trust and Savannah Advisors, (2) withdraw from all efforts for relief with respect to the Alpha Trust and its related entities, and (3) withdraw his request to the Russian court to divide the Alpha Trust and reverse any alterations of the trust that took place without the Court's approval. (*Id*.)

104.   True to form, Mr. Yegiazaryan failed to take any action, and Plaintiff Smagin, through counsel, issued Mr. Yegiazaryan a letter on May 30, 2023, an additional demand to comply with the Second Contempt Order, supplemented with documents Mr. Yegiazaryan need only sign to execute the Court's demands.   Only at a July 18, 2023 hearing whereby the Court ordered Mr. Yegiazaryan to show cause as to why he had not complied, again, with its contempt orders, Mr. Yegiazaryan signed a sworn declaration legally executing the four actions ordered by the Court's Second Contempt Order. (*See* Order Denying Motion for Order to Show Cause, Enforcement Action, ECF 466)   Unsurprisingly, Mr. Yegiazaryan issued a notarized declaration the same day (ECF 465-2) purporting to completely repudiate his July 18, 2023 sworn declaration to the Court, claiming he only agreed to its terms to avoid incarceration as a result of the Court's increasing contempt orders.

105.   It is apparent that this Court's orders mean nothing to Defendant Tsagolova or Mr. Yegiazaryan, and that their enterprise of criminals have no intention of halting their illegal and obstructionist efforts around the globe.   This Court said it best years ago when it recognized that "[Ashot] has a pattern of taking actions that precipitate new litigation as a stall tactic to avoid collection." (Enforcement Action, ECF 296 at 7, a

true and correct copy of which is attached hereto as **Exhibit 41.**)  That remains true today—and Ashot has now enlisted Ms. Tsagolova and a whole band of conspirators to help him follow this goal.

## FIRST CLAIM FOR RELIEF
### (Federal Racketeer Influenced and Corrupt Organizations Act
### 18 U.S.C. § 1962(c))

106.   Plaintiff  realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 105, inclusive, as set forth above.

107. Tsagolova, Ashot Yegiazaryan, Suren, Artem, Gogokhia, Stephan, Dozortseva, Jouniaux, Ratnikov, Thielen, CMB Bank, Prestige, Ryals, Pestrikov, Semenov, Soyuzinvest and CTC are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) because each Defendant is capable of holding, and does hold, "a legal or beneficial interest in property."

108.   Defendant Tsagolova's conduct constitutes a "pattern" of racketeering activity under 18 U.S.C. § 1961(5) because her activities include at least two acts of racketeering activities in the past 10 years, including, but not limited to, the following acts:

a. Tsagolova and Mr. Yegiazaryan have started fraudulent divorce proceedings in the US, Russia and Liechtenstein with the purpose of dividing the Alpha Trust (whereas neither of them has any legal rights to the Alpha Trust and its assets) as well as dividing the debt under the London Award in such a way that Tsagolova obtains 50% of the assets in the Alpha Trust and none of the debts arising out of or related to the London Award.

b. Tsagolova in collusion with Mr. Yegiazaryan has started bankruptcy proceedings in Russia against Mr. Yegiazaryan for the alleged debts arising out of the Russian divorce proceedings in order to appoint a

controlled bankruptcy receiver for Mr. Yegiazaryan to further obstruct Plaintiff's collection of the California Judgement.

c.   Tsagolova and Mr. Yegiazaryan have intervened in Savannah Advisor's action against CMB Bank in Monaco court and in the exequatur proceedings with respect to the 2020 Liechtenstein Court decision confirming the powers of the true trustees of the Alpha Trust, Schächle and Näscher.

d.   Tsagolova has illegally obtained second sequestration (freeze) in Monaco of 50% of Savannah Advisors' assets at CMB bank in order to prevent and further delay transfer of funds of Savannah from CMB Bank.

e.   Tsagolova has filed a third-party appeal claim to annul the exequatur decision of the Monaco court of June 1, 2023, which enforced the final decision of the Liechtenstein court of September 12, 2022 confirming the powers of the true trustees of the Alpha Trust, Schächle and Näscher.

109.   Tsagolova, Ashot Yegiazaryan, Suren, Artem Gogokhia, Stephan, Dozortseva, Jouniaux, Ratnikov, Thielen, CMB Bank, Prestige, Ryals, Pestrikov, Semenov, Soyuzinvest and CTC (or any subset thereof) constituted an "enterprise" within the meaning of 18 U.S.C. §§1961(4) and 1962(c), in that they were "a group of individuals associated in fact" for the common purpose of intentionally and willfully defrauding Plaintiff and obstruct the enforcement of this Court's orders through a scheme to fraudulently file claims and actions in multiple jurisdictions to encumber the assets of the Alpha Trust and Savannah and prevent Plaintiff from recovering his judgment.

110.   Defendant agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity for the unlawful purpose of intentionally defrauding Plaintiff.

111.   Defendant's racketeering acts consisted of, but are not limited to, multiple acts of wire fraud, including submitting fraudulent documents by using or causing to be used interstate or foreign commerce, namely, to communicate with members of the criminal enterprise, direct its affairs, and pursue sham litigations and divorce proceedings in various jurisdictions.   These acts were carried out with the intent to deceive third parties including judicial authorities in various jurisdictions in order to defraud Plaintiff and frustrate Plaintiff's judgment enforcement efforts.   Additionally, Defendant has conspired with others to engage in obstruction of justice and made numerous false statements of fact and law in courts of various jurisdictions as outlined above.   Defendant's acts were committed for the unlawful purpose of defrauding Plaintiff.   As explained in detail above, Defendant coordinated her activities with others including her husband Mr. Yegiazaryan, shared critical information and documents that support their enterprise, and acted in concert to further the interests of the enterprise.

112.   All of the acts of racketeering described herein were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. §1962(c), in that their common purpose was to further the interests of Mr. Yegiazaryan and his fraud schemes, plus hide funds and assets of the enterprise, and deny and defraud their victims, including Plaintiff Smagin, the Alpha Trust and Savannah Advisors of money and property.   They further sought to place Mr. Yegiazaryan's assets and funds beyond the reach of Plaintiff Smagin, and this Court; their common result and goal was to defraud Plaintiff of money and property and/or to place Mr. Yegiazaryan's assets beyond the reach of Plaintiff and this Court; Ms. Tsagolova, Mr. Yegiazaryan, Suren, Artem, Gogokhia, Stephan, Dozortseva, Jouniaux, Ratnikov, Thielen, CMB Bank, Prestige, Ryals,  Pestrikov, Semenov, Soyuzinvest and CTC, through their employees, members, or agents, directly or indirectly, participated in the acts and employed the same or similar methods of commission; Plaintiff was the victim of the acts of

racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

113. To the extent Ms. Tsagolova, Ashot Yegiazaryan, Suren, Artem, Gogokhia, Stephan, Dozortseva, Jouniaux, Ratnikov, Thielen, CMB Bank, Prestige, Ryals, Pestrikov, Semenov, Soyuzinvest and CTC have suspended their acts of racketeering against Plaintiff, they have only done so because of legal action taken by Plaintiff, including this Court's post-judgment injunction entered against Mr. Yegiazaryan and his agents and nominees. The ongoing nature of enterprise's pattern of racketeering is not obviated by this fortuitous interruption.

114. As a direct and proximate result of, and by reason of, the activities of Ms. Tsagolova, Ashot Yegiazaryan, Suren, Artem, Gogokhia, Stephan, Dozortseva, Jouniaux, Ratnikov, Thielen, CMB Bank, Prestige, Ryals, Pestrikov, Semenov, Soyuzinvest and CTC and their conduct in violation of 18 U.S.C. §1962(c), Plaintiff was injured in his business or property, within the meaning of 18 U.S.C. §1964(c). Among other things, Plaintiff suffered damages and injury to his property, including specifically damage to his California Judgment, including without limitation in the form of decreased value of the assets to be levied upon caused by Defendant Ms. Tsagolova and others in the enterprise's delay and interference; delay and loss in the use, enjoyment, benefits, profits, revenues, interest and interests and delay and loss of opportunity to execute on and recover against the property fraudulently transferred and/or encumbered resulting from the delay and interference; damage caused by waste, loss, plunder, and devaluation of the assets committed by Mr. Yegiazaryan, Ms. Tsagolova and others during the delay and interference; damages in the form of attorney fees and costs resulting from the interference, including attorney fees incurred in California, U.K., Russia, Nevis, Monaco and Liechtenstein and costs incurred in addressing the fraudulent conduct in litigation; and all other damages, injuries, and harms caused by the fraudulent transfers and interference. Plaintiff is, therefore, entitled

to recover threefold the damages he sustained together with the cost of the suit, reasonable attorneys' fees and reasonable experts' fees.

115.   WHEREFORE Plaintiff demands judgment against Ms. Tsagolova, for the following: Treble damages pursuant to 18 U.S.C. §1964(c); Attorney fees and costs pursuant to 18 U.S.C. §1964(c); and such other and further relief as this Court may deem just and proper.

## SECOND CLAIM FOR RELIEF
## (Civil RICO Conspiracy—18 U.S.C. § 1962(D))

116.   Plaintiff realleges and incorporates herein by reference each and every allegation set forth in paragraphs 1 through 114, inclusive, as set forth above.

117.   As alleged in Count I, Defendant Ms. Tsagolova violated 18 U.S.C. § 1962(c) by conspiring with at least one or more of the following persons: Ashot Yegiazaryan, Suren, Artem, Gogokhia, Stephan, Dozortseva, Jouniaux, Ratnikov, Thielen, CMB Bank, Prestige, Ryals,  Pestrikov, Semenov, Soyuzinvest and CTC.

118.   Ms. Tsagolova conspired with the operator(s) or manager(s) of the of the criminal enterprise to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprise, defined *supra*, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

119.   In particular, Ms. Tsagolova together with one or more of the following persons: Ashot Yegiazaryan, Suren, Artem, Gogokhia, Stephan, Dozortseva, Jouniaux, Ratnikov, Thielen,  CMB Bank, Prestige, Ryals, Pestrikov, Semenov, Soyuzinvest and/or CTC, intended to or agreed to further an endeavor of the operator(s)/manager(s) which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c)) and adopted the goal of furthering or facilitating the criminal endeavor.  Defendant's conduct includes, but is not limited to:

    a.   initiating and making fraudulent representations or material omissions of truth in divorce proceedings in the United States, Russia and Liechtenstein

48

with the purpose of dividing the Alpha Trust (whereas neither of them has any legal rights to the Alpha Trust and its assets) as well as agreeing with Mr. Yegiazaryan to allocate liability for the debt under the London Award and the California Judgment solely to Mr. Yegiazaryan while claiming an unencumbered 50% of the assets in the Alpha Trust;

b. starting bankruptcy proceedings in Russia against Mr. Yegiazaryan for the alleged debts arising out of the Russian divorce proceedings in order to appoint a controlled bankruptcy receiver of Mr. Yegiazaryan who would go to the Monaco court and make a claim for the assets of Savannah Advisors as if they were the assets of Mr. Yegiazaryan in order to prevent collection of the California Judgement by Mr. Smagin.

c. intervening in Savannah Advisor's action against CMB Bank in Monaco court and in the exequatur proceedings with respect to the 2020 Liechtenstein Court decision rejecting Stephan's claims and confirming the powers of the true trustees of the Alpha Trust, Schächle and Näscher; and

d. obtaining through false representations a second sequestration (freeze) in Monaco court of 50% of Savannah Advisors' assets at CMB bank in order to prevent and further delay transfer of funds of Savannah from CMB Bank.

e. filing a third-party appeal claim to annul the exequatur decision of the Monaco court of June 1, 2023 which enforced in Monaco the final decision of the Liechtenstein court of September 12, 2022 confirming the powers of the true trustees of the Alpha Trust, Schächle and Näscher.

120.    Plaintiff was injured by Ms. Tsagolova's overt acts that are acts of racketeering or otherwise unlawful under the RICO statute, which included (among

other acts) acts of wire fraud and obstruction of justice committed through the enterprises alleged in Count I.

121. As a direct and proximate result of, and by reason of, the activities of Ms. Tsagolova, the members of the criminal enterprise, and their conduct in violation of 18 U.S.C. §1962(d), Plaintiff was injured in his business or property, within the meaning of 18 U.S.C. §1964(c). Among other things, Plaintiff suffered damages, i.e., damages for the fraudulent transfers; decreased value of the assets to be levied upon caused by the delay and interference; delay and loss in the use, enjoyment, benefits, profits, revenues, interest and interests and delay and loss of opportunity to execute on and recover against the property fraudulently transferred and/or encumbered resulting from the delay and interference; damage caused by waste, loss, plunder, and devaluation of the assets committed by Ms. Tsagolova, Mr. Yegiazaryan, and others as described above during the delay and interference; attorney fees and costs resulting from the interference, including attorney fees and costs incurred in setting aside the fraudulent actions; all other damages, injuries, and harms caused by the fraudulent actions and interference. Plaintiff is therefore, entitled to recover threefold the damages he sustained together with the cost of the suit, reasonable attorneys' fees and reasonable experts' fees.

## **PRAYER FOR RELIEF**

122. WHEREFORE Plaintiffs demand judgment against Ms. Tsagolova for the following:

   a. all actual damages suffered as a result of this fraudulent scheme, in an amount no less than $170 million, which amount grows daily due to the applicable interest;

   b. Costs and attorneys' fees he has incurred dealing with bogus and trumped up litigations, disputes and claims in numerous legal forums around the world;

Case No._____
COMPLAINT

c.  treble damages pursuant to 18 U.S.C. §1964(c);

d.  attorney fees and costs pursuant to 18 U.S.C. §1964(c);

e.  pre-and post-judgment interest;

f.  and such other and further relief as this Court may deem just and proper.

Dated:   May 28, 2024                      BAKER & MCKENZIE LLP


                                           By:  */s/ Nicholas O. Kennedy*
                                           Nicholas O. Kennedy
                                           Attorneys for Plaintiff
                                           VITALY IVANOVICH SMAGIN

51

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Smagin demands trial by jury in this action of all issues so triable.

Dated:   May 28, 2024                          BAKER & MCKENZIE LLP


By: */s/ Nicholas O. Kennedy*
Nicholas O. Kennedy
Attorneys for Plaintiff
VITALY IVANOVICH SMAGIN

52

Case No._____
COMPLAINT