# EXHIBIT 5

PRINCIPALITY OF LIECHTENSTEIN

PRINCIPAL

DISTRICT COURT

Please always include the file number

08 EX.2016.5802

ON 109

**DECISION**

**Case**

| | |
|---|---|
| **Operating party:** | Vitaly Ivanovich Smagin, |
| | REDACTED                    Moscow |
| | represented by Advocatur Seeger, Frick & Partner AG, Landstrasse 81,9494 Schaan |
| **Obligatory party:** | Ashot YEGIAZARYAN, |
| | REDACTED         Beverly Hills, USA- 90201 California |
| | represented by Advocatur Sprenger & Partner AG, Landstrasse 11, Postfach 140, 9495 Triesen |
| **Third party debtor:** | CTX Treuhand AG as trustee of the Alpha Trust, |
| | represented by Wilhelm & Buchel, 9490 Vaduz |
| **due to:** | execution permit (VAT: CHF 91'605'445.97) |

1.1    The USE of the party pledged with the execution license of the Princely Regional Court of November 21, 2016, 08 EX.2016.5802, ON 3, the obligated party as trustor, protector and beneficiary of the Alpha Trust (FL-0002-510.771-1), c / o Dr. iur. Thomas Wilhelm, Lova Center, FL-9490 Vaduz towards CTX Treuhand Aktiengesellschaft as trustee of the Alpha Trust (FL-0002-510.771-1), c / o Dr. Iur. Thomas Wilhelm, Lova Center, FL-9490 Vaduz, overall rights, in particular the right to receive payments and benefits of all kinds from the trust, the right to appoint and remove the trustees of the Alpha Trust (Art. (2) Written Instrument from 2 June 2015), the right of the trustee to end the trust (Art. 3, 14.3 Declaration of Trust in conjunction with Art. (1) and (2) of the Written Instrument), the right of the trustee to appoint the beneficiaries of the Alpha Trust (Art . 8, 14.3 Declaration of Trust in conjunction with Art. (1) and (2) of the Written Instrument), the right of the trustee to change the trust deeds of the Alpha Trust (Art. 12, 14.3 Declaration of Trust in conjunction with Art. ( 2) the Written Instrument), the right of the trustee to delegate all rights of the trustee including his discretionary powers (Art. 11,14.3 Declaration of Trust in conjunction with Art. (1) and (2) of the Written Instrument) and the right of the trustee to exercise velvet rights defined in the First Schedule of the Declaration of Trust (Art. 11, 14.3 Declaration of Trust in conjunction with Art. (1) and (2) of the Written Instrument) is approved, namely by

**Authorization** of the operating party to exercise the above-mentioned rights of the obligated party instead of the obligated party, in particular in particular:

a)  **Removal of the CTX:**

The right instead of the obligated according to Art. 14.05 of the Trust Deeds of the Alpha Trust i.d.F.d. des Written Instruments from 2.6.2015 the former trustee of the Alpha Trust, CTX Treuhand AG, Lova-Center, 9490 Vaduz, with immediate effect.

b)  **Appointment of new trustees:**

In accordance with Art. 10.1. the trust deed to name and appoint new trustees of the Alpha Trust,

-  be it the operating party,

-  Messrs. Mag.iur. Rudolf Schdchle and lic. iur. Raphael Nascher or

-  other natural persons designated by the operating party or a trust company domiciled in Germany or abroad,

c)  **Desire and approve distribution to Yegiazarian:**

From the current or newly appointed fiduciary of the Alpha Trust instead of the obligated person on the basis of the Letter of Wishes of the obligated person from July 3rd, 2015 and the trust deed of the Alpha Trust as a rule. of the Written Instrument from 2.6.2015 as well as on the basis of its actually existing instruction right towards the trustee of the Alpha Trust

-  the distribution of the enforceable claim of CHF 91,595,445.97 (08 EX.2016.5802, ON 3) plus interest (namely quarterly compounded annual interest rate of 8% from USD 72,243,000.00 and USD 6,899,701.32 since 15. November 2016) and costs to the obligated party to a paying agent to be determined by the operating party and to request, and

-  instead of the obligated party of this distribution and its implementation (including the paying agent determined by the operating party) in its position as protector (as per Art. 14.4 in conjunction with Art. 8.1.2 of the Trust Deeds of the Alpha Trust of May 27, 2015 as amended by the Written Instrument of 2.6.2015) and beneficiary (in terms of Art. 1.1.2 and the Third Schedule of the Trust Deeds of the Alpha Trust of May 27, 2015).

d)  **Exercise rights under the Letter of Wishes agreement:**

By the current or newly appointed trustee of Alpha Trust instead of the obligated on the basis of the rights of the obligated in accordance with the letter of wishes agreement dated 3/7/2015

-  the appointment of the operating party as beneficiary of the Alpha Trust,

-  the distribution of the enforceable claim of CHF 91,595,445.97 (08 EX.2016.5802, ON 3) plus interest (namely quarterly compounded annual interest rate of 8% from USD 72,243,000.00 and USD 6,899,701.32 since 15. November 2016) and costs to the operating party (in its capacity as the designated beneficiary) and to request and wish

-  instead of the obligated person of this distribution and its implementation (including the paying agent determined by the operating party) in his position as protector (in accordance with Art. 14.4 in conjunction with Art. 8.1.2 of the Trust Deeds of the Alpha Trust of May 27, 2015 as amended by the Written Instrument of 2.6.2015) and beneficiary (in terms of Art. 1.1.2 and the Third Schedule of the Trust Deeds of the Alpha Trust of May 27, 2015)

e)  **Exercise administrative rights of the protector to carry out:**

2

Instead of the obligated person based on the trust deed of the Alpha Trust i.d.F.d. des Written Instruments dated 2.6.2015 give consent to the trustee's actions in accordance with points 4, 11, 16.2 and the first schedule of the trust deed and to exercise all rights of the obligated party to inform the trustee.

**1.2**   The **pledge** of the obligated party due to the physical exploitation according to para. 1.1 Monetary claims and payment claims to which the Alpha Trust or its trustee are entitled, in particular claims for distribution in the amount of CHF 91,595,445.97 and **transfer** of these seized claims for collection up to the amount of the enforceable claim without prejudice to any rights previously acquired by drifting persons, are granted.

The third party debtor is prohibited from making payment to the obligated party. The latter is prohibited from disposing of the pledge as well as from the pledge ordered for it, in particular the total or partial collection of this claim. Upon delivery of this prohibition of payment to the third-party debtor, the granted seizure is deemed to have been effected and a lien has been acquired in favor of the enforcing claim of the operating party on the claim mentioned above.

**2.**   The other execution costs of the operating party are determined at CHF 83,297.75.

## REASON

1.   By decision or execution permit dated November 21, 2016 (ON 3) this court was ruled as follows:

Based on the enforceable award of the London Court of International Arbitration (LCIA), London, Great Britain, of November 11, 2014 (...)

becomes the operating party. Vitaly Ivanovich SMAGIN, REDACTED Moscow, Russia,

against the committed party Ashot YEGIAZARYAN,   REDACTED   Beverly Hills, California, United States of America,

to bring in the enforceable claim of

a.   USD 72'243'000.00 (the main thing), and

b.   USD 6,899,701.32 (in capitalized interest) and

c.   GBP 2,776,473.68 and USD 672,354.08 and RUB 2,958,750.00 (at cost) and

d.   further interest at a quarterly compounded annual interest rate of 8% from USD 72,243,000.00 and USD 6,899,701.32 since November 11, 2014 as well

e.   the costs of the execution request determined at CHF 63,880.00,

the execution is approved by

1.   Pledge of the obligated party as trustor, protector and beneficiary of the Alpha Trust (FL-0002.510.771-1), c / o Dr.iur. Thomas Wilhelm, Lova Center, 9490 Vaduz, opposite the

CTX Treuhand Aktiengesellschaft as trustee of the Alpha Trust (FL-0002- 510.771-1), c / o Dr.iur. Thomas Wilhelm, Lova Center, FL-9490 Vaduz,

overall rights, in particular the right to receive payments and benefits of all kinds from the trust, the right to appoint and remove the trustees of the Alpha Trust (Art. (2) Written Instrument from June 2, 2015), the right of the trustee to terminate of the trust (Art. 3, 14.3 Declaration of Trust in conjunction with Art. (1) and (2) of the Written Instrument), the right of the trustee to appoint the beneficiaries of the Alpha Trust (Art. 8, 14.3

3

Declaration of Trust in conjunction with Art. ( 1) and (2) of the Written Instrument), the right of the trustee to change the trust deeds of the Alpha Trust (Art. 12, 14.3 Declaration of Trust in conjunction with Art. (1) and (2) of the Written Instrument), the right of the trustee to delegate all of the trustee's rights, including its discretionary powers (Art. 11, 14.3 Declaration of Trust in conjunction with Art. (1) and (2) of the Written Instrument), the trustee's right to exercise all of the rights specified in the First Schedule of the Declaration of Trust placed rights (Art. 11, 14.3 Declaration of Trust in conjunction with Art. (1) and (2) of the Written Instrument) and the rights as asset manager of the trust (Minutes of a Meeting of the Directors of CTX Treuhand AG of June 3, 2015).

2.  The obligated party Ashot YEGIAZARYAN is ordered to abstain from any disposal of the rights described above (1.).

3.  To CTX Treuhand Aktiengesellschaft as trustee of the Alpha Trust (FL- 0002-510.771 -1), c / o Dr.iur. Thomas Wilhelm, Lova Center, FL-9490 Vaduz, will prohibit, from these claims or by exercising these rights (1.), the obligated party Ashot YEGIAZARYAN and / or a third party, in particular instructions from the obligated party Ashot YEGIAZARYAN to be followed and / or accepted by the committed party Ashot YEGIAZARYAN and used as a basis for their decisions.

4.  Excepted from this execution permit are the claims already pledged by the claim execution permit of the Princely Regional Court of February 24, 2016, 08 EX.2016.839, ON 4, namely those of the obliged party due to its legal status as beneficial owner, trustor, beneficiary and client of the Alpha trusts or other fiduciary relationships against the third-party debtors (i) CTX Treuhand AG as fiduciary of the Alpha Trust, (ii) Dr. Thomas Wilhelm and (iii) Nikolaus Wilhelm are entitled to monetary claims and repayment claims.

**2.**  The committed party and the third-party debtor appealed against this decision to the higher court. With a decision dated August 3, 2017 (ON 36), this complied with both appeals in the sense of rejecting the execution request and justified its decision as follows:

6.6.7  Against the background of these general statements, the following must be said for the specific case:

Since the execution authorized for EX.2016.839 was made on the basis of Art. 210f EO, the execution request is aimed at the use of another means of execution (Art. 241f EO) with the aim of pledging further rights of the obligated person, so there is no legal conflict for the already approved execution in favor of the same operating party, especially since the claims that were already pledged on 08 EX.2016.839 should not be expressly recorded by the relevant execution license. However, the present execution license, which has taken over the partially contradictory and indefinite request of the operating party, has proven to be so deficient that the contested decision must be amended and the execution request on which the contested decision is based must be dismissed.

First of all, it can be said that there can be no question of a pledge of "total rights" of the obligated due to his position as trustor and beneficiary of the Alpha Trust, because the monetary claims and payment claims associated with this position, in particular high distribution and repayment claims of at least the outstanding (operated) claims have already been pledged on 08 EX.2016.839. The repeated inclusion of the "right to receive payments and benefits of all kinds from the trust property" in the execution permit is contradictory in itself because under item 4 of the contested decision these property rights should not be recorded. The "total rights" covered by the execution in question

4

are completely inadequate (because they are inadmissible) and contradictory in themselves by the following list of the rights "in particular" falling, whereby the application is made in the execution request without further specification of the type of favoring the obligated party (beneficiary or discretionary beneficiary) essentially only deals with his rights as a protector, whereas in the specification of these rights in the execution permit only "the right to appoint and dismiss the trustees of the Alpha Trust" can be found again, which we will have to come back to. that from the act and the documents presented for the rights of the protector, there are only approval rights to the rights granted to the trustee. In addition, only the rights of the trustees are to be granted with the execution permit in the Alpha Trust, namely the right of the trustee to terminate the trust, the right of the trustee to appoint the beneficiaries of the Alpha Trust, the right of the trustee to change the trust deeds of the Alpha Trust, the right of the trustee to delegate all rights of the Trustee, including its discretionary powers, the Trustee's right to exercise all of the rights set out in the First Schedule of the Declaration of Trust and, ultimately, the Trustee's rights as the trustee's asset manager.

Insofar as the rights of the obligated person arising from the trust relationship with the trustee are not to be seized with the execution permit in question, this proves to be inadmissible from the outset, because the condition of the seizure pursuant to Section 241 f. EO - as explained above - can only be property rights that are owned and usable by the obligated party. According to the content of the approved execution request, the operating party does, however, want to access the rights granted to the appointed trustee in the trust deed, which not only violates provisions of the law on executions, but also inadmissible in the norms regulating the nature of a trust - as they were reproduced in extracts above. intervened. As already stated, the trustor can place the execution of the orders at the discretion of the trustee, in particular with regard to individual or all beneficiaries or beneficiary classes, and can also have the trustee determine the amount of the benefits. The fact that the obligated party is a beneficiary has not been specified in the present case, nor does this result from the documents. Apart from this, according to Art. 918 Para. 1 PGR neither the trustor can stipulate provisions with which the trustee is obliged to follow ongoing instructions of the trustor, in particular with regard to the use of the trust property, nor can the protector make property decrees instead of the trustee. The rights contractually granted to the trustee in the trust deed are due to his legal status as an independent asset holder, even if he has to exercise them in the interests of the trustor and in accordance with the provisions in the trust deed.

6.6.8   This leaves only the right of the protector specified in the execution order to appoint and dismiss the trustees of the Alpha Trust. In the opinion of the Senate, no legible right is being seized for the time being, because this right does not immediately give the beneficiary a worthwhile legal position. In this respect, the oOGH's considerations in the mentioned decision 3 Ob 177 / 10s can be used, according to which, from an economic point of view, the authorization to remove and appoint organs is merely a means of diffraction. The right of recall serves to control and enforce the trustee's duties. For the time being, however, the trustee's lawful behavior can be assumed. This right might possibly become meaningful in the context of the garnishment of total rights of the obligated person within the meaning of the considerations of the oOGH in 3 Ob 177 / 10s if the trustee violated his obligation, in particular with regard to seized claims of the obligated person, in accordance with the trust order and that does not want to send benefits to beneficiaries entitled to the benefit. In its decision 3 Ob 177 / 10s, the oOGH often left the question of whether a corresponding authorization to exercise such design rights can be granted in the course of the recovery process. Even in the present case,

this question can be left all the more often because the seizure of these rights proves to be inadequate.

The third-party debtor also rightly asserts that the third-party ban in this form cannot exist because, according to Art. 242 Para. 1 EO, a third-party ban would only be issued if a certain third party had to perform due to the liened rights of the obligated party would be obliged. Insofar as this should apply to the claims of the obligated party as trustor or beneficiary from the trust, a corresponding third-party ban has already been issued in procedure 08 EX.2016.839. On the other hand, no other rights of the obligated person were pledged with the present execution permit, which the trustee is obliged to perform, which is why the third-party prohibition thus formulated lacks the legal basis.

As a result, the application for execution had to be dismissed, amending the contested decision and granting the appeals.

3.      Against this decision of the High Court, the operating party appealed to the Supreme Court. The latter followed the revision recourse by decision of 07.09.2018 (ON 72) and restored the decision of the regional court. The Supreme Court justified the following, among other things [emphasis. d. Vert.]:

7.      The Princely Supreme Court has considered:

7.1.    Reception template § 331 oEO for Art 242 EO:

7.1.1.  According to Art. 242 para. 1 EO (= § 331 para. 1 oEO), for the purpose of execution on property rights that do not form part of the requirements, the court, at the request of the operating creditor, should issue the order to abstain from any disposal of the right ( Deposit). If, by virtue of this right, a certain person is obliged to perform, the pledge shall only be regarded as effected if this third person has also been served with the legal prohibition to pay to the obligated party. According to Art. 242 Para. 2 EO, the type of exploitation of the right is to be determined by the court at the request of the operating creditor after consultation with the obligated party and all believers for whose benefit a garnishment has been made.

7.1.2.  This legal position of the Liechtenstein POs corresponds to the Austrian reception model in §§ 331 ff oEO. Austrian literature and judicature can therefore be used to assess the legal issues in question.

7.2.    Teleology of Art 242 EO:

7.2.1.  In many cases, the operating creditor is only able to lead the execution to a "universal right", especially since valuable individual rights, which must subsequently be asserted or enforced by the operating creditor, only arise in the specific factual situation and individual situation **Aspect only highly personal or otherwise obviously non-transferable rights, or those whose exercise makes economic sense only for the obligated party** (oOGH 3 Ob 101 / 04f; Oberhammer in Angst / Oberhammer, EO3 § 331 Rz 4) Individuals deriving rights deriving from a universal right must be countered that the contested execution permit does not refer to individual rights, but to the rights of the obligated person (oOGH 3 Ob 166 / 11z; see also RIS-Justiz RS0004162 [Tl]).

7.2.2.  The catch of the execution on other property rights is intended to ensure that all conceivable assets of the obligated person can be pulled into execution. The interpretation of §§ 331 ff oEO (RIS-Justiz RS0120619) must be based on this purpose of the law, which also applies to the interpretation of Art 242 ff EO. "Other property rights" within the meaning of Art. 242 Para. 1 EO are only those substantive claims of the defendant, which are neither to the immovable property nor to those parts of the

6

moveable property of the debtor that can be classified as monetary claims, physical items or as claims for surrender or performance of physical items are to be defined (OGH 03 CG.2007.66 LES 2008, 266 Erw 8.1; LES 1987, 80; RZ 1956, 111). For example, the donor's option right to use himself as beneficiary was seen as a lienable asset. Even the right to appoint organs, which does not immediately provide a legal position worthy of a fortune, can indirectly result in a monetary benefit, for example from the earnings of the foundation's assets, as an influence of the founder on the board. Section 333 (1) oEO (Arf 244 (1) EO) is based on the fact that the pledged right grants entitlement to "delivery of a mass of property". The right itself does not have to be usable, but it must in turn enable access to a usable property ( oOGH 3 Ob 177 / 10s; Oberhammer in Angst / Oberhammer, EO3 § 331 Rz 3), such as the right specified in the law, for example, to make a declaration (Art. 244 Para. 1 EO). In principle, several steps from legal acts to "execution a wealth ", the law does not restrict the operating creditor to a single executive exploitation document.

7.3.   Abarenzuna   execution   on   total   rights   and   execution   on   claims: 7.3.1. In the present case, contrary to the statements of the opponents of the revision, the issue is not the seizure of individual "claims" for which at least the "existence" would have to be assumed, but an execution on "other property rights" within the meaning of Art. 242 et seq. EO for such an execution that usable claims are not (yet) available at the time of the executive access, because this type of execution has an "all-encompassing right" and, as a rule, only further steps by the operating creditor within the framework of the originating individual claims and claims recycling must be assumed (Oberhammer in Angst / Oberhammer, E03§ 331 Rz 3 f).

7.3.2.   The oRsp also allows seizures in accordance with § 331 EO if further legal acts by the operating creditor only give rise to the obligatory person's valuable rights. The EO does not presuppose that these exist at the time of the seizure (see oOGH 3 Ob 165 / 10a; 6 Ob 235 / 08i GesRZ 2009, 237 [Arnold]).

7.3.3.   This difference - on the one hand attachment of claims, which presupposes conditional or aged claims, because only expected claims cannot be attached to monetary claims within the scope of the execution and, on the other hand, the attachment of overall rights, if, for example, due to a lack of notification of the underlying contractual relationship, attachable claims have not yet arisen - oOGH just highlighted in a decision to execute trustor rights (oOGH 3 Ob 223 / 12h ecolex 2013/211). In the specific case, it was about the execution of the trustor's claims against the trustee, which can only be executed in accordance with § 331 oEO (= Art 242 EO). This provision was applied because the fiduciary contract could only be terminated by a declaration by one of the contracting parties.

7.3.4.   While not only the means of execution, but also the execution object in the case of the execution of claims differs from that in the case of the execution on "other property rights", there is only one thing in common in the question of the law that has already arisen: In this case, there is no difference that the right to which the execution is made has already arisen at the time of the seizure. Depending on the object of the execution, such a right can then be executed. Also for an execution to other property rights it is assumed that the universal right has already arisen and the obligated party is entitled (OGH 25.8.2014, 8 Ob A 56 / 14i ecolex 2014, 1061).

7.4.   For the execution request:

7.4.1. In the present case, the operating party has asserted several legal positions of the obligated person as total rights and requested their attachment: In the approved application, for example, it presented the position of the obligated party as trustor, protector and beneficiary of the Alpha Trust vis-à-vis the third-party debtor and the attachment of the resulting one Obligated to the total rights due to the third party debtor (item 1 paragraph 1 - 3). In relation to the position of the obligated person as protector of the Alpha Trust, partial rights were put forward in detail, such as that the obligated person had transferable rights under the trust deed, such as the right to consent as a protector to various rights and actions of the trustee: in particular to the termination of the trust by the trustee, to determine the beneficiaries, to delegate all rights of the trustee including his (alleged) discretionary power and to change the provisions of the trust deed. In addition, the obligated party had the sole right to appoint or remove the trustees of the Alpha Trust. In addition, the debtor even let the trusts of the Alpha Trust (which he controls) act as asset manager of the trust.

7.4.2. With this, however, the operating party made long claims about the pledges of the total rights of the obligated party. The individual rights of the universal law do not have to be asserted and certified, if it does happen (as here, for example, verb "in particular"), it does not harm the operator, even if, as a rule, examples are given of rights that cannot be exploited by the believer in charge This execution application clearly specifies the total rights to be seized, namely those of the obligated as trustor, protector and beneficiary of the Alpha Trust vis-à-vis the third-party debtor. It is not necessary to specify the individual rights resulting from these legal positions in more detail.

7.4.3. The type of execution requested by the operator coincides with the type of execution requested by the oOGH in 3 Ob 223 / 12h (ecolex 2013/211; see Oberhammer in Angst / Oberhammer, EO3 § 325 Rz 5), namely the execution on other property rights according to §§ 331 ff oEO (oOGH 3 Ob 223 / 12h). In this context, it does not catch the objection of the appeal against the appeal against the revision that the Alpha Trust only grants a discretionary advantage and no entitlement to preferential treatment, since - as it may turn out in the course of the liquidation process - the obligated party can obtain usable monetary claims due to his overall rights through changes in the trust deed. In addition, as part of the exploitation of his overall rights, the obligated party could also end the trust with corresponding claims. This should not be examined and decided in more detail here, but rather reserved for any exploitation of the total rights of the obligated party. In addition, it was expressly pointed out that, in the absence of a corresponding ban in the trust deed, the obligated party was even entitled to use himself as a trustee, which was also legally permissible (Art 910 para in conjunction with Art 923a, § 40 para 2 PGR). Therefore, it is neither contradictory nor incorrect if, within the framework of the exemplary payment of the individual rights falling under the overall rights of the obligated party, the operator also includes the rights of the trustee according to the trust certificates mentioned there, especially since he claims that the obligated party could potentially be the trustee of the Alpha Trust itself (ON 1 margin no.38).

7.4.4. Incidentally, it is incorrect that the operating party in its submissions in the execution request had merely restricted itself to the rights of the obligated person as a protector. The operating party has also argued that the obligated party can still fully control the assets in the trust by instructing the trustees, and in particular can issue instructions to be followed by the trustees in relation to distributions from the trust assets. An application was made for the rights of the obligated to the trustee of the Alpha Trust, whereby the operator referred to the total rights of the obligated as the trustor. With regard to the legal position of the obligated party, the trust agreement of May 27, 2015

and the supplementary "Written Instrument" of June 2, 2015 were expressly asserted, and the individual consent powers of the obligated party to the trustee's agendas were set out in the "Declaration of Trust" (ON 1 margin no.18 and in FN 3).

7.4.5. Therefore, there can be no question of an indecision or indefiniteness of the execution request: An execution request is only conclusive if it lacks the complete, definite and precise assertion of the facts which, as a legal consequence, resulted in the coveted execution permit (OGH 08 EX.2006.4224 LES 2009, 221). The operator has asserted all legal bases from which the obligated party has full rights against the third-party debtor: According to the operating creditor, the obligated party has overall rights as the trustor, protector and beneficiary of the third-party debtor's Alpha Trust.

7.4.6. Also, the lack of specification of the rights by the operator, which he wants to resort to, claimed by the opponents of the appeal against the revision is not available. The exploitation acts specified by law in Art the operator's general clause-cited authority to "make the declarations otherwise required to exercise and utilize the pledged right effectively for the obligated party" does not have to be shown in detail in the execution request. For a garnishment in accordance with the provision of Art 242 EO, it is sufficient if the seized universal right in turn allows access to a usable property (Oberhammer in Angst / Oberhammer, EO3 § 331 Rz 3). The application can only be rejected if the unusability of the right from the file situation is obvious (oOGH 3 Ob 28 / 99k SZ 72/108; 3 Ob 243 / 11y JBl 2012, 535; RIS-Justiz RS0127665; RS0001249, RS0000085). However, this is not the case here: the fact that a usable property can be seized or exploited by means of the universal right to be pledged has been demonstrated in detail by the operating creditor, and there is no reason to assume that it is "obvious" that it cannot be used The legal position of the obligated person as trustor already allows the possibility of bringing about worthy claims against the trustee in accordance with general principles.

7.5. Indirect usability:

7.5.1. The decision of the oOGH 3 Ob 177 / 10s, cited several times in this procedure, is published, among others, in PSR 2011/47, 183 (Rassi / Zollner) = GesRZ 2011.317 (Wurzer / Foglar-Deinhardstein; Zollner / Paulsen, overview of the judge's judicial system in foundation matters in 2011, PSR 2012/18, 66 [68 f]) concerned an execution against a founder and dealt only with the question of the exploitation of legally enforced total rights of the obligated as the founder. There, the "comprehensive" right to change and the donor's right to determine the beneficiary were effectively seized and the commandment to the obligated party to abstain from any disposal of these rights and the foundation to be prohibited from making payments to the obligated persons or their decrees Only in the context of the exploitation process (Section 331 (2) EO) were applications for exploitation made more precise and supplemented and the court of first instance empowered the operating party in its own name to appoint the obligated party as beneficiary, but indicated the authorization to remove the members The second instance complied with the appeals of both parties and overturned the decision of the first judge justified recognized. He stated that the total rights due to the founder towards a private foundation are subject to the execution according to §§ 331 f EO if he has reserved the right of revocation and according to the foundation declaration or according to § 36 paragraph 4 PSG is at least partially the last beneficiary or reserves the right to make changes (RIS-Justiz RS0120752). Because, as long as a founder reserves the right to change or withdraw, the principle of the complete separation of the foundation from the founder is not implemented. However, contrary to the view of the

9

obligated party, a cumulative reservation of both design rights is not a prerequisite for an execution according to §§ 331 ff EO (3 Ob 217 / 05s; 3 Ob 16 / 00h).

7.5.2.  The execution case here is not a case of a foundation. In the case of the decision, it is essential in the case law of the oOGH for execution on donor rights that the indirect usability is sufficient for the suitability of an execution object according to §§ 331 ff oEO. Thus the oOGH saw in the founder's right to change "in any case a right of property", it may also be necessary first, according to the legal arrangements to be initiated by the operator, until he can access concrete property rights of the founder (3 Ob 217 / 05s Erw 3; 3 Ob 177 / 10s Erw III 1 ff; see Zollner / Paulsen, PSR 2012/18, 69) An amendment to the declaration of stipulation to favor the sififter (again) creates the conditions for the establishment of usable property rights of the founder (oOGH 3 Ob 217 / 05s RdW 2006, 505).

If the beneficiary is (finally) entitled to an actionable claim against the foundation, this is cedarable, pledgeable and pledgeable (with reference to Csoklich, access to assets of the private foundation by believers of the benefactors and beneficiaries, OBA 2008, 416 [424 ff]).

7.5.3.  In the case of execution against a founder, the position was also taken in the oElere that the believer had the option of being empowered instead of the founder to change the declaration of the foundation with regard to the specific amount and consistency of donations in order to In this way, the donor has a legally enforceable (and executable) entitlement to benefits (Rassi, PSR 2011/47, 189 [decision-making discussion]; RIS Justice RS0120753).

7.5.4.  The execution according to Art. 242 EO therefore does not call for the immediate viability of the right to be pledged, but "indirect usability" is sufficient. In 3 Ob 16 / 06h ZIK 2006, 143, the oOGH assumed a lienable other property right if a founder is the ultimate beneficiary In addition, the OGH was satisfied in this decision that pledged design rights (of a donor) are only transferable according to their exercise (with reference to oOGH 3 Ob 55/80) and emphasized that the exercise the design rights (of the donor) could also be granted by third parties (cf. oOGH 6 Ob 106 / 03m for the administrator of the founder or oOGH 6 Ob 332 / 98m GesRZ 1999, 126 for the donor's custodial parents with authorization from a caregiver) the fact that the operator can exercise the individual rights contained in the overall rights instead of the obligated party There should be obstacles to this. Apart from that, an execution to other property rights is not about transferring the design rights to third parties, but about the judicial authorization of the operating creditor to exercise the rights instead of the obligated party in the execution proceedings, thereby, albeit only indirectly, towards the proceeds from the liquidating individual rights. An authorization granted by the execution court as part of an execution on other property rights entitles the operating creditor to everything to which the obligated party was previously entitled (oOGH 3 Ob 33/84 SZ 57/102; 3 Ob 16 / 06h ZIK 2006, 143) .

7.5.5.  The provisions of the reception template (§§ 331 ff oEO) also aim to expand the execution options and therefore want to cover all of the asset positions of the obligated party that have not yet been recorded by other executions (cf. Art 242 paragraph 1 sentence 1 EO). It is true that the oOGH is therefore of the opinion that, in case of doubt, non-execution of other property rights can be assumed (oOGH 3 Ob 16 / 06h; RIS-Justiz RS0120349). However, there is no need to refer to this in the case to be decided, since there are no such doubts.

7.5.6.  It can thus be seen that, according to the doctrine and the Rsp, a pledge of total rights is always possible if, through further legal steps, in particular through the assertion of design rights of the obligated person, a usable asset of the obligated person can arise or be created. The so-called "indirect usability" of the universal law is therefore sufficient for the execution of universal rights in accordance with Art. 242 EO.

7.6.    Asset:

7.6.1.  From this it can further be concluded that the pledged property law does not itself have to represent any property worthy. The operator does not have to certify such an asset. The rights of the operating creditor are determined by the scope of the rights of the obligated and are identical to them. The operator is to be given the judicial authorization to exercise the rights of the sponsor, instead of the obligated founder, in order to be able to resort to a conceivable loss. Nothing else can apply in the case of pledging of total rights by the creditor of a trustor, who is also the beneficiary and protector of a trust.

7.6.2.  Moreover, the pledge of the donor's total rights does not automatically mean that the exploitation is permissible by authorizing the operating creditor to exercise all of the donor's individual rights (oOGH 3 Ob 177/1 Os Erw 5). The fact that execution can be carried out in accordance with sections 242 of the EO does not therefore indicate whether the total rights seized in the specific case to be assessed have a net worth (see oOGH 6 Ob 228 / 17y PSR 2018, 90). The individual right of the obligated person resulting from the universal law therefore does not have to be asserted, proven or certified in the application for execution, otherwise the creditor in charge would be burdened with the assertion of a possible multitude of individual rights potentially resulting from a universal right, which does not correspond to the teleology of the right of execution, not indefinitely making it difficult for an operating creditor to access the debtor's assets. An assertion of the assets of the universal right is only necessary insofar as the exploitation of the individual rights results in the possibility of an asset. In any case, this must be answered in the affirmative due to the operator's statements in ON 1. Only if it already emerged from the application for execution that it was obviously a non-attachable right would the application for execution be rejected (Oberhammer in Angst / Oberhammer, EO3 § 331 Rz 10; Heller / Berger / Stix, commentary on the Execution Regulation III 2336), whereby however the Rsp generously assesses the claim of the possible assets of the right to be pledged at the stage of the garnishment (oOGH 3 Ob 217 / 05s; 3 Ob 26 / 08g GeS 2008, 112) and therefore should there be a lack of usability in the exploitation stage, the individual application for exploitation - but not the application for pledge regarding the universal right - must be rejected.

7.6.3.  The decision of the Princely Supreme Court 2 R EX.2008.7877 quoted by the obligated party concerned a security offer with which the obligated party should be prohibited from having their claims against the third party debtor up to the amount of the actual trust assets. Accordingly, it was not an execution on other property rights within the meaning of Art 242 ff EO, but a forced access to individual claims, hence a claim execution. This decision does not provide anything for the question of the seizure of total rights in accordance with Art. 242 EO, since the requirements for the execution object "claim" are fundamentally different for the execution of claims: the Princely Supreme Court already spoke in LES for the attachment of "claims" 2008, 266 that these cannot be imposed by a third-party ban if their legal basis has not yet been created at the time of the judicial decision and it is therefore still uncertain whether they will ever come into being (LES 2008, 266; 2 R EX.2008.7877). In the present case, however, the issue is not the seizure or realization of individual assets worth "claims", but only the

seizure of a universal right of the obligated party against the third-party debtor, from which - if only indirectly - only after additional legal acts (to be undertaken by the operator) have been added - Assets, in particular claims, can arise (Art 242 para 2, Art 243 ff EO).

7.6.4.   The Princely Supreme Court has already affirmed a fortune of total rights several times: For example, in decision 10 CG.2004.58 LES 2007, 141 the beneficiary's claim was largely dependent on the discretion of the organs of a foundation, but the administration of the foundation was based on of a mandate contract determined by the beneficiary. On this basis, the Princely Supreme Court affirmed the defendant's assets as the access depended solely on the declaration of intent by the obligated party. He pointed out the principle that conditional rights are assets if the occurrence of the condition only depends on an act of will by the defendant. This circumstance distinguishes this decision from the factual basis of decision 2 R EX.2008.7877, according to which there was no - also not unconditional - disposable right of the defendant regarding the property of the third party debtor (2 R EX.2008.7877 adult 13.5.). In the decision OGH 03 CG.2007.66 LES 2008, 266 the rights of a founder to revoke and change the declaration of the foundation were expressly recognized as so-called "other property rights within the meaning of Art 241 f EO".

7.7.   **For execution on trustor rights:**

7.7.1   In the oRsp, the execution on trustor claims was assessed from the aspect of execution on the trustor's claim against the trustee to surrender the trust. If the trust property consisted of money, the attachment of the claim was affirmed in accordance with § 294 oEO (= Art 217 EO). In the event that the trust relationship has not yet ended and this is only to be terminated by the trustor in order for the claim to recovery to arise, the oOGH assumes that in such a case only a garnishment in accordance with § 331 EO will be considered (oOGH 3 Ob 223 / 12h ecolex 2013/211; Oberhammer in Angst / Oberhammer, EO3 § 325 Rz 5). The claim for reimbursement cannot be deposited beforehand because it has not yet arisen due to a lack of notification. Since the boundaries between the individual types of execution are "fluid", the oOGH even allows an application aimed at the wrong type of execution to be reinterpreted without further ado (oOGH 3 Ob 223 / 12h ecolex 2013/211; Oberhammer in Angst / Oberhammer, EO3 § 325 Rz 5) In the decision of the oOGH 2 Ob 166 / 02d ecolex 2002, 882, it was expressly pointed out that the creditor of the trustor can not directly lead to the trust property execution, but only to the claims of the trustor against the trustor This legal opinion was confirmed by the oOGH in 3 Ob 85 / 08h ecolex 2008, 1021 = OBA 2009, 322.

7.7.2.   The oOGH has already decided in E 3 Ob 177 / 10s that the right to designate beneficiaries can be seized and exercised by the operating creditor, so that it is clear from this alone that the pledge of the total rights of the obligated person as a trustor on the one hand and that for determination the beneficiary protector entitled to consent (Art 8 Declaration of Trust) may be at least indirectly relevant to the trustee in terms of property law.

7.7.3.   When executing trustor rights, the OGH did not respond to the existence or non-existence of the alleged seized property right due to the lack of a liquidation application (oOGH 3 Ob 143/93), which clearly shows that 1) trustor rights are fundamentally pledgeable as a universal right in accordance with § 331 oEO and 2) this is possible regardless of whether or not, at the time of this garnishment, the universal right in the specific case also allows executive access to the right claimed to be usable (a property

there). To the extent that the opponents of the appeal against the appeal object that individual rights of the obligated party could not be pledged, this is not the subject of the procedure for the application for pledge of trustor rights.

7.8.   "Double deposit"?

7.8.1.   Contrary to the statements made by the opponents of the appeal against the revision, there is no "double deposit" because the execution request and the operator's argument clearly show that the debtor's entire rights vis-à-vis the debtor are to be seized and the legal position of the obligated party is his position as trustor, protector and Beneficiaries of the Alpha Trust The seizure of various individual rights from the requested seizure of the universal right according to item 1 paragraph 3 (from "in particular" to "June 3, 2015)", which is only requested as an example, is not necessary to describe the universal right to be seized. At the exploitation stage, it is necessary to examine in detail which individual rights flowing from the total rights of the obligated party can be exploited and assets.

7.8.2.   Point 4 of the execution permit does not make the execution permit (or the execution request) contradictory, because it is clear from what has been said above that the operator does not want to deposit the claims that have already been seized with this execution, because this has already happened in procedure 08 EX.2016.839 . With the current execution request, only total rights are seized, not individual claims, so that this point can remain to clarify that individual claims should not be seized, although this restriction would not have been necessary. A "double pledge", which the opponents of the appeal against the revision of the appraisal have repeatedly described, does not exist because the execution objects are different: in the case of the case in question, these are overall rights of the obligated party, in the case of procedure 08 EX.2016.839, there were demands. the approval of the execution in question led to a multiple pledge, in void.

8.   In summary, it should therefore be stated that the operating creditor pledges to pledge the total rights of the obligated party as the trustor, protector and beneficiary of the third-party debtor to the Alpha Trust. The decision of the Princely High Court had to be overturned and the decision of the first court restored.

**4**.   Against this decision of the Supreme Court, the obliged party and the third-party debtor each lodged individual complaints with the State Court. With judgments dated 29.10.2019 on StGH 2018/111 (ON 94) and StGH 2018/114 (ON 95), the individual complaints were not followed. To justify the state court carried out among other things [emphasis. d. Author]:

In ON 94:

3.2.1   The complainant's complaint mentioned above does not comply with the relevant literature or with the relevant judicature: As the Supreme Court correctly states, Art. 242 EO corresponds to the Austrian model of reception in §§ 331 ff. OEO, which is why Austrian literature and Judicature can be used (see detailed ON 72, p. 34). Within the scope of the approval of the execution, it must be checked on the basis of the file (execution request) whether the right drawn into execution is accessible for exploitation. There is no need to investigate beyond this, the operating Gldubiger, in particular in his execution request, neither has to prove nor certify that the pledged right can be exploited. As with the execution of claims, the granting court does not have to check whether the pledged right exists. The execution is to be approved if the invalidity of the right is not obvious from the outset because it cannot be used. However, should it become clear in the course of the exploitation stage that the seized right is impossible for legal or factual

reasons, the procedure must be terminated. If the procedure is otherwise null and void, the obligated party and all creditors must be questioned in favor of a pledge (cf. Oberhammer, in: Angst / Oberhammer, EO3, N 10 on § 331 OEO with reference to extensive literature and judicature; correctly the Supreme Court, see in particular ON 72, pp. 35 and 42). With reference to the teleology of Art. 242 EO, the Supreme Court then rightly states that the fact that the execution of the execution of other property rights is intended to ensure that all conceivable assets of the obligated person can be executed. The interpretation of §§ 331 ff. OEO has to be based on this purpose of the law, which therefore also applies to the interpretation of Art. 242 ff. EO (cf. ON 72, p. 35).

3.2.2   From the case-law just referred to it is clear that the Supreme Court did not, as the appellant believes, have exercised its own competence with regard to assessing the usability of the pledged universal rights. The complainant fails to recognize that the Supreme Court does not have to examine within the framework of Art. 242 (1) EO whether there is "simple unusability", whatever that may mean in detail, but only whether the unusability is not a priori It is obvious what the Supreme Court undoubtedly did in the contested decision (see in particular ON 72, p. 38 f.). The complainant consistently fails to recognize that the question of the specific (actual) usability is reserved for the recovery process (see also Art. 242 Para. 2 EO). The case law cited above, according to which the Supreme Court judged in ON 72, is not objectionable from a constitutional point of view: The teleology of Art. 242 EO aims to ensure that all conceivable assets of the obligated person can be executed. As the Supreme Court correctly states, this purpose of the law must be interpreted in accordance with §§ 331 ff. OEO and thus also Art. 242 ff. EO. In this respect, there is also no objection if the Supreme Court, in accordance with the relevant literature, comes to the conclusion that the assessment of whether a property right can be pledged must be carried out generously and, in case of doubt, that it is subject to execution. In addition, as is relevant above, the recovery procedure is reserved, the execution procedure is to be discontinued if the further examination within the scope of the recovery stage shows that the recovery of the pledged right is impossible for legal or factual reasons.

Furthermore, the complainant should be informed that the Supreme Court's observations on the non-existence of an obvious unusability (see above) already indicate that there is no obvious non-transferable right. In addition, the Supreme Court, referring to Austrian jurisprudence, points out that design rights that have been pledged only have to be transferable when exercised and that design rights can also be exercised by third parties. Furthermore, the Supreme Court rightly states that the objective is that the operator can exercise the individual rights contained in the overall rights instead of the obligated party and that it is not clear which obstacles to execution law should prevent this (cf. ON 72, p. 45). . To what extent is the specification of the Supreme Court and the reference to Austrian jurisprudence that an execution on other property rights is about the judicial authorization of the operating creditor to exercise the rights instead of the obligated person in the execution proceedings in order to thereby, if only indirectly, To be able to access the proceeds from the individual right to be liquidated, which should be contradictory, does not open up to the State Court. (...)

4.3.   The complainant now fails to recognize that the decision of the Austrian Supreme Court of 14 July 2011 on 3 Ob 177 / 10s or RS0120752 is a foundation case, whereas the case in question is a trust, namely with regard to the attachment of the applicant's overall rights , underlying. For this reason alone, there can be no change in practice as the complainant thinks, and thus there is no violation of the duty to justify the change in

practice claimed by the complainant. It is clear from the contested decision that the Supreme Court uses the Austrian decisions mentioned in order to justify "indirect usability" (cf. ON 72, p. 42 ff.). Specifically, the Supreme Court, referring to the mentioned Austrian judiciary, states that the execution case in question is not a case of a foundation. What is essential in the case law of the Austrian Supreme Court for execution on donor rights is, however, in the decision-making case that the object's suitability for execution is sufficient according to §§ 331 ff. OEO. With reference to other Austrian judicature, the Supreme Court finally comes to the correct conclusion that the execution according to Art. 242 EO does not require immediate usability of the right to be seized, but rather an indirect usability (cf. detailed ON 72, p. 45 f .). (...)

5.2.   To para. 9. The applicant complains of his individual complaint that the Supreme Court only concludes that there is no obvious uselessness from the fact that the complainant's position as a trustor "is affirmed by general principles as to the possibility of generating worthy claims against the trustees".

5.3.   Contrary to the appellant's view, the Supreme Court did not base the lack of obvious usability solely on the introductory phrase (see also ON 72, p. 42). Rather, the Supreme Court has substantiated other points in the contested decision with reference to teaching and case law, which is why it cannot be assumed that it is obviously unusable. In particular, the Supreme Court has stated that in the light of the execution request made by the respondent, which is relevant to the Supreme Court from several sides (see p. 38 ff. In ON 72), there is no obvious uselessness (cf. also the reference of the Supreme Court on p. 42 of the contested decision). As mentioned, the contested decision contains various other versions of the (indirect) usability of the liened rights (see in particular p. 42 ff. And p. 50 ff. In ON 72), which is why there can be no question that the usability or the apparent unusability of the seized rights, as assumed by the complainant, was not justified. There is therefore no violation of the obligation to state reasons. (...)

6.2.   To para. 3.9 and no. 10.10 of the individual complaint, the complainant argues that the Supreme Court misjudges that there must first be a exploitation with regard to the pledge made on 08 EX.2016.839, before other rights, namely overall rights such as the object, have been seized. In this respect, the complainant does not consider the contested decision to be proportionate.

First of all, it should be pointed out to the complainant that the Supreme Court is making detailed considerations on "double seizure" and "multiple seizure" in this connection (see ON 72, pp. 52 f.). In particular, the Supreme Court correctly states that in the case in question, the debtor's overall rights were seized, but in the case of 08 EX.2016.839 claims of the debtor were pledged. In addition, the complainant ignores the fact that restrictions on the means of execution can only arise if there are no doubts as to whether individual means of execution are sufficient to fully satisfy the operator's claim. The mere probability is not enough. It is indisputable that this requirement is generally not recognizable to the court with sufficient certainty at the stage of the execution permit, as is the case, which is why the document apparently (implicitly) addressed by the applicant. 9, 2nd half sentence EO is hardly used in practice at the procedural stage in question (cf. the whole Jakusch, in: Angst, op. Cit., N 6 to § 14 OEO). The same applies to the case in question all the more, since the contested decision pledged overall rights and so it is only at the stage of exploitation that individual details can be ascertained which individual rights flowing from the overall right of the obligated party can be exploited and assets. In this respect, the decision of the Supreme Court stands in this aspect of an arbitrary review.

6.3.   Furthermore, the complainant considers it arbitrary that the complainant's overall rights with regard to the alpha trust are accessed or pledged as a result of the execution procedure in question, since "an execution procedure is not the right place for it". Rather, such an argument had to be brought up in an appeal procedure.

This complaint by the complainant initially misjudges that the fact that the execution of the execution on other property rights is in accordance with Art. 242 EO should ensure that all conceivable assets of the obligated party can be executed. The interpretation of Art. 242 ff. EO has to be based on precisely this purpose of the law (cf. also ON 72, p. 35 with reference to judicature and case law). As is already relevant in detail, it is sufficient to be able to indirectly use the pledged total rights (cf. ON 72, p. 42 ff.). In this respect, there can be no question that the respondent, as the appellant believes, is in the "wrong" procedure: rather, the respondent is to be held that within the framework of the attachment of overall rights, it is not necessary that the exercise makes individual assets of the obligated person directly usable as long as and to the extent that the specific exercise is aimed at bringing assets of the obligated person to execution. In addition, as mentioned, it must then be examined in detail at the stage of exploitation which individual rights flowing from the overall right of the obligated person can be exploited and assets. In this respect there can be no question of a violation of the ban on free will.

6.4.   Finally, the complainant considers it arbitrary that the Supreme Court has pledged its universal right to protect the Alpha Trust. All these rights are not property rights and this Supreme Court practice misjudges "the nature of the trust".

The fact that the complainant's argument is unjustified already results from the above statements by the State Court (see in particular also the statements on the criteria of sufficient obvious usability and indirect usability). As far as the complainant relies on the non-pledging of individual rights that can be derived from a universal right, he fails to recognize that the contested execution permit does not refer to individual rights, but to the rights of the obligated person (as applicable, the Supreme Court with reference to case law, cf., ON 72, P. 35). Ultimately and consistently, the complainant, as is relevant in detail to the Supreme Court, fails to recognize that the complainant can obtain usable monetary claims due to his overall rights. Whether the latter is actually the case, as the Supreme Court rightly states, cannot be examined or decided at the current stage of the proceedings, but rather reserved for any exploitation of the complainant's overall rights (see in particular ON 72, p. 40). For this reason too, the objections raised by the complainant, in particular with regard to Art. 918 Para. 1 PGR, are irrelevant. Even in the light of these statements, a qualified or grossly misguided decision by the Supreme Court cannot be assumed.

In ON 95:

6.2.   The complainant considers herself to have been violated in the constitutionally justified claim, since the Supreme Court has neglected to deal with the alleged non-pledgeability of organ appointment and dismissal rights. Again, as before, the complainant points out that the Supreme Court "only refers to the (subsequent) recovery process".

The fact that the complainant's argument is unjustified already results from the above statements by the State Court (cf. in particular also the statements on the criteria of sufficient obvious usability and indirect evaluability). As far as the complainant relies on the non-pledging of individual rights that can be derived from an all-encompassing right, she fails to recognize that the contested execution permit does not refer to individual rights, but to the rights of the obligated person (as the Supreme Court rightly

refers to case law, see ON 72, P. 35). Ultimately and consistently, the complainant, as is relevant to the Supreme Court in detail, fails to recognize that the party involved can obtain usable monetary claims based on its overall rights. As the Supreme Court rightly states, whether the latter is actually the case in the future is neither to be examined more closely nor to be decided at the current stage of the proceedings, but rather to be reserved for any exploitation of the overall rights of the party involved (see ON 72, p. 40 ). In the light of these considerations, there is no need to go into the other decisions cited by the appellant, namely LES 2007, 141 and LES 2008, 266, since, as shown, there is no lack of a comprehensible reasoning for the Supreme Court.

In addition, the Supreme Court goes on to state that even the right to appoint organs, which directly does not provide an asset with legal value, can indirectly result in a monetary benefit, for example from the earnings of the foundation's assets, as the founder can influence the board of directors. The law itself, according to the Supreme Court, must not be assessable, but must in turn enable access to a usable property (cf. ON 72, p. 36 with reference to case law and judicature). For an execution on universal rights, the Supreme Court rightly, it is just typical of the nature that evaluable claims are not (yet) available at the time of the executive access, because this type of execution uses a universal right and leads to the emergence of individual claims and claims As a rule, further steps by the operating creditor as part of the recovery are to be assumed. Austrian jurisprudence, according to the Supreme Court, also allows seizures in accordance with section 331 OEO if further legal acts by the operating creditor only give rise to the rights of the obligated person. The execution order does not presuppose that these already exist at the time of the seizure (cf. ON 72, p. 37 with reference to case law and literature). What is more, the Supreme Court states that the individual rights of universal law do not have to be asserted and certified, but if the latter does happen, it does no harm to the operator, even if, for example, rights were listed that could not be used by the believer. Ultimately, according to the Supreme Court, this execution request clearly states the total rights to be seized, namely those of the obligated person as the trustor, protector and beneficiary of the Alpha Trust vis-à-vis the applicant (cf. ON 72, p. 39). With reference to oOGH 3 ob 143/93, the Supreme Court even comes to the conclusion that trustor rights are fundamentally attachable as a universal right in accordance with § 331 OEO and that this is possible regardless of whether the universal right in the specific case also includes executive access in the specific case to the right claimed to be usable or not. To the extent that the complainant objects that individual rights of the obligated party were not attachable, this was not the subject of the procedure regarding the application for the attachment of all trustor rights.

In the light of the fact that there is no entitlement to detailed justification and that the constitutional obligation to justify only contains a minimal right to justification, the Supreme Court, as just shown, not only fulfilled its duty to justify it, but even detailed and detailed it, which is why he considers a pledge of organ appointment and dismissal rights as a pledge. In addition, the complainant even test in her individual complaint that the OOGH is "only" critically concerned about the lienability of the right to order. The State Court is not aware of what the applicant is trying to gain from this. As a result, the complainant's statements and objections to para. 5.5 of your individual complaint. In this respect, there is no violation of the obligation to state reasons.

6.3.   The complainant rugt further argues that the Supreme Court, on the one hand, has ignored the "file situation" and, on the other hand, has pledged rights that are not attachable at all. The Supreme Court ultimately only looked at the claims of the operating party and the file situation and the "adversary's" argument based on this.

The State Court has already indicated that the contested decision did not "seize non-attachable rights", as the appellant believes. The State Court has also already stated that the Supreme Court has detailed and, in the State Court's view, correct grounds that the overall rights, namely those of the party involved as trustor, protector and beneficiary of the Alpha Trust vis-à-vis the complainant, can be pledged. In this respect, it is not necessary for the State Court to go into the appellant's repeated statements.

If the complainant adds on this topic that "not only the rights of the obligated person have been seized", this does not open up to the State Court of Justice in advance, since with the execution permit of November 21, 2016 (ON 3), now confirmed by the contested decision, the rights belonging to the obliged party as trustor, protector and beneficiary of the Alpha Trust have been seized. If the appellant continues to object that the Supreme Court has not (specifically) dealt with the file situation and to this extent also ignores arguments of "the opponent", the appellant is again to be referred to the above statements by the State Court, from which it follows that it results casually the Supreme Court correctly assumed, particularly on the basis of the execution request, that the position of the party concerned as the giver, protector and beneficiary of the Alpha Trust vis-à-vis the complainant and the resulting rights of the party concerned against the complainant. As part of the approval of the execution, it must be checked, based on the case law, on the basis of the execution request whether the right drawn into execution is accessible for exploitation. No further check is required. The grant court does not even have to check whether the pledged right exists (cf. Oberhammer, op. Cit., N 10 on § 331 OEO). All of this results in the conclusion that the Supreme Court was not required to respond to the complainant's point. 5.1 of your individual complaint.

6.4    Contrary to the appellant's view, the Supreme Court did not simply point out the lack of obvious usability to the position mentioned by the appellant in the contested decision, cf. P. 42 in ON 72, trimmed. Rather, the Supreme Court has substantiated other points in the contested decision with reference to teaching and case law, which is why it cannot be assumed that it is obviously unusable. In particular, the Supreme Court has stated that in the light of the execution request made by the respondent, which is relevant to the Supreme Court in several respects (see p. 38 ff. In ON 72), it turns out that there is no obvious unusability (cf. also the reference of the Supreme Court on p. 42 of the contested decision). As mentioned, the contested decision contains various other versions of the (indirect) usability of the liened rights (see in particular p. 42 ff. And p. 50 ff. In ON 72), which is why there can be no question that the usability or the fact that the pledged rights were obviously not usable, as claimed by the complainant, had not been substantiated. There was therefore no violation of the duty to justify the complainant regarding this complaint. (...)

**5.**    With a document dated July 24th, 2017 (ON 34), more specifically with a document dated February 11th, 2020 (ON 105), the operating party submitted the application for recovery evident from the award. To substantiate the reason, it was summarized that the objective of the execution in question was to remove the assets from the Alpha Trust, where the operating party could then access these assets executive. According to Art. 244 Para. 1 EO, the operating creditor had to be authorized to carry out the necessary legal acts on behalf of the obligated party. It was not necessary that the exercise of individual powers of the obligated person immediately made use of an asset, as long and insofar as the concrete exercise - albeit indirectly - aimed at enforcing the debtor's assets.

As a possible method of exploitation, the operating party should in particular be authorized to request the removal of the previous trustees of the Alpha Trust and the appointment of a person

designated by the operating party as a trustee of the Alpha Trust instead of the obligated party to the Alpha Trust and then by the operating party certain trustee of the Alpha Trust to request the distribution of the amount of CHF 91,595,445.97 plus costs and interest to the obliged party to a paying agent to be determined by the operating party and instead of the obligated party this distribution and its implementation in its position as protector and Agree to beneficiary.

An alternative variant would be to authorize the operating party to make a distribution directly to the beneficiary, which the operating party could simultaneously exercise under Article 244 (2) EO.

6.   he obliged party applied for rejection, possibly rejecting the application for recycling (ON 88 and 97) and summarized the following reasons:

The operating party had failed to state to what extent the total rights of the obligated party or individual rights from them would be subject to exploitation. The operating party had not fulfilled its substantiation obligation and the application for exploitation had to be rejected for this reason alone.

Even if the application for exploitation were formally admissible, the content would have to be rejected after there was no usability of the total rights of the obligated party or individual rights resulting therefrom.

The Alpha Trust beneficiaries were all discretionary beneficiaries. There was therefore no reason why the obligated party should receive a sum of over USD 80 million from the trust assets.

In addition, any monetary claims of the obligated party against the Alpha Trust from their position as trustor and beneficiary had already been seized in the procedure on 08 EX.2016.839. The rights of the obligated party against the Alpha Trust from their position as a protector would only be rights of consent and no rights that are worth doing. The operating party could therefore simply not get any money.

Since the obligated party had neither reserved the right of cancellation nor the right to change, the overall rights were not subject to exploitation. In line with the principle of gradual enforcement, the operating party must also first make use of the monetary claims and payment claims to which the obligated party was entitled as beneficial owner, trustor, beneficiary and client of the Alpha Trust on 08 EX.2016.839 could pledge further rights.

Moreover, the proportionality of the recovery is lacking. First of all, a sale had to be made with regard to the pledge made on 08 EX.2016.839. On the other hand, the exploitation proposals of the operating party would disproportionately interfere with the nature of the Alpha Trust. Finally, the operating party circumvents the contestation procedure and the shortening of the party rights of the obligated party.

7.   The third-party debtor argued that the application for recovery had to be rejected because the rights seized could not be used. The exploitation of recall and appointment rights by the operating party would also be an inadmissible because, among other things, disproportionate interference in the nature and organizational structure of the trust. The seized rights were not granted access to the trust assets. It is therefore not possible for the operating party to obtain satisfaction from the seized rights.

8.   Based on the documents submitted by the parties, in particular documents according to ON 1 [Certified copy of the Final Award of the London Court of International Arbitration for Case No. 101721 of 11 November 2014, Supplement Al, LCIA Rules 1998 in German and English, Supplement A.2, LCIA Rules 2014 in English, Supplement A.3, List of interpreters and translators approved before Liechtenstein courts and administrative authorities, Stand 1

October 2015, supplement A.4, correction of the award of January 9, 2015, supplement A.5, certified translation of the correction of the award of January 9, 2015, supplement A.6, decision of the Princely Regional Court of February 24 2016, 08 EX.2016.839, ON 4, supplement A.7, certified extract from the commercial register of the Alpha Trust of February 12, 2016, supplement A.8, certified extract from the Flandels Register of CTX Treuhand AG of February 11, 2016, supplement A.9, declaration of Trust dated May 27, 2015 including German translation (in the envelope), enclosure A.10, Written Instrument dated June 2, 2015 including German translation (in the envelope), enclosure A.ll, Minutes of a Meeting of fhe Directors of CTX Treuhand AG as Trustees of the Al pha Trust of July 3, 2015 (in the envelope), Supplement A.12, Letter of Wishes of July 3, 2015 (in the envelope) including German translation, Supplement A.13, Instrument of Nomination of July 3, 2015 (in the envelope) including German translation, enclosure A. 14, declaration of Menelaus Kyprianou to case no. 14-CV-09764-R, United States District Court California (September 2015), Supplement A.l5, Second Witness Statment by Ashot Yegiazaryan in the Kerimov procedure dated February 17, 2013, including extracts from German translation, Supplement Al 6, proof of transfer from CMB Monaco - Campagnie Monegasque de Banque of May 6, 2015, enclosure A. 17, email Jamra & Jamra LLP of July 17, 2015 including German translation, enclosure A.18, email Roland Anteau of August 6, 2015 to Codex Treuhand AG including German translation, enclosure A. 19, right stipulation. Advance Distribution of Funds, etc. dated July 6, 2015, including extracts from German translation, supplement A.20, Instructions to the Trustee from July 28, 2015, including German translation, supplement A.21, email Yegiazaryan to Nikolaus Wilhelm from 21. July 2015 (18:49) including German translation, enclosure A.22 and responsive declaration on case no. BD 595136 of August 18, 2015 including German translation, Supplement A.23], Memorandum of points and Authorities including extract translation (Supplement B), interrogation minutes of 23/24 June 2015 and 11/07/2017 including extract translation (Supplement C), judgment dated 31.05.2018 (supplement D), certificate dated 08.06.2017 (supplement Dl), individual complaint dated 10.10.2018 (supplement D2), questioning the suspect (supplement E), email dated 18.06.2015 (supplement F), email dated 01.07 .2015 (Enclosure G), Letter of wishes dated 03.07.2015 (Enclosure H), form dated 03.06.2015 (Enclosure I), signature card of the CMB including extracts (Enclosure J), letter 02.06.2015 (Enclosure K), payment order (Attachment L), transfer confirmation 26.08.2015 (Attachment M), transfer confirmation from 11.08.2015 (Attachment N), transfer confirmation from 27.07.2015 (Attachment O), transfer confirmation from 25.06.2015 (Attachment P), payment order from 16.12.2015 ( Enclosure Q), Invoice Drew Holinger June 5, 2016 (Enclosure R), Right Request for help (supplement S), email 30.10.2019 (supplement T), brief 15.03.2019 (supplement U), brief 12.03.2019 (supplement V), minutes to CG.2019.5 (supplement W), edict of 23.09.2016 (supplement X), decision oOGH of April 26, 2018 (Appendix 1), extract from PSR 2018/21, S, 90ff (Appendix 2), decision OG of April 11, 2017 on 11 UR.2016.77-119 (Appendix 3), certificate of June 8 .2017 (supplement Dl), individual complaint dated 10.10.2018 (supplement D2) and the ed. Act 08 EX.2016.839 the following facts can be assumed:

The Alpha Trust is a trust established on May 27, 2015 in accordance with Liechtenstein law. The trust has been registered in the Liechtenstein commercial register since November 30, 2015 under registration number FL-0002.510.771-1. CTX Treuhand AG acts as the sole trustee.

(Appendix A8)

CTX Treuhand AG is a stock corporation established under Liechtenstein law with its registered office at 9490 Vaduz, Lava-Center. It has been registered in the Liechtenstein Commercial Register since November 27, 2001 under the registration number FL-0002.042.435-5 and is (among other things) by members of the Board of Directors Dr. Thomas

Wilhelm and lic.iur. Martin Hornig represented. Nikolaus Wilhelm is an authorized signatory with collective signing rights for two.

(Appendix A9)

The Alpha Trust's trust agreement, the "Declaration of Trust" of May 27, 2015, has the following content, among others:

THIS TRUST DECLARATION will take place on May 27, two thousand and fifteen

**BY**

CTX Treuhand AG ("Trustee", whereby the term - if the context allows it - includes the person or trustees of the trust in question).

**REQUIREMENTS**

i.      The trustees confirm that they have received the assets specified in the second appendix, to trust it according to the following conditions.

ii.     This trust is established irrevocably.

iii.    This trust is referred to as 'ALPHA TRUST'.

**THIS CERTIFICATE TESTED** THE FOLLOWING:

**1.      Definitions**

(...)

1.1.2. "The beneficiaries" are and include the persons named or described in the third appendix;

(...)

**3.      Termination of the loyalty relationship**

The trustees have the authority to set a date in a certificate (which is not earlier than the date of issue of this certificate), which is to be regarded as the end of the trust relationship.

**4.      Sale of trust assets**

The Trustees will, on their own discretion, manage the Trust Assets with respect to investments or property (other than money) to sell, collect or convert all or part of those Investments or assets, but convert them into money, but with the possibility of such sale, collection Or postpone the conversion and allow the investment to be preserved and the money to be fiduciary, with the same discretion to invest the money or property on their behalf or under your control in a manner approved by this trust or the law , and the authority to change these facilities or to exchange them for other permitted facilities if they consider it appropriate to do so.

**5.      Income and capital trusteeship**

5.1     The trustees administer the capital and the income of the trust assets in trust for the benefit of all, one or more beneficiaries, whereby one or more other beneficiaries may be excluded, in the form of shares or in a specific relationship if more than one beneficiary is intended and on the basis of powers and provisions for their maintenance, training, further development or other advantages or for the accumulation of income (including administrative powers and provisions or discretionary trusts and powers which are to be carried out or exercised by one or more persons, whether as Trustees act or not, or whether the trustee or a trustee is included or not), so that the exercise of

21

this authority to determine beneficiaries can be delegated to a certain extent and in a manner that the trustee can obtain through one or more deeds, the during the Tru st duration may be revoked or may be irrevocable and may be exercised during the trust duration, however it is REQUIRED that the exercise of this authority requires a prior payment or use of all or part or all of the capital or income is not invalidated from the trust assets that were granted within the framework of a power granted by this document or by law.

5.2   Up to a provision according to clause 5.1., Dependent or in the absence thereof

5.2.1   the trustees pay the income of the trust property to all, a certain or several beneficiaries or use it in their favor, whereby the other or others can be excluded if available at the respective time and - in the case of several beneficiaries - in shares and in a manner that the Trustees deem appropriate at their sole discretion.

5.2.2   Notwithstanding the provisions in clause 5.2.1. At any time during the trust duration, the trustees may, at their sole discretion, accumulate the income by compounding instead of using it in whole or in part by investing the income or "the resulting income" in a manner or otherwise use that permitted by this deed or the law; on the basis of clause 5.2.3., they manage these capital accumulations as capital growth.

5.2.3   The trustees can, at one or more times during the trust duration, use the information specified in sub-section 5.2.2. Use all or part of the accumulated income as if it were income that accrued in the respective year.

5.2.4   Regardless of the powers of attorney and provisions listed and contained in this clause, the Trustees may

5.2.4.1 Pay the capital of the trust assets in whole or in part to all, one or more beneficiaries to the exclusion of other beneficiaries or use them in their favor at any time during the duration of the trust, whereby corresponding shares must be provided for several beneficiaries and disbursement or use may be made in a manner that the trustees deem appropriate at their sole discretion.

5.2.4.2.  Pay income or capital from the trust assets to the trustees of another trust, regardless of the place of establishment in which one or more beneficiaries are involved (regardless of whether all beneficiaries or one or more beneficiaries are the only persons who are involved in this trust other trusts are involved or qualify as beneficiaries) if the trustees believe, at their sole discretion, that this payment or transfer should benefit one or more beneficiaries.

5.3.   If the aforementioned powers, which were granted to the trustees by the previous sub-points, are not exercised, and depending on the exercise of these powers, the trustees may have the trust assets at the expiry of the trust duration, with the beneficiaries living at the relevant time, received absolutely identical parts.

5.4   On the basis of the above statements and if and insofar as the trust's capital and income are not sold as a whole for any reason in accordance with the above provisions, the trust's capital and income are administered in trust for the Red Cross and Amnesty International, and in the event of failure this trust for charity in general.

(...)

## 8.   Authority. Add beneficiaries and exclude them

8.1.   The trustees can declare in writing at any time during the trust period that

8.1.1.  a person, group or description of people is no longer a beneficiary, so that this person, group or description of people is then no longer a beneficiary than if this beneficiary had originally been expressly excluded as a beneficiary, but without prejudice to previous payments of capital or income to this beneficiary.

8.1.2.  a person, group or description of persons who has been designated by the trustees is now the beneficiary, provided that the addition of beneficiaries does not affect, change or influence the provision for the use of capital or income that has already been made.

(...)

## 10.  Change of trustees

10.1.   At least two trustees or one trust company and a maximum of five trustees must be provided for this trust.

10.2.   With more than one appointed trustee, all trustees must act unanimously. However, the trustees have the right to delegate all business transactions, the exercise of powers and discretionary powers to one or more of their co-trustees, provided that they deem this transfer advisable at their own discretion.

10.3.   A trustee who wishes to withdraw and / or be released from the trustee relationship can send a written message to the fiduciary officers (if any) and to the person (s) authorized to appoint new trustees and will do so one month after dismissed upon dispatch of this message, or at an earlier date if the person (s) authorized to appoint new trustees give their written consent in accordance with the provisions of clause 10, provided that such dismissal will not take effect until after Dismissal at least one trustee exists.

10.4.   If a trustee steps down and is released from all fiduciary relationships, or refuses to act or becomes incapable of acting, or is no longer able to do business or dies, or if a company acting as a trustee is dissolved, then appointed

10.4.1. the protector, or if he has died (or is a company that is being dissolved), or if he is unable or unwilling to act;

10.4.2. the beneficiaries (other than charities) if they are able to do business and make a majority decision, or if they are unable or unwilling to act;

10.4.3. the trustees in office or if there are no trustees;

10.4.4 the Liechtenstein District Court of Vaduz, by means of a written document, one or more persons, regardless of whether they live at the administrative seat of the trust or in another place, to trustees at the place of the deceased or dissolved trustee or the trustee who might be released Action refused or incapable of action or no longer capable of doing business as stated above.

10.5.   The person responsible for appointing new trustees in accordance with 10.4.1. and 10.4.2. in the same order as described above, one or more persons may be appointed as further trustees until the maximum permitted number has been reached.

10.6.   A trustee can live anywhere in the world.

10.7.   The person authorized to appoint additional trustees can at any time and without reason remove one or more trustees by sending a written notice.

## 11.  Power to delegate

11.1.   A trustee has the authority (irrespective of any other statutory provisions) to delegate to a person the exercise or exercise of all trustee powers and discretions, which the hereby trusts,

23

with a document that can be revoked during the trust period or that is irrevocable or transferred by law.

**12.   Power to change or revoke**

12.1.   The Trustees may, at their discretion, change the provisions of this deed at any time, the exercise of this authority not having the effect of revoking this Trust.

**13.   Other powers**

13.1.   In addition and without prejudice to all legal powers, the Trustees have the powers and immunities defined in the first Appendix, provided that the Trustees do not exercise any of the powers to conflict with the terms of this Trust in connection with the benefits.

**14.   The protector**

14.1.   The protector may reside or, in the case of a company, be based anywhere in the world.

14.2.   The first protector is Ashot Egiazaryan.

14.3.   The Protector may delegate or delegate its powers, rights and / or responsibilities for a certain period of time or permanently at any time to a person or persons, and under conditions that it deems appropriate, always assuming that this transfer takes place first takes effect when the trustees have been informed in writing.

14.3.1. If this transfer fails or there is no protector, or if a protector dies (or - in the case of a company - is dissolved) or is unable or unwilling to act without valid transfer of its powers, rights and / or obligations, then appoint /appoint

14.3.1.1.the beneficiaries (except in the case of charities) who are business-minded and who make a majority decision or if they are unable or unwilling to act

14.3.1.2.the Liechtenstein District Court Vaduz a protector within 90 days.

14.4.   For the exercise of powers and rights under clauses 2.4., 2.5.1., 3.5., 8., 11., 12., 16.2., 16.3. and Clause 11 of the first Appendix by the Trustees requires the Protector's written consent.

(...)

**16.   Accountability and information**

16.1.   De Treuhander kept a complete and accurate record of all transactions related to the trust assets.

16.2.   The records are available to the beneficiaries or their legal or duly authorized representatives for review within a reasonable period of time. Notwithstanding the above, the trustees are not obliged to inform a beneficiary of the beneficiaries to whom they have provided capital or income from the trust assets or to which beneficiaries they have made a payment from the capital or income of the trust assets; nor do they need to give reasons for exercising or not exercising, or exercising their powers, rights, and discretion under the trust.

16.3.   The trustees can appoint a control body according to Art. 923 PGR at their own discretion, the control body then being the only person who receives the information mentioned above.

(...)

THIRD ANNEX

1.   Ashot Egiazaryan

2.   A person or persons who designate the trustees as additional beneficiaries.

(Appendix A10)

This trust agreement will be supplemented by the "Written Instrument" of June 2, 2015, which was concluded between the trustee CTX on the one hand and the obligated person in his capacity as protector of the Alpha Trust and signed by the obligated person.

(1)    In exercising the powers set out in clause 12 of the main deed, the trustee hereby changes the following paragraphs of the main deed:

(A)    Paragraph 14.4 now has the following wording: "The protector's prior written consent is required if the trustees exercise their powers and rights under clauses 2.4, 2.5.1, 3., 5., 8., 11., 12., 16.2., 16.3 and exercise the powers in the first appendix ".

(B)    In paragraph 14, the following clause is added:

"May 14th The protector has the authority to dismiss and appoint trustees by written instructions. "

(Appendix A11)

The letter of wishes of 27 May 2015, signed by the obligated party, has the following content:

LETTER OF WISHES BY MR ASHOT EGIAZARYAN

To: The trustees of the ALPHA TRUST, set up on May 27, 2015

1.    You are the trustee of the ALPHA Trust, established on May 27, 2015.

2.    I am creating this Letter of Wishes to let you know my wishes regarding the management of trust assets both during my lifetime and after my death. In relation to the ALPHA Trust, this is my first letter of wishes. I reserve the right to revoke or change requests at any time. The information contained herein does not release you from the need to obtain the protector's consent whenever required by the trust deed.

It is my wish that you include me in the circle of possible beneficiaries of the trusteeship and provide me with income and capital at my request.

Welters it is my wish that you _____ possible in the circle _____ pick up the beneficiary of the trust.

4.    For the time after my death, my wishes are as follows:

A.    If there is an outstanding balance that I owe from the time before the trust was established and which can be legally established to have _____ and _____ and _____, it is my wish that you first settle this before the discretionary beneficiaries benefit from loyalty.

B.    Loyalty must be held in favor of _____.

5.    I am aware that you are not legally bound to follow my requests outlined above, but I hope that you will take my requests into account in exercising your discretion in the trusteeship.

July 3, 2015

Ashot Egiazaryan

(Appendix H)

Nikolaus Wilhelm sent the (new) draft of the Letter of Wishes to the obligated party by email on July 1, 2015, and did the following:

"Attached you will find a new design for your Letter of Wishes.

As of now, you are the first beneficiary of the trust. This means that you have access to the trust fund during your lifetime. If you have a believer and want to pay, you can request a payout to yourself so that you can pay the believer. You don't have to name the believers in the Letter of Wishes. "

(Appendix G)

In the internal form of the third party debtor countersigned by the obligated party regarding the mandate "The Alpha Trust" (form "Discretionary Trust"), the obligated party is listed under point IV. ("Information on curators / protectors and persons authorized to issue instructions").

(Appendix I)

**9.**   From a legal point of view, the following results:

**9.1**   In the present case, the operating party requests the exploitation of the seized rights within the meaning of Art. 244 EO. This provision provides for a two-stage recovery process:

In the first step, the operating party is to be authorized upon application to assert the right of the obligated person on his behalf. For this purpose, it can submit all legal acts for the obligated party that are necessary for this. Due to the fact that in the execution according to Art. 242 ff EO the overall right of the obligated execution object is always, the operating creditor is also authorized to exercise this overall right if this serves to liquidate usable assets. The additional payment in Art. 244 Para. 1 EO ("to request division or initiation of the dispute procedure, to make notices and to make the declarations otherwise necessary for the exercised and utilization of the pledged right for the obligated party") is merely demonstrative. If in the application or Authorization by the court to name such individual powers, this serves the purpose of highlighting the respective powers of the operating creditor ("in particular"). This authorization is a special case of transfer for confiscation (see Oberhammer in Angst / Oberhammer, EO3 § 333 EO Rz 2; Heller / Berger / Stix III 2379; LGZ Wien ZBl 1937/500). The dogmatics developed for the legal consequences of the transfer to confiscation can therefore be used to clarify doubts regarding the authorization under paragraph 1 mutatis mutandis (cf. Oberhammer in Angst / Oberhammer, EO3 § 308 EO Rz 1 ff; 3 Ob 225/07 w ecolex 2008 / 232 = JBl 2008, 726 = RdW 2008/492).

The provisions on the execution of "other property rights" are deliberately formulated "often" in order to allow any access to usable assets of the debtor. This also applies to the provision of Art. 244 Para. 1 EO (cf. Oberhammer, wobl 1997, 252 f), in which no narrow-minded formalism needs to be maintained, particularly with regard to the interpretation of execution requests.

In principle, the rights of the authorized operating creditor are the same as those of the obligated party (Heller / Berger / Stix III 2379; see 3 Ob 165/10 a SZ 2010/127 = ecolex 2011/20 = GesRZ 2011, 126 [Eckert]; RIS-Justiz RS0003934 ).

The fact that the seizure within the meaning of Art. 242 EO also includes all ancillary rights of the obligated party, which he is entitled to against any third-party debtor, becomes much clearer here than with the execution according to Art. 237 ff EO, since this fact already results from this that the execution object in this type of execution is always the "universal right" of the obligated party.

In a second step, in accordance with Art. 244 Para. 2 EO, the wealth used in this way has to be realized. This takes place in the corresponding application of the type of liquidation provided for in the EO for the respective asset. If, for example, movable items are handed over, they are recycled in accordance with paragraph 2 in accordance with the regulations of the Fahrekisekeklung. If the debtor incurs a monetary claim as a result of the exercising of the right by the operating creditor, the provisions of the debt enforcement etc. apply here.

The question remains unanswered as to how, at what point in time, and thus in what degree, the lien of the operating creditor on the assets thus obtained arises with regard to his satisfaction in the context of the liquidation in accordance with Art. 244 para. 2 EO. In this connection,

almost every conceivable opinion is represented (cf. Oberhammer in Angst / Oberhammer, EO3 § 333 Rz 6 ff; Frauenberger in Burgstaller / Deixler-Hubner, EO § 333 Rz 3 ff; Heller / Berger / Stix III 2394 ff mwN).

There is much to suggest that after the successful exercising of the right of the obligated by the operating creditor in accordance with Art. 244 Para. 1 EO, there is no renewed attachment of the assets used. This was not least the result of the systematic interpretation of paragraph 2 leg. Cit. surrender; This also applies to the execution of claims (in which, for example, the right of lien on the ipso iure claim is converted into one based on a court order pursuant to Art. 228 EO without requiring a new pledge) and in the execution of claims for surrender pursuant to Art. 237 ff EO ( in which the lien on the ipso iure surrender claim is also converted into a lien on the surrendered item), no new pledge of the collection realty is provided. Above all, the parallel provision of Art. 238 Para. 2 EO is clearly based on the fact that after the EO, in the wake of the successful "use" of an asset by confiscation of a claim aimed at it, it is only a matter of recovery, but not of a new pledge of the Realisats is coming.

**9.2**   In the present case, the exploitation must - as requested - be done by authorizing the operating party to assert the seized rights on behalf of the obligated party and to carry out the necessary legal acts on behalf of the obligated party (Art. 244 (1) EO). In principle, the court does not have to pay for individual legal acts in question. It is sufficient if - as requested in the present case - the operating creditor, under the custody of the seized property right, is exercised to exercise the rights to which the obligated person is entitled or to carry out the required general legal acts on behalf of the obligated person, which have been pledged with the relevant execution license. As stated, it is not necessary that the exercise of individual powers of the obligated person immediately make use of an asset, as long as and to the extent that the concrete exercise - albeit indirectly - is aimed at bringing the obliged entity's assets to execution.

In accordance with Art. 244 Para. 2 EO, the operating party has the execution of the leg.cit in the manner of Paragraph 2. assets used (these are all conceivable proceeds from the trust). Even if - as explained above - there is much to suggest that the lien on the real estate obtained by means of the execution permit has an effect in accordance with Art. 244 Para. 2 leg. Cit. Into a pledge on these assets had to be granted to the requesting party in view of the different - quite different - opinions represented in teaching and jurisprudence. In any case, it should be clearly stated for debtors and third parties what the The third-party debtor should be prevented from paying to the obligated party by a clear payment ban.

**9.3**   The application for exploitation was therefore to be granted in full. The design rights and legal acts of the obligated party specified by the operating party, which the operating party is to be authorized to exercise, can all be transferred and are at least indirectly relevant in terms of property law. All of them are usable and worthwhile. The dismissal of the previous trustee and the appointment of new trustees [Art. (1) (B) des Written Instrument], his right to request distributions [Letter of Wishes] or his rights of consent [Art. 14.3 Declaration of Trust in connection with Art. (1) (A) of the Written Instrument] are all suitable for realizing usable assets or for providing access to usable assets.

As already stated by the Supreme Court in ON 72 (rec. 7.4.3.), The obligated person is also entitled to use himself as a trustee, which is legally permissible (Art. 910 para. 5 in conjunction with 932a §40 Paragraph 2 PGR).

According to Art. 14.3 Declaration of Trust in conjunction with Art. (1) (A) of the Written Instrument requires the protector's prior express consent for a large number of the (formally existing) rights and duties and acts of the trustee, in particular:

-        for the termination of the trust by the trustee (Art. 3 Declaration of Trust),

27

- for the administration of the assets of the trust and the results thereof for the benefit of the beneficiaries (Art. 5 Declaration of Trust),

- for the determination of the beneficiaries (Art. 8 Declaration of Trust),

- for the delegation of all rights of the trustee including his discretionary power (Art. 11 Declaration of Trust),

- for the change of provisions of the trust deed (Art. 12 Declaration of Trust).

In any case, the exercise of the individual rights mentioned is suitable for realizing usable assets: the authorization enables the operating party, first of all, to remove the previous trustee of the Alpha Trust (CTX) and to set up one appointed by the operating party instead of the obligated party to the Alpha Trust Desire person as a trustee of the Alpha Trust, secondly then request a distribution - that of the amount owed - from the trustee of the Alpha Trust (to the party due) to the paying party to a paying agent to be determined by the operating party and thirdly instead of the obligated party ( in his position as protector and beneficiary) agree to this distribution and its implementation.

The alternative option requested by the operating party to empower them - on the basis of the Letter of Wishes - to request and approve a distribution directly to the beneficiary is undoubtedly a valuable right, especially since the operating party is entitled to this distribution according to Art .244 para. 2 EO can be accessed executive.

Finally, the exercise of the rights from the Letter of Wishes (appointment of the operating party as beneficiary, request and approval of the distribution to them) can be exploited and gives the operating party access to usable assets.

**9.4** The objections of the obligated party and the third-party debtor repeat for a long time what is stated in the appeals in the "pledge procedure", which is no longer relevant in the current liquidation process and on which the Supreme Court and the State Court have already carried out a lot of conclusive and legally binding have to make a decision so that there is no further discussion

The application for recovery was made in good time, sufficiently substantiated and undoubtedly admissible. In the sense of the cited case law of the Supreme Court and the State Court, the total rights seized are basically usable and, as explained above, these are also the individual design rights and actions to which the operating party is to be authorized.

As the Supreme Court has already stated, even an actual discretionary discretion would not prevent the exploitation of the liened rights (ON 72, rec. 7.4.3., See also rec. 7.6.4.). The operating party also rightly points out that - even if one wanted to formally manage the administration based on the exercise of discretion - this would not change the fact that the titled claim of the operating party could be satisfied from the trust assets.

Even if the obligated party submits, based on the case law, that a right of recall is only used to "control and enforce the duties of the trustee", at the same time they must concede that in this case the right of the protector to appoint and remove the trustee of the Alpha Trust " according to the documents not bound by requirements ". From this point of view, the obligated person is simply entitled - at least objectively speaking - the right to appoint and remove the trustee, without there being any prerequisite or the obligated person having to state the reason. But even if one interpreted the trust deed subjectively like foundation statutes, when looking at the letter of wishes, one comes to no other conclusion than that the obligated party wanted to secure control over the trust assets - among other things with the competence to remove the trustee.

If the obligated party addresses the "principle of proportionality" and makes an "unwritten constitutional principle" for this purpose, it is referred to Art. 9 EO, where this principle has become a legal text. Accordingly, the simultaneous use of several execution agents is permitted. Only if the execution request clearly shows that one or more of the requested means of execution are sufficient to satisfy the operating Gldubiger can the permit be restricted to individual means of execution. The latter is not asserted by the obligated party, let alone certified.

Regarding the submissions of the obligated party regarding their legal interrogation, reference should be made to the fact that, according to Art. 242 Para. 2 EO, the type of recovery after the interrogation must be determined, inter alia, by the obligated party. This means an interrogation according to Art. 34 EO, which can take place verbally or by requesting a written statement. Which form the court chooses is at its own discretion. The law expressly stipulates that the provisions of Art. 38 EO applicable to the oral proceedings, which primarily concern the keeping of the minutes, do not apply to the questioning. Rather, it is enough to record the result of the interrogation in a short file note (Art. 34 Para. 1 EO).

In the present case, the court requested the obliged party by decision of November 9, 2018 (ON 80) to process the application for exploitation by the operating party of July 24, 2017 (ON 34) in accordance with Art. 242 (2) in conjunction with Art. 34 EO within 14 days after the delivery of this decision in writing, otherwise it is assumed that she agrees to this application (Art. 34 and Art. 35 paras. 2 and 3 EO) ". The obliged party has also expressed itself, even twice in detail, with briefs dated November 28, 2018 (ON 88) and December 20, 2019 (ON 97). Because both sides have requested the holding of a statute (at the hearing), which is not required by law, the court has - to avoid back and forth written statements and counter-statements [also in the sense of the case law to protect the legal Obedient] - such an order also arranged to conclusively and with the simultaneous presence of the parties to negotiate the exploitation request (adversarial).

As can be seen from Art. 34 Para. 3 EO, the evidence in the execution proceedings is fundamentally not restricted. In addition to the certificates and evidence "according to the provisions of the Code of Civil Procedure", the court has all the appropriate surveys at its disposal. The questioning of the parties or parties - as explained above under Article 34 (1) EO - is not necessarily two-sided and a formal, direct party questioning comes into question only where the law provides for a hearing (such as Art. 140 para. 1 EO - Most Bots distribution or Art. 290 para. 3 let. c EO - opposition hearing) and in the case of Art. 242 para. 2 EO the law only provides for an interrogation, but not an oral hearing. And the interrogation has ordered the court in writing. The obligated party also submitted a written opinion in accordance with the judicial order and was thus within the meaning of Art. 34 EO, there was and is no room for formal, direct or even legal interrogation of the obliged party and had the ver obliged the party "all the time in the world" to prove its allegations (and has also used the written consent given to do so).

For the rest, reference should be made once again to the statements of the Supreme Court and the Court of Justice, which the objections of the obligated party and the third-party debtor have raised, reproduced above.

**9.5**    The costs recorded by the operating party in the process of recovery in good time and essentially correct (there was no resolution fee and could not be awarded; the contestant surcharge for document ON 105 and the Articles of Association of February 18, 2020 did not apply) were included as further execution costs CHF 83,297.75 to be determined.

Princely country court

Vaduz, 02.03.2020

Mag. Konrad Lanser

Princely district judge

For the correctness of the copy

Iris Feuerstein

**APPEAL**

Against this decision, the appeal of the appeal to the Furstliche Obergericht, Vaduz, is admissible within the indefinite period of 14 days from delivery. He has a specific explanation of the extent to which the decision is contested, a brief description of the reasons for the challenge (grounds for appeal), the factual arguments and the evidence capable of proving the truth of the grounds for appeal, and whether the cancellation or Modification of the decision and, if applicable, which one is to be included (application for appeal).



FÜRSTENTUM LIECHTENSTEIN
**FÜRSTLICHES**
LANDGERICHT

EINGEGANGEN

.09. März 2020

FRIST: 23. 03. 2020 / Ir

Aktenzeichen bitte immer anführen
08 EX.2016.5802
ON 109

# BESCHLUSS

## Rechtssache

| | |
|---|---|
| **Betreibende Partei:** | Vitaly Ivanovich Smagin, REDACTED Moskau |
| | vertreten durch Advocatur Seeger, Frick & Partner AG, Landstrasse 81, 9494 Schaan |
| **Verpflichtete Partei:** | Ashot YEGIAZARYAN, REDACTED Beverly Hills, USA- 90201 California |
| | vertreten durch Advocatur Sprenger & Partner AG, Landstrasse 11, Postfach 140, 9495 Triesen |
| **Drittschuldnerin:** | CTX Treuhand AG als Treuhänderin des Alpha Trust, vertreten durch Wilhelm & Büchel, 9490 Vaduz |
| **wegen:** | Exekutionsbewilligung (StW: CHF 91'605'445.97) |

1.1 Die **VERWERTUNG** der mit Exekutionsbewilligung des Fürstlichen Landgerichts vom 21. November 2016, 08 EX.2016.5802, ON 3, gepfändeten, der verpflichteten Partei **als Treugeber, Protektor und Begünstigter des Alpha Trusts** (FL-0002-510.771-1), c/o Dr. iur. Thomas Wilhelm, Lova Center, FL-9490 Vaduz gegenüber der **CTX Treuhand Aktiengesellschaft** als Treuhänderin des Alpha Trust (FL-0002-510.771-1), c/o Dr .iur. Thomas Wilhelm, Lova Center, FL-9490 Vaduz zustehenden Gesamtrechte, nämlich insbesondere des Rechts zum Erhalt von Zahlungen und Zuwendungen aller Art aus dem Treugut, des Rechts zur Bestellung und Abberufung der Treuhänder des

■   Seite 2   ■

Alpha Trusts (Art. (2) *Written Instrument* vom 2. Juni 2015), des Rechts des Treuhänders zur Beendigung des Trusts (Art. 3, 14.3 *Declaration of Trust* i.V.m. Art. (1) und (2) des *Written Instrument*), des Rechts des Treuhänders zur Bestellung der Begünstigten des Alpha Trusts (Art. 8, 14.3 *Declaration of Trust* i.V.m. Art. (1) und (2) des *Written Instrument*), des Rechts des Treuhänders zur Änderung der Treuhandurkunden des Alpha Trusts (Art. 12, 14.3 *Declaration of Trust* i.V.m. Art. (1) und (2) des *Written Instrument*), des Rechts des Treuhänders zur Delegation sämtlicher Rechte des Treuhänders einschliesslich seiner Ermessensbefugnisse (Art. 11,14.3 *Declaration of Trust* i.V.m. Art. (1) und (2) des *Written Instrument*) und des Rechts des Treuhänders zur Ausübung sämtlicher der im *First Schedule* des *Declaration of Trust* festgelegten Rechte (Art. 11, 14.3 *Declaration of Trust* i.V.m. Art. (1) und (2) des *Written Instrument*), wird **bewilligt**, und zwar durch

**Ermächtigung** der betreibenden Partei, die oben bezeichneten Rechte der verpflichteten Partei anstelle des Verpflichteten geltend zu machen, nämlich insbesondere:

**a)   Abberufung der CTX:**

Das Recht anstelle des Verpflichteten gemäss Art. 14.05 des Trust Deeds des Alpha Trusts i.d.F.d. des *Written Instruments* vom 2.6.2015 die bisherige Treuhänderin des Alpha Trusts, die CTX Treuhand AG, Lova-Center, 9490 Vaduz mit sofortiger Wirkung abzuberufen.

**b)   Benennung neuer Treuhänder:**

Im Einklang mit Art. 10.1. der Treuurkunde neue Treuhänder des Alpha Trust zu benennen und zu bestellen,

- sei dies die betreibende Partei,
- *die* Herren Rechtsanwälte Mag.iur. Rudolf Schächle und lic. iur. Raphael Näscher oder
- sonstige von der betreibenden Partei bestimmte natürliche Personen oder eine Treuhandgesellschaft mit Sitz im In- oder Ausland,

**c) Ausschüttung an Yegiazarian begehren und genehmigen:**

Von der gegenwärtigen oder neu bestellten Treuhänderin des Alpha Trust anstelle des Verpflichteten auf Basis des Letter of Wishes des Verpflichteten vom 3.7.2015 und der Treuurkunde des Alpha Trusts i.d.F.d. des Written Instruments vom 2.6.2015 sowie auf Basis seines tatsächlich bestehenden Instruktionsrechts gegenüber der Treuhänderin des Alpha Trusts

- die Ausschüttung der verfahrensgegenständlich vollstreckbaren Forderung von CHF 91'595'445.97 (08 EX.2016.5802, ON 3) zuzüglich Zinsen (nämlich vierteljährlich aufgezinsten Jahreszinssatz von 8% aus USD 72'243'000.00 und USD 6'899'701.32 seit 15. November 2016) und Kosten an die verpflichtete Partei an eine von der betreibenden Partei zu bestimmende Zahlstelle zu fordern und zu wünschen, und
- anstelle des Verpflichteten dieser Ausschüttung und ihrer Durchführung (einschliesslich der von der betreibenden Partei bestimmten Zahlstelle) in seiner Position als Protektor (i.S.d. Art. 14.4 i.V.m. Art. 8.1.2 des Trust Deeds des Alpha Trust vom 27.5.2015 i.d.F.d. des Written Instruments vom 2.6.2015) und Begünstigter (i.S.d. Art. 1.1.2 und des Third Schedules des Trust Deeds des Alpha Trust vom 27.5.2015) zuzustimmen.

**d) Rechte aus der Vereinbarung zum Letter of Wishes ausüben:**

Von der gegenwärtigen oder neu bestellten Treuhänderin des Alpha Trust anstelle des Verpflichteten auf Basis der Rechte des Verpflichteten gemäss der Vereinbarung zum Letter of Wishes vom 3.7.2015

- die Bestellung der betreibenden Partei als Begünstigter des Alpha Trusts,
- die Ausschüttung der verfahrensgegenständlich vollstreckbaren Forderung von CHF 91'595'445.97 (08 EX.2016.5802, ON 3) zuzüglich Zinsen (nämlich vierteljährlich aufgezinsten Jahreszinssatz von 8% aus USD 72'243'000.00 und USD 6'899'701.32 seit 15. November 2016) und Kosten an die betreibende Partei (in deren Eigenschaft als bestellte Begünstigte) zu fordern und zu wünschen, sowie
- anstelle des Verpflichteten dieser Ausschüttung und ihrer Durchführung (einschliesslich der von der betreibenden Partei bestimmten Zahlstelle) in seiner Position als Protektor (i.S.d. Art.

14.4 i.V.m. Art. 8.1.2 des Trust Deeds des Alpha Trust vom 27.5.2015 i.d.F.d. des Written Instruments vom 2.6.2015) und Begünstigter (i.S.d. Art. 1.1.2 und des Third Schedules des Trust Deeds des Alpha Trust vom 27.5.2015) zuzustimmen

**e)   Administrative Rechte des Protektors zur Durchführung ausüben:**

Anstelle des Verpflichteten auf Basis der Treuurkunde des Alpha Trusts i.d.F.d. des Written Instruments vom 2.6.2015 die Zustimmung zu Handlungen des Treuhänders gemäss der Punkte 4,11,16.2 und des First Schedule der Treuurkunde geben sowie alle Informationsrechte des Verpflichteten gegenüber dem Treuhänder auszuüben.

**1.2**   Die **Pfändung** der der verpflichteten Partei aufgrund der gegenständlichen Verwertung nach Ziff. 1.1 gegen den Alpha Trust bzw. dessen Treuhänder zustehenden Geldforderungen und Zahlungsansprüche, insbesondere Ausschüttungsansprüche in Höhe von CHF 91'595'445.97 und **Überweisung** dieser gepfändeten Forderungen zur Einziehung bis zur Höhe der vollstreckbaren Forderung unbeschadet etwa früher erworbener Rechte dritter Personen, wird bewilligt.

Der Drittschuldnerin wird verboten, an die verpflichtete Partei Zahlung zu leisten. Letzterer wird jede Verfügung über die gepfändete Forderung sowie über das für sie bestellte Pfand insbesondere die gänzliche oder teilweise Einziehung dieser Forderung untersagt. Mit Zustellung dieses Zahlungsverbotes an die Drittschuldnerin ist die bewilligte Pfändung als bewirkt anzusehen und zu Gunsten der vollstreckbaren Forderung der betreibenden Partei an der oben bezeichneten Forderung ein Pfandrecht erworben.

**2.**   Die weiteren Exekutionskosten der betreibenden Partei werden mit CHF 83'297.75 bestimmt.

■ Seite 5 ■

# Begründung

1. Mit Beschluss bzw. Exekutionsbewilligung vom 21.11.2016 (ON 3) hat dieses Gericht wie folgt entschieden:

Aufgrund des vollstreckbaren Schiedsspruches des London Court of International Arbitration (LCIA), London, Grossbritannien, vom 11. November 2014 (…)

wird der betreibenden Partei, Vitaly Ivanovich SMAGIN, REDACTED REDACTED Moskau, Russland,

wider die verpflichtete Partei Ashot YEGIAZARYAN, REDACTED , Beverly Hills, California, Vereinigte Staaten von Amerika,

zur Hereinbringung der vollstreckbaren Forderung von

a. USD 72'243'000.00 (an Hauptsache), und
b. USD 6'899'701.32 (an kapitalisierten Zinsen) und
c. GBP 2'776'473.68 und USD 672'354.08 und RUB 2'958'750.00 (an Kosten) und
d. weiteren Zinsen in Höhe eines vierteljährlich aufgezinsten Jahreszinssatz von 8% aus USD 72'243'000.00 und USD 6'899'701.32 seit 11. November 2014 sowie
e. der mit CHF 63'880.00 bestimmten Kosten des Exekutionsantrages,

die Exekution bewilligt durch

1. Pfändung der der verpflichteten Partei als Treugeber, Protektor und Begünstigter des Alpha Trusts (FL-0002.510.771-1), c/o Dr.iur. Thomas Wilhelm, Lova Center, 9490 Vaduz, gegenüber der

CTX Treuhand Aktiengesellschaft als Treuhänderin des Alpha Trust (FL-0002-510.771-1), c/o Dr.iur. Thomas Wilhelm, Lova Center, FL- 9490 Vaduz,

zustehenden Gesamtrechte, insbesondere das Recht zum Erhalt von Zahlungen und Zuwendungen aller Art aus dem Treugut, das Recht zur Bestellung und Abberufung der Treuhänder des Alpha Trusts (Art. (2) Written Instrument vom 2. Juni 2015), das Recht des Treuhänders zur Beendigung des Trusts (Art. 3, 14.3 Declaration of Trust i.V.m. Art. (1) und (2) des Written Instrument), das Recht des Treuhänders zur Bestellung des Begünstigten des Alpha Trusts (Art. 8, 14.3 Declaration of Trust i.V.m. Art. (1) und (2) des Written Instrument), das Recht des Treuhänders zur Änderung der Treuhandurkunden des Alpha Trusts (Art. 12, 14.3 Declaration of Trust i.V.m. Art. (1) und (2) des Written Instrument), das Recht des Treuhänders zur Delegation sämtlicher Rechte des Treuhänders einschliesslich seiner Ermessensbefugnisse (Art. 11, 14.3 Declaration of Trust i.V.m. Art. (1) und (2) des Written Instrument), das Recht des Treuhänders zur Ausübung sämtlicher der im First Schedule des Declaration of Trust festgelegten Rechte (Art. 11, 14.3 Declaration of Trust i.V.m. Art. (1) und (2) des Written Instrument) und den Rechten als Vermögensverwalter des Trusts (Minutes of a Meeting of the Directors of CTX Treuhand AG vom 3. Juni 2015).

■   Seite 6   ■

2. An die verpflichtete Partei Ashot YEGIAZARYAN wird das Gebot erlassen, sich jeder Verfügung über die oben (1.) bezeichneten Rechte zu enthalten.

3. An die CTX Treuhand Aktiengesellschaft als Treuhänderin des Alpha Trust (FL-0002-510.771-1), c/o Dr.iur. Thomas Wilhelm, Lova Center, FL-9490 Vaduz, wird das Verbot erlassen, aus diesen Ansprüchen oder unter Ausübung dieser Rechte (1.) an die verpflichtete Partei Ashot YEGIAZARYAN und/oder einen Dritten zu leisten, insbesondere Weisungen durch die verpflichtete Partei Ashot YEGIAZARYAN zu befolgen und/oder Zustimmungen durch die verpflichtete Partei Ashot YEGIAZARYAN zu akzeptieren und ihren Entscheidungen zugrunde zu legen.

4. Ausgenommen von dieser Exekutionsbewilligung sind die durch die Forderungsexekutionsbewilligung des Fürstlichen Landgerichtes vom 24. Februar 2016, 08 EX.2016.839, ON 4, bereits gepfändeten Forderungen, nämlich die der verpflichteten Partei aufgrund seiner Rechtstellung als wirtschaftlich Berechtigter, Treugeber, Begünstigter und Auftraggeber des Alpha Trusts oder anderer Treuhand-verhältnisse gegen die Drittschuldner (i) CTX Treuhand AG als Treuhänderin des Alpha Trust, (ii) Dr. Thomas Wilhelm und (iii) Nikolaus Wilhelm zustehenden Geldforderungen und Rückzahlungsansprüche.

**2.** Gegen diesen Beschluss erhoben die verpflichtete Partei und die Drittschuldnerin Rekurs an das Obergericht. Dieses gab mit Beschluss vom 03.08.2017 (ON 36) beiden Rekursen im Sinne einer Abweisung der Exekutionsanträge Folge und begründete seine Entscheidung unter anderem wie folgt:

6.6.7 Vor dem Hintergrund dieser allgemeinen Ausführungen ist für den konkreten Fall Folgendes zu sagen:

Da die zu EX.2016.839 bewilligte Exekution auf Grundlage der Art. 210f EO erfolgte, das gegenständliche Exekutionsbegehren auf die Anwendung eines anderen Exekutionsmittels (Art. 241f EO) mit dem Ziel der Pfändung weiterer Rechte des Verpflichteten gerichtet ist, besteht von daher kein rechtlicher Konflikt zur schon bewilligten Exekution zugunsten derselben betreibenden Partei, zumal von der gegenständlichen Exekutionsbewilligung die bereits zu 08 EX.2016.839 gepfändeten Forderungen ausdrücklich nicht erfasst sein sollen. Allerdings erweist sich die vorliegende Exekutionsbewilligung, die das teilweise widersprüchliche und unbestimmte Begehren der betreibenden Partei unreflektiert übernommen hat, als derart mangelhaft, dass der angefochtene Beschluss abzuändern und der dem angefochtenen Beschluss zugrunde liegende Exekutionsantrag abzuweisen ist.

So ist zunächst festzuhalten, dass von einer Pfändung von „Gesamtrechten" des Verpflichteten aufgrund seiner Stellung als Treugeber und Begünstigter des Alpha Trusts schon deshalb keine Rede sein kann, weil ja die mit dieser Stellung verbundenen Geldforderungen und Zahlungsansprüche, insbesondere Ausschüttungs- und Rückzahlungsansprüche in Höhe von zumindest der ausstehenden (betriebenen) Forderungen bereits zu 08 EX.2016.839 gepfändet wurden. Die nochmalige Aufnahme des „Rechtes zum Erhalt von Zahlungen und Zuwendungen aller Art aus dem Treugut" in die Exekutionsbewilligung ist schon deshalb in sich widersprüchlich, weil unter Z 4 des angefochtenen Beschlusses diese Vermögensrechte gerade nicht erfasst sein sollen. Die mit der gegenständlichen Exekution erfassten „Gesamtrechte" werden völlig unzureichend (weil unzulässig) und in sich widersprüchlich durch die nachfolgende Auflistung der darunter „insbesondere" fallenden Rechte konkretisiert, wobei sich das Antragsvorbringen im Exekutionsantrag ohne nähere Spezifizierung der Art der Begünstigung des Verpflichteten (Begünstigungsberechtigter oder Ermessensbegünstigter) im Wesentlichen nur mit seinen Rechten als Protektor auseinandersetzt, wogegen in der Spezifizierung dieser Rechte in der Exekutionsbewilligung sich wiederum lediglich „das Recht zur Bestellung und Abberufung der Treuhänder des Alpha Trusts" wiederfindet, worauf noch zurückzukommen ist. Dazu ist auch festzuhalten, dass sich aus dem Akt und den vorgelegten Urkunden für die Rechte des Protektors lediglich Zustimmungsrechte zu den dem Treuhänder eingeräumten Rechten gemäss Treuhandurkunde finden. Im Übrigen sollen mit der Exekutionsbewilligung ausschliesslich Rechte der Treuhänderin des Alpha Trusts gepfändet werden, nämlich das Recht der Treuhänderin zur Beendigung des Trusts, das Recht der Treuhänderin zur Bestellung der Begünstigten des Alpha Trusts, das Recht der Treuhänderin zur Änderung der Treuhandurkunden des Alpha Trusts, das Recht der Treuhänderin zur Delegation sämtlicher Rechte des Treuhänders einschliesslich seiner Ermessensbefugnisse, das Recht der Treuhänderin zur Ausübung sämtlicher der im First Schedule des Declaration of Trust festgelegten Rechte und letztlich die Rechte der Treuhänderin als Vermögensverwalterin des Trusts.

Soweit also mit der gegenständlichen Exekutionsbewilligung nicht Rechte des Verpflichteten aus dem Treuhandverhältnis mit der Treuhänderin gepfändet werden sollen, erweist sich dies von vornherein als unzulässig, weil Voraussetzung der Pfändung nach § 241 f. EO – wie oben ausgeführt – lediglich dem Verpflichteten gehörende und verwertbare Vermögensrechte sein können. Nach Inhalt des bewilligten Exekutionsantrages will die betreibende Partei allerdings auf die der bestellten Treuhänderin in der Treuhandurkunde eingeräumten Rechte zugreifen, womit aber nicht nur exekutionsrechtliche Bestimmungen verletzt würden, sondern auch unzulässig in die das Wesen eines Trusts regelnden Normen – wie sie oben auszugsweise wiedergegeben wurden

- eingegriffen würde. Wie schon ausgeführt kann der Treugeber die Ausführung der getroffenen Anordnungen in das freie Ermessen des Trustee, insbesondere in Bezug auf einzelne oder alle Begünstigten bzw. Begünstigtenklassen stellen und auch die Höhe der Zuwendungen durch den Trustee festlegen lassen. Dass es sich um den Verpflichteten um einen Begünstigungsberechtigten handelt, wurde vorliegend weder näher konkretisiert, noch ergibt sich dies aus den Urkunden. Abgesehen davon kann nach Art. 918 Abs. 1 PGR weder der Treugeber Bestimmungen aufstellen, mit welchen der Treuhänder zur Befolgung fortlaufender Weisungen des Treugebers verpflichtet wird, insbesondere mit Bezug auf die Verwendung des Treugutes, noch der Protektor anstelle des Treuhänders Vermögensverfügungen treffen. Die dem Treuhänder in der Treuhandurkunde vertraglich eingeräumten Rechte stehen diesem aufgrund seiner Rechtstellung als selbständiger Vermögensträger unmittelbar zu, auch wenn er sie im Interesse des Treugebers und gemäss den Bestimmungen in der Treuhandurkunde auszuüben hat.

6.6.8   Damit verbleibt lediglich das in der Exekutionsordnung näher spezifizierte Recht des Protektors zur Bestellung und Abberufung der Treuhänder des Alpha Trusts. Nach Auffassung des Senates wird damit vorderhand kein vermögenswertes Recht gepfändet, weil dieses Recht dem Berechtigten nicht unmittelbar eine vermögenswerte Rechtsposition verschafft. Insoweit kann auf die Erwägungen des öOGH in der erwähnten Entscheidung 3 Ob 177/10s zurückgegriffen werden, wonach die Befugnis auf Abberufung und Bestellung von Organen, wirtschaftlich betrachtet, lediglich ein Beugemittel darstellt. Das Abberufungsrecht dient der Kontrolle und Durchsetzung der Pflichten des Treuhänders. Vorderhand ist jedoch vom rechtmässigen Verhalten der Treuhänderin auszugehen. Möglicherweise würde dieses Recht im Rahmen der Pfändung von Gesamtrechten des Verpflichteten im Sinne der Erwägungen des öOGH in 3 Ob 177/10s dann eine Bedeutung erlangen, wenn der Treuhänder seine Pflicht, insbesondere mit Bezug auf gepfändete Ansprüche des Verpflichteten, gemäss der Treuhandanordnung verletzte und dem anspruchsberechtigten Begünstigten keine Zuwendungen zukommen lassen will. Der öOGH hat in seiner Entscheidung 3 Ob 177/10s die Frage offen gelassen, ob im Zuge des Verwertungsverfahrens eine entsprechende Ermächtigung zur Ausübung derartiger Gestaltungsrechte erteilt werden kann. Auch im hier vorliegenden Fall kann diese Frage umso mehr offen gelassen werden, weil sich schon die Pfändung dieser Rechte als mangelhaft erweist.

Die Drittschuldnerin macht auch zu Recht geltend, dass das erlassene Drittverbot in dieser Form keinen Bestand haben kann, weil nach Art. 242 Abs. 1 EO ein Drittverbot nur dann zu erlassen wäre, wenn eine bestimmte dritte Person aufgrund der gepfändeten Rechte des Verpflichteten zu Leistungen verpflichtet wäre. Soweit das auf die

Forderungen des Verpflichteten als Treugeber bzw. Begünstigungs-
berechtigter aus dem Trust zutreffen sollte, wurde ein entsprechendes
Drittverbot ohnehin schon im Verfahren 08 EX.2016.839 erlassen.
Dagegen wurden mit der vorliegenden Exekutionsbewilligung keine
sonstigen Rechte des Verpflichteten gepfändet, denen eine
Leistungspflicht der Treuhänderin gegenüberstünde, weshalb dem so
formulierten Drittverbot die rechtliche Grundlage fehlt.

Im Ergebnis war daher in Abänderung des angefochtenen Beschlusses
und in Stattgebung der Rekurse der Exekutionsantrag abzuweisen.

3.   Gegen diesen Beschluss des Obergerichts erhob die betreibende Partei
Revisionsrekurs an den Obersten Gerichtshof. Dieser gab dem
Revisionsrekurs mit Beschluss vom 07.09.2018 (ON 72) Folge und stellte
den Beschluss des Landgerichts wieder her. Zur Begründung führte der
Oberste Gerichtshof unter anderem folgendes aus [Hervorh. d. Verf.]:

7.   Hiezu hat der Fürstliche Oberste Gerichtshof erwogen:

7.1.   Rezeptionsvorlage § 331 öEO für Art 242 EO:

7.1.1.   Gem Art 242 Abs 1 EO (= § 331 Abs 1 öEO) hat zum Zwecke der Exekution
auf Vermögensrechte, die nicht zu den Forderungen gehören, das
Gericht auf Antrag des betreibenden Gläubigers das Gebot zu erlassen,
sich jeder Verfügung über das Recht zu enthalten (Pfändung). Ist kraft
dieses Rechts eine bestimmte Person zu Leistungen verpflichtet, so ist die
Pfändung erst dann als bewirkt anzusehen, wenn auch dieser dritten
Person das gerichtliche Verbot, an den Verpflichteten zu leisten,
zugestellt wurde. Gem Art 242 Abs 2 EO ist die Art der Verwertung des
Rechtes vom Gericht auf Antrag des betreibenden Gläubigers nach
Einvernahme des Verpflichteten und aller Gläubiger, zu deren Gunsten
Pfändung erfolgte, zu bestimmen.

7.1.2.   Diese Rechtslage der liechtensteinischen EO entspricht dem
österreichischen Rezeptionsvorbild in §§ 331 ff öEO. Es ist daher
österreichische Literatur und Judikatur zur Beurteilung der
gegenständlichen Rechtsfragen heranziehbar.

7.2.   Teleologie des Art 242 EO:

7.2.1.   In vielen Fällen vermag der betreibende Gläubiger nur auf ein
„Gesamtrecht" die Exekution zu führen, zumal sich vermögenswerte
Einzelrechte, die vom betreibenden Gläubiger in der Folge geltend zu
machen bzw durchzusetzen sind, erst in der konkreten Sachlage und
Einzelsituation ergeben. **Unpfändbar sind unter diesem Aspekt nur
höchstpersönliche oder sonst offenkundig nicht übertragbare Rechte
oder solche, deren Ausübung nur für den Verpflichteten wirtschaftlich
sinnvoll ist** (öOGH 3 Ob 101/04f; Oberhammer in Angst/Oberhammer,

■   Seite 10   ■

EO³ § 331 Rz 4). Soweit sich daher die Revisionsrekursgegner auf die Unpfändbarkeit einzelner aus einem Gesamtrecht ableitbarer Rechte verweisen, ist ihnen entgegenzuhalten, dass sich die bekämpfte Exekutionsbewilligung nicht auf Einzelrechte, sondern auf Gesamtrechte des Verpflichteten bezieht (öOGH 3 Ob 166/11z; vgl auch RIS-Justiz RS0004162 [T1]).

7.2.2.  Der Auffangtatbestand der Exekution auf andere Vermögensrechte soll sicherstellen, dass alle denkbaren Vermögenswerte des Verpflichteten in Exekution gezogen werden können. An dieser Zwecksetzung des Gesetzes hat sich die Interpretation der §§ 331 ff öEO zu orientieren (RIS-Justiz RS0120619), was auch für die Auslegung der Art 242 ff EO zu gelten hat. "Andere Vermögensrechte" iS des Art 242 Abs 1 EO sind nur solche materiellrechtliche Ansprüche des Antragsgegners, die weder dem unbeweglichen Vermögen noch jenen Teilen des beweglichen Vermögens des Schuldners zuzuordnen sind, die als Geldforderungen, körperliche Sachen bzw als Ansprüche auf Herausgabe oder Leistung körperlicher Sachen zu definieren sind (OGH 03 CG.2007.66 LES 2008, 266 Erw 8.1; LES 1987, 80; RZ 1956, 111). So wurde in dem **Optionsrecht des Stifters, sich selbst als Begünstigten einsetzen zu können**, ein **pfändbarer Vermögenswert** erblickt. Sogar das **Recht auf Organbestellung**, welches unmittelbar keine vermögenswerte Rechtsposition verschafft, kann als Einflussmöglichkeit des Stifters auf den Vorstand mittelbar zu einer Geldwertzuwendung, zB aus den Erträgnissen des Stiftungsvermögens, führen. § 333 Abs 1 öEO (Art 244 Abs 1 EO) stellt darauf ab, dass das gepfändete Recht Anspruch auf „Ausfolgung einer Vermögensmasse" gewähre. **Das Recht selbst muss zwar nicht verwertbar sein, es muss aber seinerseits den Zugriff auf ein verwertbares Vermögen ermöglichen** (öOGH 3 Ob 177/10s; Oberhammer in Angst/Oberhammer, EO³ § 331 Rz 3), wie etwa das im Gesetz beispielsweise angeführte Recht, eine Kündigung vorzunehmen (Art 244 Abs 1 EO). **Grundsätzlich können auch mehrere Schritte von Rechtshandlungen zur „Ausfolgung einer Vermögensmasse" führen**, das Gesetz beschränkt den betreibenden Gläubiger nicht auf einen einzigen exekutiven Verwertungsschritt.

7.3.  Abgrenzung Exekution auf Gesamtrechte und Exekution auf Forderungen:

7.3.1.  Im gegenständlichen Fall geht es nun entgegen den Ausführungen der Revisionsgegner nicht um die Pfändung einzelner „Forderungen", für die zumindest das „Entstandensein" vorauszusetzen wäre, sondern um eine Exekution auf „andere Vermögensrechte" im Sinne der Art 242 ff EO. Es ist wesenstypisch für eine derartige Exekution, dass verwertbare Forderungen im Zeitpunkt des exekutiven Zugriffs (noch) nicht vorhanden sind, weil diese Art der Exekution auf ein „Gesamtrecht" greift und zum Entstehen einzelner Forderungen und Ansprüche in aller Regel erst weitere Schritte durch den betreibenden Gläubiger im Rahmen der Verwertung vorauszusetzen sind (Oberhammer in Angst/Oberhammer, EO³ § 331 Rz 3 f).

■   Seite 11   ■

7.3.2. Die öRsp lässt denn auch Pfändungen gem § 331 EO dann zu, **wenn erst weitere Rechtsakte durch den betreibenden Gläubiger vermögenswerte Rechte des Verpflichteten entstehen lassen.** Dass diese bereits im Pfändungszeitpunkt bestehen setzt die EO nicht voraus (vgl öOGH 3 Ob 165/10a; 6 Ob 235/08i GesRZ 2009, 237 [Arnold]).

7.3.3. Diesen Unterschied – einerseits Pfändung von Forderungen, die bedingte oder betagte Forderungen voraussetzt, weil bloss erwartete Forderungen nicht im Rahmen der Exekution auf Geldforderungen pfändbar sind und andererseits die Pfändung von Gesamtrechten, wenn zB mangels Kündigung des zugrundeliegenden Vertragsverhältnisses pfändbare Forderungen noch gar nicht entstanden sind – hob der öOGH gerade in einer Entscheidung zur Exekution auf Treugeberrechte hervor (öOGH 3 Ob 223/12h ecolex 2013/211). Im konkreten Fall ging es um die Exekution auf Ansprüche des Treugebers gegen den Treuhänder, auf die nur nach § 331 öEO (= Art 242 EO) Exekution geführt werden kann. Diese Bestimmung kam deshalb zur Anwendung, weil das treuhänderische Vertragsverhältnis nur durch eine Gestaltungserklärung einer der Vertragsparteien beendet werden konnte.

7.3.4. Während sich sohin nicht nur das Exekutionsmittel, sondern auch das Exekutionsobjekt im Fall der Forderungsexekution von jenem im Fall der Exekution auf „andere Vermögensrechte" unterscheidet, ist lediglich in der Frage des bereits zumindest entstandenen Rechts eine Gemeinsamkeit gegeben: Diesfalls besteht kein Unterschied darin, dass das Recht, auf das Exekution geführt wird, zum Zeitpunkt der Pfändung bereits entstanden ist. Auf ein solches Recht kann dann - je nach Exekutionsobjekt - Exekution geführt werden. Auch für eine Exekution auf andere Vermögensrechte ist somit vorausgesetzt, dass das Gesamtrecht bereits entstanden ist und dem Verpflichteten zusteht (OGH 25.8.2014, 8 Ob A 56/14i ecolex 2014, 1061).

7.4. <u>Zum Exekutionsantrag:</u>

7.4.1. Die betreibende Partei hat im vorliegenden Fall **mehrere Rechtspositionen des Verpflichteten als Gesamtrechte** geltend gemacht und deren Pfändung beantragt: So hat sie im bewilligten Antrag die Stellung der verpflichteten Partei **als Treugeber, Protektor und Begünstiger des Alpha Trust** gegenüber der Drittschuldnerin vorgebracht und die Pfändung der hieraus dem Verpflichteten gegenüber der Drittschuldnerin zustehenden Gesamtrechte begehrt (Pkt 1 Abs 1 - 3). Zur Position des Verpflichteten als Protektor des Alpha Trust wurden im Einzelnen ua Teilrechte vorgebracht, wie zB dass der Verpflichtete nach der Trust-Urkunde übertragbare Rechte, so etwa das Recht zur Zustimmung als Protektor zu diversen Rechten und Handlungen des Treuhänders habe: so insbesondere zur Beendigung des Trusts durch den Trustee, zur Bestimmung der Begünstigten, zur Delegation sämtlicher Rechte des Trustees einschliesslich seiner (angeblichen) Ermessensbefugnis und zur Änderung von Bestimmungen der Treuhandurkunde. Überdies habe der Verpflichtete das alleinige Recht,

die Trustees des Alpha Trusts zu bestellen oder abzuberufen. Es komme hinzu, dass sich der Verpflichtete von den (von ihm kontrollierten) Trustees des Alpha Trusts sogar als Vermögensverwalter des Trusts einsetzen habe lassen.

7.4.2. Damit wurden aber von der betreibenden Partei hinlängliche Behauptungen zur Pfändbarkeit der Gesamtrechte des Verpflichteten aufgestellt. Die Einzelrechte des Gesamtrechts müssen nicht behauptet und bescheinigt werden, wenn es doch (wie hier beispielhaft, verb „insbesondere") geschieht, schadet es dem Betreibenden nicht, selbst wenn idZ Rechte beispielhaft aufgezählt werden, die für den betreibenden Gläubiger nicht verwertbar sind. Der vorliegende Exekutionsantrag gibt klar die zu **pfändenden Gesamtrechte**, nämlich die des Verpflichteten **als Treugeber, als Protektor und als Begünstigter des Alpha Trust gegenüber der Drittschuldnerin** an. **Einer näheren Detaillierung bzw Aufzählung der aus diesen Rechtspositionen resultierenden Einzelrechte bedarf es nicht.**

7.4.3. Die vom Betreibenden begehrte Exekutionsart deckt sich mit der vom öOGH in 3 Ob 223/12h (ecolex 2013/211; vgl Oberhammer in Angst/Oberhammer, EO³ § 325 Rz 5) geforderten Exekutionsart, nämlich der Exekution auf andere Vermögensrechte gem §§ 331 ff öEO (öOGH 3 Ob 223/12h). Es verfängt in diesem Zusammenhang auch nicht der Einwand der Revisionsrekursgegner, dass der Alpha Trust lediglich eine **Ermessensbegünstigung** und keine Begünstigungsberechtigung einräume, da – was sich im Rahmen des Verwertungsverfahrens herausstellen kann – **der Verpflichtete aufgrund seiner Gesamtrechte durch Änderungen der Treuhandurkunde zu verwertbaren Geldforderungen gelangen kann.** Es kommt hinzu, dass **im Rahmen der Verwertung seiner Gesamtrechte der Verpflichtete auch zu einer Beendigung des Trusts mit entsprechenden Forderungen gelangen könnte.** Dies ist hier nicht näher zu prüfen und zu entscheiden, sondern vielmehr einer allfälligen Verwertung der Gesamtrechte des Verpflichteten vorzubehalten. Darüber hinaus wurde ausdrücklich darauf hingewiesen, dass **mangels eines entsprechenden Verbots in der Treuhandurkunde der Verpflichtete sogar berechtigt sei, sich selbst als Treuhänder einzusetzen, was auch gesetzlich zulässig sei** (Art 910 Abs iVm Art 923a, § 40 Abs 2 PGR). Daher ist es weder widersprüchlich noch unrichtig, wenn der Betreibende im Rahmen der beispielhaften Aufzählung der in die Gesamtrechte des Verpflichteten fallenden Einzelrechte ua auch Rechte des Treuhänders laut den dort genannten Trusturkunden aufzählt, zumal er behauptet, der Verpflichtete könne potentiell selbst der Treuhänder des Alpha Trust werden (ON 1 Rz 38).

7.4.4. Es ist im Übrigen unrichtig, dass sich die betreibende Partei in ihrem Vorbringen im Exekutionsantrag bloss auf die Rechte des Verpflichteten als Protektor beschränkt hätte. Die betreibende Partei hat auch vorgetragen, dass der Verpflichtete das Vermögen im Trust mittels Instruktionen an die Trustees nach wie vor uneingeschränkt kontrolliere

und insbesondere von den Trustees zu befolgende Instruktionen in Bezug auf Ausschüttungen aus dem Trustvermögen erteilen könne. Beantragt wurde die Exekution auf die dem Verpflichteten gegenüber dem Treuhänder des Alpha Trust zukommenden Rechte, womit sich der Betreibende auf die Gesamtrechte des Verpflichteten als Treugeber bezogen hat. Hinsichtlich der Rechtsposition des Verpflichteten wurde auch die Treuhandvereinbarung vom 27.Mai 2015 und das diese ergänzende „Written Instrument" vom 2. Juni 2015 ausdrücklich behauptet und überdies die einzelnen Zustimmungsbefugnisse des Verpflichteten zu Agenden des Treuhänders in der „Declaration of Trust" dargelegt (ON 1 Rz 18 und in FN 3).

7.4.5. Von einer Unschlüssigkeit oder Unbestimmtheit des Exekutionsantrags kann daher keine Rede sein: Unschlüssig ist ein Exekutionsantrag nur dann, wenn er die vollständige, bestimmte und genaue Behauptung jener Tatsachen vermissen lässt, welche als Rechtsfolge die begehrte Exekutionsbewilligung nach sich zögen (OGH 08 EX.2006.4224 LES 2009, 221). Der Betreibende hat alle Rechtsgrundlagen behauptet, aus denen sich Gesamtrechte des Verpflichteten gegen die Drittschuldnerin ergeben: Der Verpflichtet hat nach dem Vorbringen des betreibenden Gläubigers Gesamtrechte als Treugeber, Protektor und Begünstigter des Alpha Trust der Drittschuldnerin gegenüber.

7.4.6. Auch die von den Revisionsrekursgegnern behauptete mangelnde Spezifizierung der Rechte durch den Betreibenden, „auf die er greifen will", liegt nicht vor. Die vom Gesetz in den Art 243 ff EO genannten Verwertungshandlungen, wie die Teilung oder die Einleitung eines Auseinandersetzungsverfahrens, Kündigungen etc und die generalklauselhaft angeführte Befugnis des Betreibenden, die „sonst zur Ausübung und Nutzbarmachung des gepfändeten Rechtes erforderlichen Erklärungen wirksam für den Verpflichteten abzugeben", müssen im Exekutionsantrag nicht im Einzelnen dargetan werden. Für eine Pfändung nach der Bestimmung des Art 242 EO ist es ausreichend, wenn das gepfändete Gesamtrecht seinerseits den Zugriff auf ein verwertbares Vermögensobjekt ermöglicht (Oberhammer in Angst/Oberhammer, EO[3] § 331 Rz 3). **Der Antrag ist nur dann abzuweisen wenn die Unverwertbarkeit des Rechts aus der Aktenlage offensichtlich ist** (öOGH 3 Ob 28/99k SZ 72/108; 3 Ob 243/11y JBl 2012, 535; RIS-Justiz RS0127665; RS0001249, RS0000085). **Solches ist aber hier nicht der Fall: Dass ein verwertbares Vermögensobjekt mittels des zu pfändenden Gesamtrechts ergriffen bzw verwertet werden kann, hat der betreibende Gläubiger ausführlich dargetan, ein Grund, eine „offensichtliche" Unverwertbarkeit anzunehmen, liegt gerade nicht vor.** Allein die vom Betreibenden geltend gemachte Rechtsposition des Verpflichteten als Treugeber lässt schon nach allgemeinen Grundsätzen dessen Möglichkeit zur Herbeiführung vermögenswerter Forderungen gegen die Treuhänderin bejahen.

7.5.   Mittelbare Verwertbarkeit:

7.5.1.   Die in diesem Verfahren mehrfach zitierte Entscheidung des öOGH 3 Ob 177/10s, publiziert ua in PSR 2011/47, 183 (Rassi/Zollner) = GesRZ 2011, 317 (Wurzer/Foglar-Deinhardstein; Zollner/Paulsen, Überblick über die höchstgerichtliche Judikatur in Stiftungssachen im Jahr 2011, PSR 2012/18, 66 [68 f]) betraf eine Exekution gegen einen Stifter und befasste sich lediglich mit der Frage der Verwertung von bereits rechtskräftig gepfändeten Gesamtrechten des Verpflichteten als Stifter. Dort wurde das „umfassende" Änderungsrecht sowie das dem Stifter zustehende Recht zur Bestimmung des Begünstigten wirksam gepfändet und gegenüber dem Verpflichteten das Gebot, sich jeder Verfügung über diese Rechte zu enthalten und der Stiftung gegenüber das Verbot ausgesprochen, an den Verpflichteten zu leisten bzw dessen Verfügungen über gepfändete Rechte zu akzeptieren. Erst im Rahmen des Verwertungsverfahrens (§ 331 Abs 2 EO) wurden Verwertungsanträge präzisiert und ergänzt und ermächtigte das Erstgericht die betreibende Partei im eigenen Namen zur Bestellung des Verpflichteten als Begünstigten, wies aber das auf die Ermächtigung zur Abberufung der Mitglieder des Beirats der Stiftung und Bestellung neuer Beiratsmitglieder gerichtete Verwertungsmehrbegehren ab. Die zweite Instanz gab den Rekursen beider Parteien Folge und hob den Beschluss des Erstgerichtes auf. Gegen den Aufhebungsbeschluss richteten sich Revisionsrekurse, wobei der öOGH den Rekurs des Betreibenden als teilweise berechtigt erkannte. Er sprach aus, dass die dem Stifter gegenüber einer Privatstiftung zustehenden Gesamtrechte der Exekution nach §§ 331 f EO dann unterliegen, wenn er sich das Recht auf Widerruf vorbehalten hat und nach der Stiftungserklärung oder gem § 36 Abs 4 PSG zumindest zum Teil Letztbegünstigter ist oder sich ein Änderungsrecht vorbehalten hat (RIS-Justiz RS0120752). Denn, solange sich ein Stifter Änderungs- oder Widerrufsrechte vorbehält, sei das Prinzip der vollständigen Trennung der Stiftung vom Stifter nicht verwirklicht. Ein kumulativer Vorbehalt beider Gestaltungsrechte sei entgegen der Auffassung des Verpflichteten jedoch keine Voraussetzung für eine Exekution nach §§ 331 ff EO (3 Ob 217/05s; 3 Ob 16/00h).

7.5.2.   Bei der hier vorliegenden Exekutionssache handelt es nicht um einen Stiftungsfall. Wesentlich an der Judikatur des öOGH zur Exekution auf Stifterrechte ist aber für den entscheidungsgegenständlichen Fall, dass für die Tauglichkeit eines Exekutionsobjektes nach §§ 331 ff öEO bereits dessen **mittelbare Verwertbarkeit genügt**. So erblickte der öOGH im **Änderungsrecht eines Stifters „jedenfalls ein Vermögensrecht"**, mag es auch zuerst entsprechend der durch den Betreibenden zu veranlassenden Rechtsgestaltung bedürfen, bis er auf konkrete Vermögensrechte des Stifters greifen könne (3 Ob 217/05s Erw 3; 3 Ob 177/10s Erw III 1 ff; vgl Zollner/Paulsen, PSR 2012/18, 69). Eine Änderung der Stiftungserklärung, den Stifter (wieder) zu begünstigen, schaffe dergestalt die Voraussetzungen für die Begründung von verwertbaren Vermögensrechten des Stifters (öOGH 3 Ob 217/05s RdW 2006, 505).

Steht dem Begünstigten (schliesslich) ein klagbarer Anspruch gegen die Stiftung zu, sei dieser zedierbar, verpfändbar und pfändbar (unter Hinweis auf Csoklich, Zugriff auf Vermögen der Privatstiftung durch Gläubiger der Stifter und Begünstigten, ÖBA 2008, 416 [424 ff]).

7.5.3. In der öLehre wurde für den Fall der Exekution gegen einen Stifter ebenso der Standpunkt vertreten, dass für den Gläubiger die Möglichkeit besteht, sich anstelle des Stifters dazu ermächtigen zu lassen, die Stiftungserklärung auch hinsichtlich der konkreten Höhe und Fälligkeit von Zuwendungen zu ändern, um dem Stifter damit einen klagbaren (und exekutiv verwertbaren) Anspruch auf die Leistung von Zuwendungen zu verschaffen (Rassi, PSR 2011/47, 189 [Entscheidungsbesprechung]; RIS-Justiz RS0120753).

7.5.4. Die Exekution nach den Art 242 EO fordert daher keine unmittelbare Verwertbarkeit des zu pfändenden Rechts, sondern **es genügt die „mittelbare Verwertbarkeit"**. In 3 Ob 16/06h ZIK 2006, 143 nahm der öOGH ein pfändbares anderes Vermögensrecht an, wenn ein Stifter Letztbegünstigter ist, dies sei nicht in Zweifel zu ziehen. Überdies liess es der OGH in dieser Entscheidung genügen, dass **gepfändete Gestaltungsrechte (eines Stifters) bloss ihrer Ausübung nach übertragbar sind** (unter Verweis auf öOGH 3 Ob 55/80) und hob hervor, dass die **Ausübung der Gestaltungsrechte (des Stifters) auch durch Dritte** erfolgen könnte (vgl öOGH 6 Ob 106/03m für den Sachwalter des Stifters bzw öOGH 6 Ob 332/98m GesRZ 1999, 126 für die obsorgeberechtigten Eltern des Stifters mit pflegschaftsbehördlicher Genehmigung). Vorliegendenfalls geht es nun darum, dass der Betreibende die in den Gesamtrechten enthaltenen Einzelrechte anstelle des Verpflichteten ausüben kann. Es ist nicht ersichtlich, welche exekutionsrechtlichen Hindernisse dem entgegenstehen sollten. Abgesehen davon geht es bei einer Exekution auf andere Vermögensrechte nicht um Übertragung der Gestaltungsrechte an Dritte, sondern um **die gerichtliche Ermächtigung des betreibenden Gläubigers, im Exekutionsverfahren anstelle des Verpflichteten dessen Rechte auszuüben, um dadurch, wenngleich auch erst mittelbar, auf den Erlös aus dem zu liquidierenden Einzelrecht greifen zu können**. Eine vom Exekutionsgericht im Rahmen einer Exekution auf andere **Vermögensrechte erteilte Ermächtigung berechtigt nämlich den betreibenden Gläubiger zu all dem, zu dem zuvor der Verpflichtete berechtigt war** (öOGH 3 Ob 33/84 SZ 57/102; 3 Ob 16/06h ZIK 2006, 143).

7.5.5. Auch die Bestimmungen der Rezeptionsvorlage (§§ 331 ff öEO) zielen auf eine Erweiterung der Exekutionsmöglichkeiten ab und wollen daher all jene Vermögenspositionen des Verpflichteten erfassen, die noch nicht von anderen Exekutionen erfasst werden (vgl Art 242 Abs 1 Satz 1 EO). Es ist zutreffend, dass der öOGH deshalb auf dem Standpunkt steht, dass im Zweifel von einer Exekutionsunterworfenheit anderer Vermögensrechte auszugehen ist (öOGH 3 Ob 16/06h; RIS-Justiz RS0120349). Hierauf muss im zu entscheidenden Fall aber nicht rekurriert werden, da solche Zweifel gar nicht bestehen.

■   Seite 16   ■

7.5.6. Es zeigt sich somit, dass nach Lehre und Rsp eine Pfändung von Gesamtrechten immer dann möglich ist, wenn durch weitere rechtliche Schritte, so insbesondere auch **durch Geltendmachung von Gestaltungsrechten des Verpflichteten, ein verwertbarer Vermögenswert des Verpflichteten entstehen oder geschaffen werden kann**. Für die Exekution auf Gesamtrechte gem Art 242 EO genügt daher die sog „mittelbare Verwertbarkeit" des Gesamtrechts.

7.6.   Vermögenswert:

7.6.1. Hieraus ist weiter zu folgern: Das gepfändete Vermögensrecht muss selbst noch keinen Vermögenswert repräsentieren. Der Betreibende muss einen solchen Vermögenswert auch nicht bescheinigen. Die Rechte des betreibenden Gläubigers bestimmen sich nach dem Umfang der Rechte des Verpflichteten und sind mit ihnen identisch. Dem Betreibenden ist die gerichtliche Ermächtigung zu erteilen, anstelle des verpflichteten Stifters dessen Rechte auszuüben, um in der Folge auf einen denkbaren Erlös greifen zu können. Nichts anderes kann im Fall der Pfändung von Gesamtrechten durch den Gläubiger eines Treugebers gelten, der hier überdies Begünstigter und Protektor eines Trusts ist.

7.6.2. **Überdies bedeutet die Pfändung der Gesamtrechte des Stifters noch nicht automatisch die Zulässigkeit der Verwertung durch Ermächtigung des betreibenden Gläubigers, alle Einzelrechte des Stifters auszuüben** (öOGH 3 Ob 177/10s Erw 5). Dass auf Gesamtrechte Exekution nach §§ 242 EO geführt werden kann, **sagt daher nichts darüber aus, ob in der Folge im konkret zu beurteilenden Fall die gepfändeten Gesamtrechte einen Vermögenswert haben** (vgl öOGH 6 Ob 228/17y PSR 2018, 90). Das sich aus dem Gesamtrecht ergebende Einzelrecht des Verpflichteten muss daher im Exekutionsantrag weder behauptet, bewiesen noch bescheinigt werden, andernfalls würde man dem betreibenden Gläubiger die Behauptung einer möglichen Vielzahl der aus einem Gesamtrecht potentiell sich ergebenden Einzelrechte aufbürden, was nicht der Teleologie des Exekutionsrechts entspricht, einem betreibenden Gläubiger den Zugriff auf Vermögensobjekte des Verpflichteten nicht unnötig zu erschweren. Eine Behauptung des Vermögenswertes des Gesamtrechts ist nur insoweit erforderlich, als sich aus der Verwertung der Einzelrechte die Möglichkeit eines Vermögenswertes ergibt. Dies ist aufgrund der Ausführungen des Betreibenden in ON 1 jedenfalls zu bejahen. Nur dann, wenn sich schon aus dem Exekutionsantrag ergeben würde, dass es sich offensichtlich um ein nicht pfändbares Recht handelt, wäre der Exekutionsantrag abzuweisen (Oberhammer in Angst/Oberhammer, EO³ § 331 Rz 10; Heller/Berger/Stix, Kommentar zur Exekutionsordnung III 2336), wobei jedoch die Rsp die Behauptung der möglichen Vermögenshaltigkeit des zu pfändenden Rechts im Pfändungsstadium grosszügig beurteilt (öOGH 3 Ob 217/05s; 3 Ob 26/08g GeS 2008, 112) und daher, **sollte sich eine fehlende Verwertbarkeit im Verwertungsstadium herausstellen, der**

**einzelne Verwertungsantrag – nicht aber schon der Pfändungsantrag hinsichtlich des Gesamtrechts – abzuweisen ist**.

7.6.3. In der vom Verpflichteten zitierten Entscheidung des Fürstlichen Obersten Gerichtshofs 2 R EX.2008.7877 ging es um ein Sicherungsbot, mit dem der Verpflichteten verboten werden sollte, über ihre Forderungen gegenüber dem Drittschuldner bis zur Höhe des tatsächlichen Trustvermögens zu verfügen. Demnach handelte es sich nicht um eine Exekution auf andere Vermögensrechte im Sinne Art 242 ff EO, sondern um einen zwangsweisen Zugriff auf einzelne Forderungen, ging also um eine Forderungsexekution. Diese Entscheidung gibt für die Frage nach der Pfändung von Gesamtrechten gem Art 242 EO nichts her, da bei der Forderungsexekution schon grundsätzlich die Voraussetzungen für das Exekutionsobjekt „Forderung" andere sind: Für die Pfändung von „Forderungen" sprach der Fürstliche Oberste Gerichtshof bereits in LES 2008, 266 aus, dass diese dann nicht durch ein Drittverbot getroffen werden können, wenn deren Rechtsgrund im Zeitpunkt der richterlichen Beschlussfassung noch nicht geschaffen ist und von denen es daher noch ungewiss ist, ob sie überhaupt jemals zur Entstehung gelangen (LES 2008, 266; 2 R EX.2008.7877). Im vorliegenden Fall geht es aber nicht um die Pfändung oder Verwertung einzelner vermögenswerter „Forderungen", sondern allein um die Pfändung eines Gesamtrechts des Verpflichteten gegen die Drittschuldnerin, aus dem – wenn auch nur mittelbar, also erst nach Hinzukommen weiterer (vom Betreibenden vorzunehmender) Rechtshandlungen – Vermögenswerte, insbesondere Forderungen, entstehen können (Art 242 Abs 2, Art 243 ff EO).

7.6.4. Einen Vermögenswert von Gesamtrechten hat der Fürstliche Oberste Gerichtshof im Übrigen bereits mehrfach bejaht: So war etwa in der Entscheidung 10 CG.2004.58 LES 2007, 141 der **Anspruch des Begünstigten zwar weitgehend vom Ermessen der Organe einer Stiftung abhängig, die Verwaltung der Stiftung wurde jedoch aufgrund eines vom Begünstigten bestimmten Mandatsvertrags durchgeführt**. Hievon ausgehend bejahte der Fürstliche Oberste Gerichtshof einen Vermögenswert der Sicherungsgegnerin, weil der Zugriff allein von der Willenserklärung der Verpflichteten abhing. Er wies auf den Grundsatz hin, wonach **bedingte Rechte Vermögen sind, wenn der Eintritt der Bedingung nur von einem Willensakt des Beklagten abhängt**. Dieser Umstand unterscheidet diese Entscheidung von dem der Entscheidung 2 R EX.2008.7877 zugrundeliegenden Sachverhalt, nach dem gerade kein – auch nicht bedingt – disponibles Recht der Sicherungsgegnerin über das Vermögen des Drittschuldners bestand (2 R EX.2008.7877 Erw 13.5.). In der Entscheidung OGH 03 CG.2007.66 LES 2008, 266 wurden die Rechte eines Stifters auf Widerruf und Änderung der Stiftungserklärung ausdrücklich als sogenannte „andere Vermögensrechte iS der Art 241 f EO" anerkannt.

■  Seite 18  ■

7.7.   Zur Exekution auf Treugeberrechte:

7.7.1. In der öRsp wurde die Exekution auf Treugeberansprüche unter dem Aspekt der Exekution auf den Anspruch des Treugebers gegen den Treuhänder auf Herausgabe des Treuguts beurteilt. Dabei wurde dann, wenn das Treugut in Geld bestand, die Pfändung der Forderung gem § 294 öEO (= Art 217 EO) bejaht. Für den Fall, dass das Treuhandverhältnis noch nicht beendigt ist und dieses zur Entstehung des Rückforderungsanspruchs durch den Treugeber erst zu beendigen ist, geht der öOGH davon aus, dass in einem solchen Fall nur eine Pfändung nach § 331 EO in Betracht kommt (öOGH 3 Ob 223/12h ecolex 2013/211; Oberhammer in Angst/Oberhammer, EO³ § 325 Rz 5). Der Rückforderungsanspruch kann zuvor nicht gepfändet werden, weil er mangels Kündigung noch nicht entstanden ist. Da die Grenzen zwischen den einzelnen in Frage kommenden Exekutionsarten „fliessend" sind, lässt es der öOGH sogar zu, einen auf die falsche Exekutionsart hinzielenden Antrag ohne weiters umzudeuten (öOGH 3 Ob 223/12h ecolex 2013/211; Oberhammer in Angst/Oberhammer, EO³ § 325 Rz 5). In der Entscheidung des öOGH 2 Ob 166/02d ecolex 2002, 882, wurde ausdrücklich darauf hingewiesen, dass die Gläubiger des Treugebers nicht direkt auf das Treugut Exekution führen können, sondern nur auf die Ansprüche des Treugebers gegen den Treuhänder. Diese Rechtsauffassung bestätigte der öOGH auch in 3 Ob 85/08h ecolex 2008, 1021 = ÖBA 2009, 322.

7.7.2. Dass das **Recht zur Benennung von Begünstigten vom betreibenden Gläubiger gepfändet und ausgeübt werden kann,** hat der öOGH in der E 3 Ob 177/10s bereits entschieden, sodass schon allein hieraus erhellt, dass die Pfändung der Gesamtrechte des Verpflichteten als Treugeber einerseits und **dem zur Bestimmung der Begünstigten zustimmungsberechtigten Protektor (Art 8 Declaration of Trust) dem Treuhänder gegenüber vermögensrechtlich zumindest mittelbar relevant** sein kann.

7.7.3. Bei der Exekution auf Treugeberrechte ging der OGH mangels Verwertungsantrags nicht auf den Bestand oder Nichtbestand des behaupteten gepfändeten Vermögensrechtes ein (öOGH 3 Ob 143/93), was deutlich zeigt, dass 1) Treugeberrechte grundsätzlich gem § 331 öEO als Gesamtrecht pfändbar sind und 2) dies unabhängig davon möglich ist, ob im Zeitpunkt dieser Pfändung das Gesamtrecht im konkreten Fall auch einen exekutiven Zugriff auf das als verwertbar behauptete Recht (dort eine Liegenschaft) zulässt oder nicht. Soweit daher die Revisionsrekursgegner einwenden, dass Einzelrechte des Verpflichteten nicht pfändbar wären, ist dies nicht Gegenstand des Verfahrens über den Antrag auf Pfändung von Treugeber-Gesamtrechten.

7.8.   „Doppelpfändung"?

7.8.1.   Eine „Doppelpfändung" liegt entgegen den Ausführungen der Revisionsrekursgegner nicht vor, weil aus dem Exekutionsantrag und dem Vorbringen des Betreibenden hinlänglich klar hervorgeht, dass die **Gesamtrechte des Verpflichteten der Drittschuldnerin** gegenüber gepfändet werden sollen und als Rechtsposition des Verpflichteten hiefür seine **Stellung als Treugeber, Protektor und Begünstigter des Alpha Trusts** angeführt werden. Die nur beispielhaft begehrte Pfändung diverser Einzelrechte aus der beantragten Pfändung des Gesamtrechts laut Pkt 1 Abs 3 (von „insbesondere" bis „3. Juni 2015)" ist zur Bezeichnung des zu pfändenden Gesamtrechts nicht erforderlich. **Im Verwertungsstadium ist im Einzelnen zu prüfen, welche aus dem Gesamtrecht des Verpflichteten fliessenden Einzelrechte verwertbar und vermögenswert sind.**

7.8.2.   Pkt 4 der Exekutionsbewilligung macht die Exekutionsbewilligung (bzw den Exekutionsantrag) auch nicht widersprüchlich, weil sich aus dem vorher Ausgeführten klar ergibt, dass der Betreibende die bereits gepfändeten Forderungen mit dieser Exekution nicht pfänden will, weil dies schon im Verfahren 08 EX.2016.839 geschehen ist. Mit dem gegenständlichen Exekutionsantrag werden ausschliesslich Gesamtrechte gepfändet, nicht einzelne Forderungen, so dass dieser Pkt allein zur Klarstellung, dass nicht einzelne Forderungen gepfändet werden sollen, bestehen bleiben kann, wenngleich diese Einschränkung gar nicht notwendig gewesen wäre. Eine von den Revisionsrekursgegnern mehrfach als unzulässig bezeichnete **„Doppelpfändung" liegt allein schon deshalb nicht vor, weil die Exekutionsobjekte unterschiedlich sind: Im gegenständlichen Verfahren sind es Gesamtrechte des Verpflichteten, im Verfahren 08 EX.2016.839 waren es Forderungen.** Damit geht aber der erhobene Einwand, die Bewilligung der gegenständlichen Exekution würde zu einer Mehrfachpfändung führen, ins Leere.

8.   Zusammenfassend ist daher festzuhalten, dass der betreibende Gläubiger zulässigerweise die Gesamtrechte des Verpflichteten als Treugeber, Protektor und Begünstiger des Alpha Trust der Drittschuldnerin gegenüber pfändet. Die Entscheidung des Fürstlichen Obergerichts war daher aufzuheben und der Beschluss des Erstgerichts wieder herzustellen.

**4.**   Gegen diesen Beschluss des Obersten Gerichtshofs erhoben die verpflichtete Partei und die Drittschuldnerin jeweils Individualbeschwerde an den Staatsgerichtshof. Dieser gab mit Urteilen vom 29.10.2019 zu StGH 2018/111 (ON 94) und zu StGH 2018/114 (ON 95) den Individualbeschwerden keine Folge. Zur Begründung führte der Staatsgerichtshof unter anderem aus [Hervorh. d. Verf.]:

■   Seite 20   ■

In ON 94:

3.2.1   Die oben genannte Rüge des Beschwerdeführers geht weder mit der einschlägigen Literatur noch mit der einschlägigen Judikatur konform: Wie der Oberste Gerichtshof richtig ausführt, entspricht Art. 242 EO dem österreichischen Rezeptionsvorbild der §§ 331 ff. ÖEO, weshalb auf österreichische Literatur und Judikatur zurückgegriffen werden kann (vgl. ausführlich ON 72, S. 34). Im Rahmen der Bewilligung der Exekution ist auf der Grundlage der Aktenlage (Exekutionsantrag) **zu prüfen, ob das in Exekution gezogene Recht einer Verwertung zugänglich ist.** Darüberhinausgehende Nachforschungen sind nicht anzustellen, der betreibende Gläubiger muss insbesondere in seinem Exekutionsantrag weder beweisen noch bescheinigen, dass das gepfändete Recht verwertbar ist. Gleich wie bei der Forderungsexekution hat das Bewilligungsgericht nicht zu prüfen, ob das gepfändete Recht besteht. **Die Exekution ist sohin zu bewilligen, wenn die Unpfändbarkeit des Rechts wegen Unverwertbarkeit nicht von vornherein offenkundig ist. Sollte sich jedoch im Laufe des Verwertungsstadiums herausstellen, dass eine Verwertung des gepfändeten Rechts aus rechtlichen oder tatsächlichen Gründen unmöglich ist, so ist das Verfahren einzustellen.** Vor der Entscheidung über den Verwertungsantrag sind bei sonstiger Nichtigkeit des Verfahrens zwingend der Verpflichtete und alle Gläubiger zu deren Gunsten Pfändung erfolgte, zu vernehmen (vgl. Oberhammer, in: Angst/Oberhammer, EO3, N 10 zu § 331 ÖEO unter Hinweis auf umfangreiche Literatur und Judikatur; so richtigerweise auch der Oberste Gerichtshof, vgl. namentlich ON 72, S. 35 und 42). Unter Verweis auf die Teleologie des Art 242 EO hält der Oberste Gerichtshof sodann zutreffend fest, dass der Auffangtatbestand der Exekution auf andere Vermögensrechte sicherstellen soll, dass alle denkbaren Vermögenswerte des Verpflichteten in Exekution gezogen werden können. An dieser Zwecksetzung des Gesetzes hat sich die Interpretation der §§ 331 ff. ÖEO zu orientieren, was sohin auch für die Auslegung der Art. 242 ff. EO zu gelten hat (vgl. ON 72, S. 35).

3.2.2   Aus der soeben referierten Rechtsprechung ergibt sich zwanglos, dass der Oberste Gerichtshof mitnichten, wie der Beschwerdeführer vermeint, seine eigene Kompetenz im Hinblick auf die Beurteilung der Verwertbarkeit der gepfändeten Gesamtrechte nicht wahrgenommen hat. Der Beschwerdeführer verkennt, dass der Oberste Gerichtshof im Rahmen von Art. 242 Abs. 1 EO nicht zu prüfen hat, ob eine "schlichte Unverwertbarkeit", was auch immer das im Detail bedeuten mag, vorliegt, sondern lediglich, **ob die Unverwertbarkeit nicht von vornherein offenkundig ist**, was der Oberste Gerichtshof im angefochtenen Beschluss zweifelsohne unternommen hat (vgl. insbesondere ON 72, S. 38 f.). Der Beschwerdeführer verkennt insoweit auch durchgängig, dass die **Frage der konkreten (tatsächlichen) Verwertbarkeit dem Verwertungsverfahren** (vgl. auch Art. 242 Abs. 2 EO) **vorbehalten** ist. Die oben

referierte Rechtsprechung, gemäss welcher der Oberste Gerichtshof in ON 72 judiziert hat, ist unter verfassungsmässigen Gesichtspunkten nicht zu beanstanden: Die Teleologie des Art. 242 EO zielt nämlich darauf ab, sicherzustellen, dass alle denkbaren Vermögenswerte des Verpflichteten in Exekution gezogen werden können. An dieser Zwecksetzung des Gesetzes hat sich, wie der Oberste Gerichtshof richtig festhält, die Interpretation der §§ 331 ff. ÖEO und damit auch der Art. 242 ff. EO zu richten. Insoweit ist auch nicht zu beanstanden, wenn der Oberste Gerichtshof im Einklang mit der einschlägigen Literatur zum Ergebnis gelangt, dass bei der Beurteilung, ob ein Vermögensrecht pfändbar ist, grosszügig vorzugehen und im Zweifel die Exekutionsunterworfenheit anzunehmen ist. Hinzukommt, dass, wie oben releviert, das Verwertungsverfahren vorbehalten ist, das Exekutionsverfahren sohin einzustellen ist, **wenn die weitere Prüfung im Rahmen des Verwertungsstadiums ergibt, dass die Verwertung des gepfändeten Rechts aus rechtlichen oder tatsächlichen Gründen unmöglich ist.**

Weiter ist der Beschwerdeführer darauf hinzuweisen, dass sich bereits aus den Ausführungen des Obersten Gerichtshofes zum NichtVorliegen einer offensichtlichen Unverwertbarkeit (vgl. oben) ergibt, dass gegenständlich auch nicht offenkundig ein nicht übertragbares Recht vorliegt. Ergänzend weist der Oberste Gerichtshof in weiterer Folge unter Hinweis auf österreichische Rechtsprechung darauf hin, dass **gepfändete Gestaltungsrechte bloss ihrer Ausübung nach übertragbar sein müssen und die Ausübung der Gestaltungsrechte auch durch Dritte erfolgen kann.** Weiter hält der Oberste Gerichtshof richtigerweise fest, dass es gegenständlich darum geht, dass der Betreibende **die in den Gesamtrechten enthaltenen Einzelrechte anstelle des Verpflichteten ausüben kann** und es nicht ersichtlich ist, welche exekutionsrechtlichen Hindernisse dem entgegenstehen sollten (vgl. ON 72, S. 45). Inwieweit nunmehr die Konkretisierung des Obersten Gerichtshofes und der Hinweis auf österreichische Rechtsprechung dahingehend, wonach es bei einer Exekution auf andere Vermögensrechte um die gerichtliche Ermächtigung des betreibenden Gläubigers geht, im Exekutions-verfahren anstelle des Verpflichteten dessen Rechte auszuüben, **um dadurch, wenn gleich auch erst mittelbar, auf den Erlös aus dem zu liquidierenden Einzelrecht greifen zu können,** widersprüchlich sein soll, erschliesst sich dem Staatsgerichtshof nicht.   (…)

4.3.   Der Beschwerdeführer verkennt nunmehr, dass es sich beim Beschluss des österreichischen Obersten Gerichtshofes vom 14. Juli 2011 zu 3 Ob 177/10s bzw. bei RS0120752 um einen Stiftungsfall handelt, wohingegen dem gegenständlichen Fall ein Trust, nämlich hinsichtlich der Pfändung der bezüglichen Gesamtrechte des Beschwerdeführers, zugrunde liegt. Schon deshalb kann von Vorneherein keine Praxisänderung wie vom Beschwerdeführer vermeint und damit auch keine Verletzung der Begründungspflicht hinsichtlich der vom Beschwerdeführer behaupteten

■   Seite 22   ■

Praxisänderung vorliegen. Aus der angefochtenen Entscheidung ergibt sich im Übrigen klar, dass der Oberste Gerichtshof die erwähnten österreichischen Entscheidungen zwecks Begründung der "mittelbaren Verwertbarkeit" (vgl. ON 72, S. 42 ff.) heranzieht. Konkret führt der Oberste Gerichtshof unter Hinweis auf die erwähnte österreichische Judikatur aus, dass es sich bei der gegenständlich vorliegenden Exekutionssache um keinen Stiftungsfall handle. Wesentlich an der Judikatur des österreichischen Obersten Gerichtshofes zur Exekution auf Stifterrechte sei aber für den entscheidungsgegenständlichen Fall, dass für die Tauglichkeit eines Exekutionsobjekts nach den §§ 331 ff. ÖEO bereits dessen mittelbare Verwertbarkeit genüge. Unter Hinweis auf anderweitige österreichische Judikatur gelangt der Oberste Gerichtshof dann schliesslich zum richtigen Schluss, dass die Exekution nach den Art. 242 EO keine unmittelbare Verwertbarkeit des zu pfändenden Rechts einfordere, sondern eine mittelbare Verwertbarkeit genügt (vgl. ausführlich ON 72, S. 45 f.). (…)

5.2.    Zu Ziff. 9. seiner Individualbeschwerde führt der Beschwerdeführer aus, dass der Oberste Gerichtshof das mangelnde Vorliegen einer offensichtlichen Unverwertbarkeit einzig daraus schliesse, dass die Position des Beschwerdeführers als Treugeber "schon nach allgemeinen Grundsätzen dessen Möglichkeit zur Herbeiführung vermögenswerter Forderungen gegen die Treuhänder bejahen" lasse.

5.3.    Entgegen der Ansicht des Beschwerdeführers hat der Oberste Gerichtshof das mangelnde Vorliegen einer offensichtlichen Unverwertbarkeit nicht lediglich auf die einleitend erwähnte Wendung gestützt (vgl. auch ON 72, S. 42). Vielmehr hat der Oberste Gerichtshof an weiteren Stellen der angefochtenen Entscheidung umfangreich und unter Hinweis auf Lehre und Rechtsprechung begründet, weshalb nicht von einer offensichtlichen Unverwertbarkeit auszugehen ist. Namentlich hat der Oberste Gerichtshof festgehalten, dass sich im Lichte des durch den Beschwerdegegner gestellten Exekutionsantrages, welcher vom Obersten Gerichtshof über mehrere Seiten hinweg releviert wird (vgl. S. 38 ff. in ON 72), ergibt, dass keine offensichtliche Unverwertbarkeit vorliegt (vgl. auch den Hinweis des Obersten Gerichtshofes auf S. 42 des angefochtenen Beschlusses). Wie erwähnt, beinhaltet der angefochtene Beschluss diverse weitere Ausführungen zur (mittelbaren) Verwertbarkeit der gepfändeten Rechte (vgl. namentlich S. 42 ff. und S. 50 ff. in ON 72), weshalb keine Rede davon sein kann, dass die Verwertbarkeit bzw. die offensichtliche Unverwertbarkeit der gepfändeten Rechte, wie vom Beschwerdeführer vermeint, nicht begründet worden sei. Eine Verletzung der Begründungspflicht liegt somit nicht vor. (…)

6.2.    Zu Ziff. 3.9 und Ziff. 10.10 der Individualbeschwerde führt der Beschwerdeführer ins Feld, dass der Oberste Gerichtshof verkenne, dass zunächst eine Verwertung im Hinblick auf die zu 08 EX.2016.839 erfolgte Pfändung

zu erfolgen habe, bevor weitere Rechte, eben Gesamtrechte wie gegen-
ständlich, gepfändet würden. Insoweit erachtet der Beschwerdeführer die
angefochtene Entscheidung auch als nicht verhältnismässig.

Zunächst ist der Beschwerdeführer darauf hinzuweisen, dass der Oberste
Gerichtshof in diesem Zusammenhang ausführliche Erwägungen zur
"**Doppelpfändung**" und "**Mehrfachpfändung**" vornimmt (vgl. ON 72, S. 52
f.). Namentlich **hält der Oberste Gerichtshof richtigerweise fest, dass im
gegenständlichen Verfahren Gesamtrechte des Verpflichteten, im
Verfahren zu 08 EX.2016.839 jedoch Forderungen des Verpflichteten
gepfändet wurden**. Zudem verkennt der Beschwerdeführer, dass es nur
dann zu einer Beschränkung hinsichtlich der Exekutionsmittel kommen
darf, wenn keine Zweifel am Hinreichen einzelner Exekutionsmittel zur
vollen Befriedigung des Betreibendenanspruchs bestehen. Die blosse
Wahrscheinlichkeit genügt nicht.  Unstrittig ist, dass diese Voraussetzung
in der Regel im Stadium der Exekutionsbewilligung, wie gegenständlich,
für das Gericht mit ausreichender Sicherheit nicht erkennbar ist, weshalb
der vom Beschwerdeführer offenbar (implizit) angesprochene Art. 9, 2.
Halbsatz EO im gegenständlichen Verfahrensstadium in der Praxis kaum
zur Anwendung kommt (vgl. zum ganzen Jakusch, in: Angst, a. a. O., N 6
zu § 14 ÖEO). Soebiges gilt für den gegenständlichen Fall umso mehr, als
mit der angefochtenen Entscheidung Gesamtrechte gepfändet wurden
und sohin erst im Verwertungsstadium im Einzelnen zu prüfen ist, welche
aus dem Gesamtrecht des Verpflichteten fliessenden Einzelrechte
verwertbar und vermögenswert sind. Insoweit hält der Beschluss des
Obersten Gerichtshofes unter diesem Aspekt einer Willkürprüfung stand.

6.3.   Weiter erachtet es der Beschwerdeführer als willkürlich, dass mittels dem
gegenständlichen Exekutionsverfahren überhaupt auf die Gesamt-
rechte des Beschwerdeführers hinsichtlich des Alpha Trusts zugegriffen
wird bzw. Letztere gepfändet werden, da "ein Exekutionsverfahren nicht
der richtige Ort dafür" sei. Vielmehr müsste eine solche Argumentation in
einem Anfechtungsverfahren vorgebracht werden.

Diese Rüge des Beschwerdeführers verkennt zunächst wiederum, dass
der Auffangtatbestand der Exekution auf andere Vermögensrechte
gemäss Art. 242 EO sicherstellen soll, dass alle denkbaren
Vermögenswerte des Verpflichteten in Exekution gezogen werden
können. An eben dieser Zwecksetzung des Gesetzes hat sich die
Interpretation der Art. 242 ff. EO zu richten (vgl. auch ON 72, S. 35 unter
Hinweis auf Judikatur und Rechtsprechung). Es genügt dabei
konsequenterweise, wie bereits schon ausführlich releviert, eine
mittelbare Verwertbarkeit der gepfändeten Gesamtrechte (vgl. ON 72,
S. 42 ff.). Es kann insoweit keine Rede davon sein, dass sich der
Beschwerdegegner, wie der Beschwerdeführer vermeint, im "falschen"
Verfahren befindet: Vielmehr ist mit dem Beschwerdegegner dafür zu
halten, dass es im Rahmen der Pfändung von Gesamtrechten gerade

nicht erforderlich ist, dass die Ausübung einzelner Befugnisse des Verpflichteten unmittelbar einen Vermögenswert nutzbar macht, solange und insoweit die konkrete Ausübung darauf gerichtet ist, Vermögen des Verpflichteten der Zwangsvollstreckung zuzuführen. Im Übrigen ist in weiterer Folge, wie erwähnt, dann im Verwertungsstadium im Einzelnen zu prüfen, welche aus dem Gesamtrecht des Verpflichteten fliessenden Einzelrechte verwertbar und vermögenswert sind. Von einer Verletzung des Willkürverbots kann insoweit keine Rede sein.

6.4.    Schliesslich erachtet es der Beschwerdeführer als willkürlich, dass der Oberste Gerichtshof sein Gesamtrecht als Protektor des Alpha Trusts gepfändet hat. All diese Rechte seien keine Vermögenswerten Rechte und diese Vorgehensweise des Obersten Gerichtshofes verkenne "das Wesen des Trusts".

Dass dieses Vorbringen des Beschwerdeführers unberechtigt ist, ergibt sich bereits aus den vorstehenden Ausführungen des Staatsgerichtshofes (vgl. insbesondere auch die Ausführungen zu den Kriterien der hinreichenden offensichtlichen Unverwertbarkeit und der mittelbaren Verwertbarkeit). Soweit sich der Beschwerdeführer auf die Unpfändbarkeit einzelner aus einem Gesamtrecht ableitbarer Rechte stützt, verkennt er ohnehin, dass sich die bekämpfte Exekutionsbewilligung nicht auf Einzelrechte, sondern auf Gesamtrechte des Verpflichteten bezieht (so zutreffend der Oberste Gerichtshof unter Hinweis auf Rechtsprechung, vgl, ON 72, S. 35). Letztlich und durchgängig verkennt der Beschwerdeführer, wie vom Obersten Gerichtshof ausführlich releviert, dass der Beschwerdeführer aufgrund seiner Gesamtrechte zu verwertbaren Geldforderungen gelangen kann. Ob Letzteres in weiterer Folge tatsächlich der Fall ist, ist, wie der Oberste Gerichtshof richtig festhält, im gegenwärtigen Verfahrensstadium weder näher zu prüfen, noch zu entscheiden, sondern vielmehr einer allfälligen Verwertung der Gesamtrechte des Beschwerdeführers vorzubehalten (vgl. namentlich ON 72, S. 40). Auch deshalb sind die vom Beschwerdeführer erhobenen Einwendungen, namentlich mit Blick auf Art. 918 Abs. 1 PGR, unbeachtlich. Auch im Lichte dieser Ausführungen ist sohin nicht von einer qualifiziert bzw. grob verfehlten Entscheidung des Obersten Gerichtshofes auszugehen.

In ON 95:

6.2.    Die Beschwerdeführerin erachtet sich im verfassungsmässig gewährleisteten Begründungsanspruch als verletzt, da es der Oberste Gerichtshof verabsäumt habe, sich mit der angeblichen Unpfändbarkeit von Organbestellungs- und Abberufungsrechten auseinanderzusetzen. Wiederum, wie bereits vorgängig, weist die Beschwerdeführerin daraufhin, dass der Oberste Gerichtshof "lediglich auf das (anschliessende) Verwertungsverfahren" verweise.

Dass dieses Vorbringen der Beschwerdeführerin unberechtigt ist, ergibt sich bereits aus den vorstehenden Ausführungen des Staatsgerichtshofes (vgl. insbesondere auch die Ausführungen zu den Kriterien der hinreichenden offensichtlichen Unverwertbarkeit und der mittelbaren Verwertbarkeit). Soweit sich die Beschwerdeführerin auf die Unpfändbarkeit einzelner aus einem Gesamtrecht ableitbarer Rechte stützt, verkennt sie ohnehin, dass sich die bekämpfte Exekutionsbewilligung **nicht auf Einzelrechte, sondern auf Gesamtrechte des Verpflichteten bezieht** (so richtigerweise der Oberste Gerichtshof unter Hinweis auf Rechtsprechung, vgl. ON 72, S. 35). Letztlich und durchgängig verkennt die Beschwerdeführerin, wie vom Obersten Gerichtshof ausführlich releviert, **dass die beteiligte Parte aufgrund ihrer Gesamtrechte zu verwertbaren Geldforderungen gelangen kann.** Ob Letzteres in weiterer Folge tatsächlich der Fall ist, ist, wie der Oberste Gerichtshof richtig festhält, im gegenwärtigen Verfahrensstadium weder näher zu prüfen, noch zu entscheiden, sondern vielmehr einer allfälligen Verwertung der Gesamtrechte der beteiligten Partei vorzubehalten (siehe ON 72, S. 40). Im Lichte dieser Erwägungen erübrigt sich insbesondere ein Eingehen auf die weiteren von der Beschwerdeführerin angeführten Entscheidungen, namentlich LES 2007, 141 und LES 2008, 266, da eine nachvollziehbare Begründung des Obersten Gerichtshofes jedenfalls, wie gezeigt, nicht gänzlich fehlt.

Im Übrigen führt der Oberste Gerichtshof weiter aus, dass sogar das **Recht auf Organbestellung, welches unmittelbar keine Vermögenswerte Rechtsposition verschaffe, als Einflussmöglichkeit des Stifters auf den Vorstand mittelbar zu einer Geldwertzuwendung, zum Beispiel aus den Erträgnissen des Stiftungsvermögens, führen könne.** Das Recht selbst, so der Oberste Gerichtshof weiter, müsse zwar nicht verwertbar sein, es **müsse aber seinerseits den Zugriff auf ein verwertbares Vermögen ermöglichen** (vgl. ON 72, S. 36 unter Hinweis auf Rechtsprechung und Judikatur). Für eine Exekution auf Gesamtrechte, so der Oberste Gerichtshof richtig, ist es eben gerade wesenstypisch, dass verwertbare Forderungen im Zeitpunkt des exekutiven Zugriffs (noch) nicht vorhanden sind, weil diese Art der Exekution auf ein Gesamtrecht greift und zum Entstehen einzelner Forderungen und Ansprüche in der Regel erst weitere Schritte durch den betreibenden Gläubiger im Rahmen der Verwertung vorauszusetzen sind. Die österreichische Rechtsprechung, so der Oberste Gerichtshof, lasse denn auch Pfändungen gemäss § 331 ÖEO zu, wenn erst weitere Rechtsakte durch den betreibenden Gläubiger Vermögenswerte Rechte des Verpflichteten entstehen lassen. Dass diese bereits im Pfändungszeitpunkt bestehen, setze die Exekutionsordnung nicht voraus (vgl. ON 72, S. 37 unter Hinweis auf Rechtsprechung und Literatur). Mehr noch hält der Oberste Gerichtshof fest, dass die Einzelrechte des Gesamtrechts nicht behauptet und bescheinigt werden müssen, wenn letzteres aber dennoch geschehe, schade dies dem Betreibenden nicht, selbst wenn Rechte beispielhaft

aufgezählt würden, die für den betreibenden Gläubiger nicht verwertbar seien. Letztlich, so der Oberste Gerichtshof, gebe der vorliegende Exekutionsantrag klar die zu pfändenden Gesamtrechte an, nämlich die des Verpflichteten als Treugeber, als Protektor und als Begünstigten des Alpha Trusts gegenüber eben der Beschwerdeführerin (vgl. ON 72, S. 39). Mehr noch gelangt der Oberste Gerichtshof unter Hinweis auf öOGH 3 Ob 143/93 zum Ergebnis, dass Treugeberrechte grundsätzlich gemäss § 331 ÖEO als Gesamtrecht pfändbar sind und dies unabhängig davon möglich ist, ob im Zeitpunkt dieser Pfändung das Gesamtrecht im konkreten Fall auch einen exekutiven Zugriff auf das als verwertbar behauptete Recht zulässt oder nicht. Soweit daher die Beschwerdeführerin einwendet, dass Einzelrechte des Verpflichteten nicht pfändbar wären, sei dies nicht Gegenstand des Verfahrens über den Antrag auf Pfändung von Treugeber-Gesamtrechten.

Im Lichte der Tatsache, dass ein Anspruch auf ausführliche Begründung nicht existiert und die verfassungsmässige Begründungspflicht nur einen Minimalanspruch auf Begründung beinhaltet, ist der Oberste Gerichtshof seiner Begründungspflicht, wie soeben gezeigt, nicht nur nachge-kommen, sondern er hat sogar ausführlich und detailliert releviert, weshalb er eine Pfändbarkeit von Organbestellungs- und Abberufungs-rechten als Gesamtrecht für pfändbar erachtet. Im Übrigen hält die Beschwerdeführerin in ihrer Individualbeschwerde gar selbst fest, dass sich der ÖOGH hinsichtlich der Pfandbarkeit des Bestellungsrechts "lediglich" kritisch äussere. Was die Beschwerdeführerin hieraus für sich zu gewinnen versucht, erschliesst sich dem Staatsgerichtshof nicht. Im Ergebnis überzeugen somit die Ausführungen und Einwendungen der Beschwerdeführerin zu Ziff. 5.5 ihrer Individualbeschwerde nicht. Eine Verletzung der Begründungspflicht liegt insoweit nicht vor.

6.3.   Die Beschwerdeführerin rügt weiter, dass der Oberste Gerichtshof einer-seits die "Aktenlage" nicht beachtet habe und andererseits Rechte ge-pfändet habe, die gar nicht pfändbar seien. Der Oberste Gerichtshof habe letztlich bloss auf die Behauptungen der betreibenden Partei abgestellt und die Aktenlage und darauf beruhendes Vorbringen "der Gegner".

Der Staatsgerichtshof hat bereits darauf hingewiesen, dass mit der angefochtenen Entscheidung keine "Pfändung nicht pfändbarer Rechte", wie die Beschwerdeführerin vermeint, vorgenommen worden ist. Auch hat der Staatsgerichtshof bereits festgehalten, dass der Oberste Gerichtshof ausführlich und nach Ansicht des Staatsgerichtshofes auch richtig begründet hat, dass die Gesamtrechte, nämlich die der beteiligten Partei als Treugeber, als Protektor und als Begünstigter des Alpha Trusts gegenüber der Beschwerdeführerin, pfändbar sind. Insoweit ist es nicht notwendig, dass der Staatsgerichtshof auf die teils repetierenden Ausführungen der Beschwerdeführerin nochmals eingeht.

Wenn die Beschwerdeführerin zu diesem Themenfeld ergänzend anführt, dass "nicht nur Rechte des Verpflichteten gepfändet wurden", erschliesst sich dies dem Staatsgerichtshof zum Vornhinein nicht, da mit der Exekutionsbewilligung vom 21. November 2016 (ON 3), nunmehr bestätigt durch die angefochtene Entscheidung, die der verpflichteten Partei als Treugeber, Protektor und Begünstigter des Alpha Trusts zustehende Rechte gepfändet worden sind. Wenn die Beschwerdeführerin weiter einwendet, dass sich der Oberste Gerichtshof nicht (konkret) mit der Aktenlage auseinandergesetzt habe und insoweit auch Vorbringen "der Gegner" ignoriere, ist die Beschwerdeführerin wiederum auf die obigen Ausführungen des Staatsgerichtshofes zu verweisen, aus welchen sich zwanglos ergibt, dass der Oberste Gerichtshof richtigerweise, nämlich auf der Grundlage des Exekutionsantrages, davon ausgegangen ist, dass die Stellung der beteiligten Partei als Treugeber, Protektor und Begünstigter des Alpha Trusts gegenüber der Beschwerdeführerin und die hieraus der beteiligten Partei gegenüber der Beschwerdeführerin zustehenden Gesamtrechte pfändbar sind. Im Rahmen der Bewilligung der Exekution ist nämlich, der Rechtsprechung folgend, auf Grundlage des Exekutions-antrages zu prüfen, ob das in Exekution gezogene Recht einer Verwertung zugänglich ist. Darüber hinausgehende Nachforschungen sind nicht anzustellen. Das Bewilligungsgericht hat nicht einmal zu prüfen, ob das gepfändete Recht besteht (vgl. Oberhammer, a. a. O., N 10 zu § 331 ÖEO). Aus alledem ergibt sich im Ergebnis, dass der Oberste Gerichtshof nicht gehalten war, auf das von der Beschwerdeführerin zu Ziff. 5.1 ihrer Individualbeschwerde erneut Vorgetragene einzugehen.

6.4.   Entgegen der Ansicht der Beschwerdeführerin hat der Oberste Gerichtshof das mangelnde Vorliegen einer offensichtlichen Unverwert-barkeit auch nicht lediglich auf die von der Beschwerdeführerin erwähnte Stelle in der angefochtenen Entscheidung, vgl. S. 42 in ON 72, gestützt. Vielmehr hat der Oberste Gerichtshof an weiteren Stellen der angefochtenen Entscheidung umfangreich und unter Hinweis auf Lehre und Rechtsprechung begründet, weshalb nicht von einer offensichtlichen Unverwertbarkeit auszugehen ist. Namentlich hat der Oberste Gerichtshof festgehalten, dass sich im Lichte des durch den Beschwerdegegner gestellten Exekutionsantrages, welcher vom Obersten Gerichtshof über mehrere Seiten hinweg releviert wird (vgl. S. 38 ff. in ON 72), ergibt, dass keine offensichtliche Unverwertbarkeit vorliegt (vgl. auch den Hinweis des Obersten Gerichtshofes auf S. 42 des angefochtenen Beschlusses). Wie erwähnt, beinhaltet der angefochtene Beschluss diverse weitere Ausführungen zur (mittelbaren) Verwertbarkeit der gepfändeten Rechte (vgl. namentlich S. 42 ff. und S. 50 ff. in ON 72), weshalb keine Rede davon sein kann, dass die Verwertbarkeit bzw. die offensichtliche Unverwertbarkeit der gepfändeten Rechte, wie von der Beschwerdeführerin vorgebracht, nicht begründet worden sei. Eine Verletzung der Begründungspflicht liegt somit auch hinsichtlich dieser Rüge der Beschwerdeführerin nicht vor.  (…)

**5.**   Mit Schriftsatz vom 24.07.2017 (ON 34), konkretisiert mit Schriftsatz vom 11.02.2020 (ON 105), stellte die betreibende Partei den aus dem Spruch ersichtlichen Verwertungsantrag. Zur Begründung wurde zusammen-gefasst vorgetragen, dass es bei der gegenständlichen Exekution darum gehen würde, das Vermögen aus dem Alpha Trust herauszulösen, wo dann die betreibende Partei auf dieses Vermögen exekutiv zugreifen könne. Nach Art. 244 Abs. 1 EO sei der betreibende Gläubiger somit zu ermächtigen, die erforderlichen Rechtshandlungen namens des Verpflichteten vorzunehmen. Nicht erforderlich sei, dass die Ausübung einzelner Befugnisse des Verpflichteten unmittelbar ein Vermögenswert nutzbar mache, so lange und insoweit die konkrete Ausübung – wenn auch indirekt – darauf gerichtet sei, Vermögen des Verpflichteten der Zwangsvollstreckung zuzuführen.

Als mögliche Verwertungsart sei die betreibende Partei insbesondere zu ermächtigen, anstelle des Verpflichteten gegenüber dem Alpha Trust die Abberufung der bisherigen Treuhänder des Alpha Trusts und die Einsetzung einer von der betreibenden Partei bestimmen Person als Trustee des Alpha Trusts zu begehren und sodann vom von der betreibenden Partei bestimmten Trustee des Alpha Trusts die Ausschüttung des Betrages von CHF 91'595'445.97 züzüglich Kosten und Zinsen an die verpflichtete Partei an eine von der betreibenden Partei zu bestimmende Zahlstelle zu begehren und anstelle des Verpflichteten diese Ausschüttung und ihre Durchführung in seiner Position als Protektor und Begünstigter zuzustimmen.

Eine alternative Variante bestehe darin, die betreibende Partei zu ermächtigen, eine Ausschüttung direkt an den Begünstigten vorzu-nehmen, auf welche die betreibende Partei gleichzeitig nach Art. 244 Abs 2 EO exekutiv greifen könne.

**6.**   Die verpflichtete Partei beantragte die Zurückweisung, in eventu Abweisung des Verwertungsantrages (ON 88 und 97) und brachte zur Begründung zusammengefasst folgendes vor:

Die betreibende Partei habe es unterlassen darzulegen, inwiefern die Gesamtrechte der verpflichteten Partei oder einzelne Rechte daraus der Verwertung unterliegen würden. Die betreibende Partei sei ihrer

Substantiierungspflicht nicht nachgekommen und sei der Verwertungsantrag schon aus diesem Grund zurückzuweisen.

Selbst wenn der Verwertungsantrag formell zulässig wäre, wäre er inhaltlich abzuweisen, nachdem keine Verwertbarkeit der Gesamtrechte der verpflichteten Partei oder einzelner sich daraus ergebender Rechte bestehen würde.

Die Begünstigten des Alpha Trusts wären allesamt Ermessensbegünstigte. Es gäbe somit keinen Grund warum gerade die verpflichtete Partei eine Summe von über USD 80 Mio aus dem Trustvermögen ausgeschüttet erhalten solle.

Im Übrigen wären jegliche geldwerten Ansprüche der verpflichteten Partei gegen den Alpha Trust aus ihrer Stellung als Treugeber und Begünstigter bereits im Verfahren zu 08 EX.2016.839 gepfändet worden. Die Rechte der verpflichteten Partei gegen den Alpha Trust aus ihrer Stellung als Protektor wären lediglich Zustimmungsrechte und keine vermögenswerten Rechte. Die betreibende Partei könne daher schlicht nicht an Geld kommen.

Nachdem sich die verpflichtete Partei weder ein Widerrufsrecht noch ein Änderungsrecht vorbehalten habe, würden die Gesamtrechte nicht der Verwertung unterliegen. Im Sinne des Grundsatzes der stufenweisen Zwangsausübung habe die betreibende Partei zunächst auch eine Verwertung im Hinblick auf die zu 08 EX.2016.839 erfolgte Pfändung der der verpflichteten Partei als wirtschaftlich Berechtigte, Treugeber, Begünstigter und Auftraggeberin des Alpha Trusts zustehenden Geldforderungen und Zahlungsansprüche vorzunehmen, bevor sie weitere Rechte pfänden könne.

Im Übrigen fehle es an der Verhältnismässigkeit der Verwertung. Zunächst hätte eine Verwertung im Hinblick auf die zu 08 EX.2016.839 erfolgte Pfändung erfolgen sollen. Andererseits würden die Verwertungsvorschläge der betreibenden Partei unverhältnismässig in das Wesen des Alpha Trusts eingreifen. Schliesslich umgehe die betreibende Partei das Anfechtungsverfahren und die Verkürzung der Parteirechte der verpflichteten Partei.

7. Die Drittschuldnerin brachte vor, dass der Verwertungsantrag abzuweisen sei, weil die gepfändeten Rechte nicht verwertbar wären. Die Verwertung von Abberufungs- und Bestellungsrechten durch die betreibende Partei wäre auch ein unzulässiger, weil unter anderem unverhältnismässiger Eingriff in das Wesen und in die Organisationsverfassung des Trusts. Die gepfändeten Rechte würden keinen Zugriff auf das Trustvermögen gewähren. Es sei der betreibenden Partei damit nicht möglich, über die gepfändeten Rechte Befriedigung zu erlangen.

8. Aufgrund der von den Parteien vorgelegten Urkunden, insbesondere Urkunden laut ON 1 [Beglaubigte Kopie des Final Awards des London Court of International Arbitration zu Case No. 101721 vom 11. November 2014, Beilage A.1, LCIA Rules 1998 in deutscher und englischer Version, Beilage A.2, LCIA Rules 2014 in englischer Sprache, Beilage A.3, Liste der vor liechtensteinischen Gerichten und Verwaltungsbehörden zuge- lassenen Dolmetscher und Übersetzer, Stand 1. Oktober 2015, Beilage A.4, Berichtigung des Schiedsspruches vom 9. Januar 2015, Beilage A.5, Beglaubigte Übersetzung der Berichtigung des Schieds-pruches vom 9. Januar 2015, Beilage A.6, Beschluss des Fürstlichen Landgerichtes vom 24. Februar 2016, 08 EX.2016.839, ON 4, Beilage A.7, Beglaubigter Handels- registerauszug des Alpha Trusts vom 12. Februar 2016, Beilage A.8, Beglaubigter Handelsregisterauszug der CTX Treuhand AG vom 11. Februar 2016, Beilage A.9, Declaration of Trust vom 27. Mai 2015 samt deutscher Übersetzung (im Kuvert), Beilage A.10, Written Instrument vom 2. Juni 2015 samt deutscher Übersetzung (im Kuvert), Beilage A.11, Minutes of a Meeting of the Directors of CTX Treuhand AG as Trustees of the Alpha Trust vom 3. Juli 2015 (im Kuvert), Beilage A.12, Letter of Wishes vom 3. Juli 2015 (im Kuvert) samt deutscher Übersetzung, Beilage A.13, Instrument of Nomination vom 3. Juli 2015 (im Kuvert) samt deutscher Übersetzung, Beilage A.14, Erklärung des Menelaos Kyprianou zu Case No. 14-CV-09764- R, United States District Court California (September 2015), Beilage A.15, Second Witness Statment von Ashot Yegiazaryan im Kerimov-Verfahren vom 17. Februar 2013 samt auszugsweiser deutscher Übersetzung, Beilage A.16, Überweisungsbeleg der CMB Monaco - Campagnie Monégasque de Banque vom 6. Mai 2015, Beilage A.17, E-Mail Jamra & Jamra LLP vom 17. Juli 2015 samt deutscher Übersetzung, Beilage A.18, E-Mail Roland

Anteau vom 6. August 2015 an die Codex Treuhand AG samt deutscher Übersetzung, Beilage A.19, Stipulation re. Advance Distribution of Funds, etc. vom 6. Juli 2015 samt auszugsweiser deutscher Übersetzung, Beilage A.20, Instructions to the Trustee vom 28. Juli 2015 samt deutscher Übersetzung, Beilage A.21, E-Mail Yegiazaryan an Nikolaus Wilhelm vom 21. Juli 2015 (18:49) samt deutscher Übersetzung, Beilage A.22 und Responsive Declaration zu Case No. BD 595136 vom 18. August 2015 samt deutscher Übersetzung, Beilage A.23], Memorandum of points and Authorities samt auszugsweiser  Übersetzung (Beilage B), Vernehmungs-protokoll vom 23/24.06.2015 und 11.07.2017 samt auszugsweiser Über-setzung (Beilage C), Urteil vom 31.05.2018 (Beilage D), Urkunde vom 08.06.2017 (Beilage D1), Individualbeschwerde vom 10.10.2018 (Beilage D2), Vernehmung des Verdächtigen (Beilage E), Email vom 18.06.2015 (Beilage F), Email vom 01.07.2015 (Beilage G), Letter of wishes vom 03.07.2015 (Beilage H), Formular vom 03.06.2015 (Beilage I), Unter-schriftenkarte der CMB samt auszugsweiser Übersetzung (Beilage J), Schreiben  02.06.2015  (Beilage  K),  Zahlungsauftrag  (Beilage  L), Überweisungsbestätigung  26.08.2015  (Beilage  M),  Überweisungs-bestätigung vom 11.08.2015 (Beilage N), Überweisungsbestätigung vom 27.07.2015 (Beilage O), Überweisungsbestätigung vom 25.06.2015 (Beilage P), Zahlungsauftrag vom 16.12.2015 (Beilage Q), Invoice Drew Holinger 05.06.2016 (Beilage R), Rechtshilfeersuchen (Beilage S), Email 30.10.2019 (Beilage T), Schriftsatz 15.03.2019 (Beilage U), Schriftsatz 12.03.2019 (Beilage V), Protokoll zu CG.2019.5 (Beilage W), Edikt vom 23.09.2016 (Beilage X), Beschluss öOGH vom 26.04.2018 (Beilage 1), Auszug aus PSR 2018/21, S, 90ff (Beilage 2), Beschluss OG vom 11.04.2017 zu 11 UR.2016.77-119 (Beilage 3), Urkunde vom 08.06.2017 (Beilage D1), Individualbeschwerde vom 10.10.2018 (Beilage D2) sowie den hg. Akt 08 EX.2016.839  ist von folgendem **Sachverhalt** auszugehen:


Der Alpha Trust ist eine am 27. Mai 2015 nach liechtensteinischem Recht errichtete Treuhänderschaft. Der Trust ist seit 30. November 2015 unter Registernummer FL-0002.510.771-1 im liechtensteinischen Handelsregister eingetragen. Als alleinige Treuhänderin (Trustee) agiert die CTX Treuhand AG.

(Beilage A8)

Die CTX Treuhand AG ist eine nach liechtensteinischem Recht errichtete Aktiengesellschaft mit Sitz in 9490 Vaduz, Lova-Center. Sie ist seit 27. November 2001 unter der Registernummer FL-0002.042.435-5 im liechtensteinischen Handelsregister eingetragen und wird (u.a.) durch Mitglieder des Verwaltungsrates Dr. Thomas Wilhelm und lic.iur. Martin Hörnig vertreten. Nikolaus Wilhelm ist Prokurist mit Kollektivzeichnungsrecht zu zweien.

(Beilage A9)

Die Treuhandvereinbarung des Alpha Trust, die „*Declaration of Trust*" vom 27. Mai 2015, hat unter anderem folgenden Inhalt:

DIESE TREUHANDERKLÄRUNG erfolgt am 27. Mai zweitausendfünfzehn

**DURCH**

CTX Treuhand AG („Treuhänder", wobei der Begriff - sofern der Kontext es erlaubt - den oder die zum jeweiligen vorhandenen Treuhänder des Trusts einschliesst).

**VORAUSSETZUNGEN**

    i. Die Treuhänder bestätigen, das im zweiten Anhang angegebene Vermögen erhalten zu haben,
       um es nach den folgenden Bedingungen treuhänderisch zu verwalten.

    ii. Dieser Trust wird unwiderruflich errichtet.

    iii. Dieser Trust wird als „ALPHA TRUST" bezeichnet.

***DIESE* URKUNDE BEZEUGT** Folgendes:

**1.**    **Definitionen**

(...)

1.1.2. „die Begünstigten" sind und umfassen die Personen, die im dritten Anhang genannt oder beschrieben werden;

(...)

**3.**    **Beendigung des Treuverhältnisses**

Die Treuhänder haben die Befugnis, im Rahmen einer Urkunde ein Datum festzulegen (das nicht vor dem Datum der Ausfertigung dieser Urkunde liegen darf), das als Ende des Treuhandverhältnisses anzusehen ist.

■ Seite 33 ■

4. **Verkauf von Trustvermögen**

Die Treuhänder verwalten das Trustvermögen im Hinblick auf Investitionen oder Eigentum (ausser Geld) treuhänderisch nach ihrem eigenen Ermessen, um diese Investitionen oder das Vermögen insgesamt oder teilweise zu verkaufen, einzuziehen oder in Geld umzuwandeln, wobei jedoch die Möglichkeit besteht, diesen Verkauf, die Einziehung oder die Umwandlung *zu verschieben und* die Möglichkeit einzuräumen, dass diese Investitionen erhalten bleiben und das Geld treuhänderisch verwaltet wird, wobei sie denselben Ermessensspielraum haben, das Geld oder Eigentum in ihrem Namen oder unter ihrer Kontrolle in einer von diesem Trust oder vom Gesetz genehmigten Weise anzulegen, und die Befugnis diese Anlagen zu ändern oder gegen andere zulässige auszutauschen, wenn sie dies nach eigenem Ermessen für angebracht halten.

5. **Treuhänderschaft von Einkünften und Kapital**

5.1. Die Treuhänder verwalten das Kapital und die Einkünfte des Treuhandvermögens treuhänderisch zugunsten von allen, einem oder mehreren Begünstigten, wobei ein oder mehrere andere Begünstigte ausgeschlossen sein können, in Form von Anteilen oder in einem bestimmten Verhältnis, wenn mehr als ein Begünstigter vorgesehen ist, mit und auf der Basis von Befugnissen und Bestimmungen für deren Unterhalt, Ausbildung, Weiterentwicklung oder sonstigen Vorteilen oder zur Ansammlung von Einkünften (einschliesslich Verwaltungsbefugnissen und Bestimmungen oder Ermessens-Trusts und Befugnissen, die von einer oder mehreren Personen auszuführen oder auszuüben sind, ob diese nun als Treuhänder fungieren oder nicht oder ob die Treuhänder oder ein Treuhänder eingeschlossen ist oder nicht), so dass die Ausübung dieser Befugnis zur Bestimmung von Berechtigten in einem bestimmten Umfang und in einer Art und Weise delegiert werden kann, die die Treuhänder durch eine oder mehrere Urkunden, die während der Trust-Dauer widerrufen werden können oder die unwiderruflich sind und während der Trust-Dauer ausgeübt werden, benennen können, wobei jedoch VORAUSGESETZT wird, dass durch die Ausübung dieser Befugnis eine vorherige Zahlung oder Verwendung des gesamten Kapitals oder Einkommens oder eines Teils des Kapitals oder Einkommens aus dem Treuhandvermögen nicht ungültig gemacht wird, die im Rahmen einer Befugnis vorgenommen wurde, welche von dieser Urkunde oder vom Gesetz erteilt wird.

5.2. Bis zu einer Bestimmung nach Klausel 5.1., in Abhängigkeit oder in Ermangelung davon

5.2.1. zahlen die Treuhänder die Einkünfte des Treuhandvermögens an alle, einen bestimmten oder mehrere Begünstigte oder verwenden es zu dessen/deren Gunsten, wobei der andere oder andere ausgeschlossen sein können, wenn zum jeweiligen Zeitpunkt vorhanden und - bei mehreren Begünstigten - in Anteilen und in einer Art und Weise, die die Treuhänder nach ihrem alleinigen Ermessen jeweils für angemessen halten.

5.2.2. Ungeachtet der Bestimmungen in Klausel 5.2.1. können die Treuhänder zu einem oder mehreren beliebigen Zeitpunkten während der Trust-Dauer nach ihrem alleinigen Ermessen die Einkünfte im Wege der Aufzinsung ansammeln anstatt es insgesamt oder teilweise zu verwenden, indem sie die Einkünfte oder" die daraus resultierenden Einkünfte jeweils in einer Art und Weise anlegen oder anderweitig verwenden, die von dieser Urkunde oder vom Gesetz gestattet ist; auf der Basis von Klausel 5.2.3. verwalten sie diese Kapitalansammlungen als Kapitalzuwachs.

5.2.3. Die Treuhänder können zu einem oder mehreren Zeitpunkt/en während der Trust-Dauer die nach Unterpunkt 5.2.2. angesammelten Einkünfte insgesamt oder teilweise verwenden, als wenn es sich um Einkünfte handeln würde, die in dem jeweiligen Jahr angefallen sind.

5.2.4. Ungeachtet der Treuhandvollmachten und Bestimmungen, die in dieser Klausel aufgeführt werden und enthalten sind, können die Treuhänder

5.2.4.1 zu einem beliebigen Zeitpunkt während der Trust-Dauer das Kapital des Trustvermögens insgesamt oder teilweise an alle, einen oder mehrere Begünstigte/n unter Ausschluss von anderen Begünstigten zahlen oder zu dessen/deren Gunsten verwenden, wobei bei mehreren Begünstigten entsprechende Anteile vorzusehen sind und die Auszahlung oder Verwendung in einer Art und *Weise* erfolgen kann, die die Treuhänder nach ihrem alleinigen Ermessen für angebracht halten.

5.2.4.2. Einkommen oder Kapital aus dem Trustvermögen an die Treuhänder eines anderen Trusts bezahlen der übertragen, unabhängig von dem Ort der Errichtung, an dem ein oder mehrere Begünstigte beteiligt sind (unabhängig davon ob alle Begünstigten oder ein oder mehrere Begünstigte die einzigen Personen sind, die an diesem anderen Trust beteiligt sind oder als Nutzniesser in Frage kommen), wenn die Treuhänder nach ihrem alleinigen Ermessen der Meinung sind, dass diese Zahlung oder Übertragung allen, einem oder mehreren Begünstigten zugute kommen soll.

5.3. Bei Nichtausübung der genannten Befugnisse, die den Treuhändern durch die vorhergehenden Unterpunkte erteilt wurden, und in Abhängigkeit von der Ausübung dieser Befugnisse können die Treuhänder bei Ablauf der Trust-Dauer TREUHÄNDERISCH Ober das Trustvermögen verfügen, wobei die Begünstigten, die zu dem betreffenden Zeitpunkt leben, absolut gleiche Teile erhalten.

5.4 Auf der Basis der obigen Ausführungen und wenn und sofern Kapital und Einkünfte des Treuhandvermögens nicht aus einem beliebigen Grund nach den obigen Bestimmungen insgesamt veräussert werden, werden Kapital und Einkünfte des Treuhandvermögens treuhänderisch für das Rote Kreuz und Amnesty International verwaltet, und im Falle eines Scheiterns dieses Trusts für wohltätige Zwecke im Allgemeinen.

(…)

## 8. Befugnis. Begünstigte hinzuzufügen und auszuschliessen

8.1. Die Treuhänder können zu einem beliebigen Zeitpunkt während der Trust-Dauer schriftlich erklären, dass

8.1.1. eine Person, Gruppe oder Beschreibung von Personen kein Begünstigter mehr ist, so dass diese Person, Gruppe oder Beschreibung von Personen daraufhin kein Begünstigter mehr ist, als wenn dieser Begünstigte bereits ursprünglich als Begünstigter ausdrücklich ausgeschlossen worden wäre, jedoch unbeschadet bisheriger Zahlungen von Kapital oder Einkünften an diese/n Begünstigten.

8.1.2. eine Person, Gruppe oder Beschreibung von Personen, die von den Treuhändern benannt worden ist, von nun an Begünstigter ist, VORAUSGESETZT, dass eine Hinzufügung von Begünstigten die bereits getroffene Bestimmung für die Verwendung von Kapital oder Einkünften nicht beeinträchtigt, ändert oder beeinflusst.

(…)

## 10. Änderung der Treuhänder

10.1. Für diesen Trust sind mindestens zwei Treuhänder oder eine Trustgesellschaft und maximal fünf Treuhänder vorzusehen.

10.2. Bei mehr als einem ernannten Treuhänder müssen alle Treuhänder einstimmig handeln. Die Treuhänder haben jedoch das Recht, alle geschäftlichen Vorgänge, die Ausübung von

Vollmachten und Ermessensfragen an einen oder mehreren ihrer Mit-Treuhänder zu delegieren, sofern sie diese Übertragung nach eigenem Ermessen für ratsam halten.

10.3.   Ein Treuhänder, der zurücktreten und oder aus dem Treuhandverhältnis entlassen werden möchte, kann den Mit-Treuhändern (sofern vorhanden), und der/den Person/en, die befugt sind, neue Treuhänder zu ernennen, eine schriftliche Nachricht schicken und wird einen Monat nach dem Versand dieser Nachricht entlassen, oder zu einem früheren Zeitpunkt, wenn die Person/en, die zur Ernennung neuer Treuhänder berechtigt sind, nach den Bestimmungen dieser Klausel 10 ihre schriftliche Zustimmung erteilen, VORAUSGESETZT, dass diese Entlassung erst dann wirksam wird, wenn nach der Entlassung mindestens ein Treuhänder vorhanden ist.

10.4.   Wenn ein Treuhänder zurücktreten und aus allen Treuhandverhältnissen entlassen werden möchte oder er es ablehnt zu handeln oder er handlungsunfähig wird, oder er nicht mehr geschäftsfähig ist oder stirbt oder wenn eine Gesellschaft, die als Treuhänder fungiert, aufgelöst wird, dann ernennt

10.4.1. der Protektor oder wenn er verstorben ist (oder es sich dabei um eine Gesellschaft handelt, die aufgelöst wird) oder wenn er nicht in der Lage oder bereit ist zu handeln;

10.4.2. die Begünstigten *(ausser* Wohltätigkeitsorganisationen), wenn sie geschäftsfähig sind und mehrheitlich entscheiden, oder wenn sie nicht in der Lage oder bereit sind zu handeln;

10.4.3. die jeweils im Amt befindlichen Treuhänder oder wenn es keine Treuhänder gibt;

10.4.4   das Liechtensteinische Landgericht Vaduz durch schriftliche Urkunde eine oder mehrere Personen, unabhängig davon, ob sie am Verwaltungssitz des Trusts wohnen oder an einem anderen Ort, zu Treuhändern am Ort des verstorbenen oder aufgelösten Treuhänders oder des Treuhänders, der entlassen werden möchte, eine Handlung ablehnt oder handlungsunfähig ist oder nicht mehr geschäftsfähig ist, wie oben angegeben.

10.5.   Die Person, die zur Ernennung neuer Treuhänder nach Unterpunkt 10.4.1. und 10.4.2. berechtigt ist kann in derselben Reihenfolge wie oben beschrieben eine oder mehrere Personen zu weiteren Treuhändern ernennen bis die maximal zulässige Anzahl erreicht ist.

10.6.   Ein Treuhänder kann überall in der Welt wohnen.

10.7.   Die Person, die zur Ernennung zusätzlicher Treuhänder berechtigt ist, kann jederzeit und ohne Grund einen oder mehrere Treuhänder durch Zustellung einer schriftlichen Nachricht absetzen.

**11.   Befugnis zu delegieren**

11.1.   Ein Treuhänder hat die Befugnis (ungeachtet aller anderslautenden gesetzlichen Vorschriften), mit einer Urkunde, die während der Trust-Dauer widerrufen werden kann oder die unwiderruflich ist, an eine Person die Ausführung oder Ausübung aller treuhänderischen Befugnisse und Ermessensspielräume zu delegieren, die dem Treuhänder hiermit oder per Gesetz übertragen wurden.

■   Seite 36   ■

**12.   Befugnis zu ändern oder zu widerrufen**

12.1.   Die Treuhänder können jederzeit nach ihrem Ermessen Bestimmungen dieser Urkunde ändern, wobei die Ausübung dieser Befugnis nicht die Wirkung einer Widerrufung dieses Trusts hat.

**13.   Weitere Befugnisse**

13.1.   Die Treuhänder haben zusätzlich und unbeschadet aller gesetzlichen Befugnisse die Vollmachten und Immunitäten, die im ersten Anhang definiert werden, vorausgesetzt, dass die Treuhänder keine der Befugnisse so ausüben, dass sie mit den Bestimmungen dieses Trusts in Verbindung mit den Begünstigungen in Konflikt geraten.

**14.   Der Protektor**

14.1.   Der Protektor kann seinen Wohnsitz oder - im Falle einer Gesellschaft - seinen Firmensitz an einem beliebigen Ort in der Welt haben.

14.2.   Der erste Protektor ist Ashot Egiazaryan.

14.3.   Der Protektor kann seine Befugnisse, Rechte und/oder Pflichten für einen bestimmten Zeitraum oder dauerhaft zu jeder Zeit durch ein Schriftstück an eine Person oder Personen delegieren oder übertragen und zu Bedingungen, die er für angemessen hält, wobei immer vorausgesetzt wird, dass diese Übertragung erst wirksam wird, wenn die Treuhänder darüber schriftlich in Kenntnis gesetzt wurden.

14.3.1.   Wenn diese Übertragung scheitert oder kein Protektor vorhanden ist oder wenn ein Protektor stirbt (oder - im Falle einer Gesellschaft - aufgelöst wird) oder unfähig oder nicht bereit ist zu handeln, *ohne seine* Befugnisse, Rechte und/oder Pflichten gültig übertragen zu haben, dann ernennt/ernennen

14.3.1.1.   die Begünstigten (ausser im Falle von Wohltätigkeitsorganisationen), die geschäftsfähig sind und mehrheitlich entscheiden oder wenn sie unfähig oder nicht bereit sind zu handeln

14.3.1.2.   das Liechtensteinische Landgericht Vaduz innerhalb von 90 Tagen einen Protektor.

14.4.   Für die Ausübung der Befugnisse und Rechte nach den Klauseln 2.4., 2.5.1., 3.5., 8., 11., 12., 16.2., 16.3. und Klausel 11 des ersten Anhangs durch die Treuhänder ist die schriftliche Zustimmung des Protektors erforderlich.

(...)

**16.   Rechenschaftspflicht und Informationen**

16.1.   De Treuhänder führen vollständige und genaue Aufzeichnungen über alle Transaktionen im Zusammenhang mit dem Trustvermögen.

16.2.   Die Aufzeichnungen stehen den Begünstigten oder ihren rechtlichen oder ordnungsgemäss bevollmächtigten Vertretern innerhalb eines angemessenen Zeitraums zur Prüfung zur Verfügung. Ungeachtet der obigen Ausführungen sind die Treuhänder nicht verpflichtet, einem Begünstigten mitzuteilen, welchem anderen Begünstigten sie Kapital oder Einkünfte aus dem Trustvermögen haben zukommen lassen oder an welchen Begünstigten sie eine Zahlung aus dem Kapital oder den Einkünften des Trustvermögens geleistet haben; sie müssen auch keine Gründe für die

■   Seite 37   ■

Ausübung oder Nichtausübung oder die Art der Ausübung ihrer Befugnisse, Rechte und Ermessensspielräume im Rahmen des Trusts nennen.

16.3.   Die Treuhänder können nach eigenem Ermessen eine Kontrollstelle nach Art. 923 PGR ernennen, wobei die Kontrollstelle dann die einzige Person ist, die die oben genannten Informationen erhält.

(...)

DRITTER ANHANG

1.   Ashot Egiazaryan
2.   Eine Person oder Personen, die die Treuhänder jeweils als weitere Begünstigte benennen.

(Beilage A10)

Diese Treuhandvereinbarung werde durch das „*Written Instrument*" vom 2. Juni 2015 ergänzt, welches zwischen dem Treuhänder CTX einerseits und dem Verpflichteten in seiner Eigenschaft als Protektor des Alpha Trusts geschlossen und vom Verpflichteten unterfertigt worden ist. Dieses hat unter anderem folgenden Inhalt:

(1)   In Ausübung der in Klausel 12 der Haupturkunde genannten Befugnisse ändert der Treuhänder hiermit die folgenden Paragraphen der Haupturkunde:

(A)   Paragraph 14.4 hat ab jetzt den folgenden Wortlaut: „Die vorherige schriftliche Zustimmung des Protektors ist erforderlich, wenn die Treuhänder ihre Befugnisse und Rechte nach den Klauseln 2.4, 2.5.1, 3., 5., 8., 11., 12., 16.2., 16.3 und die Befugnisse in ersten Anhang ausüben".

(B)   In Paragraph 14 wird die folgende Klausel hinzugefügt:
„14.05. Der Protektor hat die Befugnis, durch schriftliche Anweisungen Treuhänder zu entlassen und zu ernennen."

(Beilage A11)

Das vom Verpflichtete unterfertigte Letter of wishes vom 27. Mai 2015 hat folgenden Inhalt:

LETTER OF WISHES VON HERRN ASHOT EGIAZARYAN

An:   Die Treuhänder des ALPHA TRUSTS, errichtet am 27. Mai 2015

1.   Sie sind die Treuhänder des ALPHA Trusts, errichtet am 27. Mai 2015.

2.   Ich erstelle diesen Letter of Wishes, um Ihnen meine Wünsche in Bezug auf die Verwaltung des Treuvermögens sowohl zu meinen Lebzeiten als auch nach meinem Ableben zur Kenntnis zu bringen. In Bezug auf den ALPHA Trust handelt es sich dabei um meinen ersten Letter of Wishes. Ich behalte mir das Recht vor, die Wünsche jederzeit zu widerrufen oder abzuändern. Die hierin enthaltenen Angaben entbinden Sie nicht von der Notwendigkeit, die Zustimmung des Protektors einzuholen, wann immer dies gemäss Treuhandurkunde erforderlich ist.

Seite 38

Es ist mein Wunsch, dass Sie mich in den Kreis möglicher Begünstigter der Treuhänderschaft aufnehmen und mir jeweils auf mein Verlangen Erträgnisse und Kapital zur Verfügung stellen.

Weiters ist es mein Wunsch, dass Sie _____

_____   _____ in den Kreis möglicher

Begünstigter des Trusts aufnehmen.

4.   Für die Zeit nach meinem Ableben sind meine Wünsche folgende:

   A.   Sollte es einen ausstehenden Saldo geben, den ich aus der Zeit vor Errichtung des Trusts schulde und von dem rechtskräftig festgestellt werden kann, dass er _____ und _____ und _____ gebührt, so ist es mein Wunsch, dass Sie diesen zuerst ausgleichen, bevor die Ermessensbegünstigten in den Genuss des Treuvermögens kommen.

   B.   Das Treuvermögen ist zugunsten von _____ zu halten.

5.   Ich bin mir bewusst, dass Sie rechtlich nicht gebunden sind, meine oben dargelegten Wünsche zu befolgen, hoffe jedoch, dass Sie meine Wünsche bei der Ausübung Ihrer Ermessensfreiheit im Rahmen des Treuhandverhältnisses berücksichtigen.

3. Juli 2015

Ashot Egiazaryan

(Beilage H)

Mit E-Mail vom 1. Juli 2015 hatte Nikolaus Wilhelm den (neuen) Entwurf für den Letter of Wishes an den Verpflichteten übermittelt und dabei folgendes ausgeführt:

„Anbei finden Sie einen neuen Entwurf für Ihren Letter of Wishes.

So wie er jetzt verfasst ist, sind Sie der Erstbegünstigte des Trusts. Das bedeutet, dass Sie zu Ihren Lebzeiten Zugriff auf den Treuhandfonds haben. Falls Sie einen Gläubiger haben und zahlen wollen, können Sie eine Ausschüttung an sich selbst beantragen, damit Sie den Gläubiger bezahlen können. Sie müssen die Gläubiger im Letter of Wishes nicht nennen."

(Beilage G)

Im internen, vom Verpflichteten gegengezeichneten Formular der Drittschuldnerin betreffend das Mandat „The Alpha Trust" (Form „Discretionary Trust") ist unter Punkt IV. („Angaben zu Kuratoren/Protektoren und weisungsberechtigten Personen") der Verpflichtete angeführt.

(Beilage I)

■   Seite 39   ■

**9.** In rechtlicher Hinsicht ergibt sich Folgendes:

**9.1** Die betreibende Partei beantragt vorliegend die Verwertung der gepfändeten Rechte im Sinne des Art. 244 EO. Diese Bestimmung sieht ein zweistufiges Verwertungsverfahren vor:

Im ersten Schritt ist die betreibende Partei auf Antrag zu ermächtigen, das Recht des Verpflichteten in dessen Namen geltend zu machen. Sie kann zu diesem Zweck alle Rechtshandlungen für den Verpflichteten abgeben, die dazu notwendig sind. Aufgrund des Umstandes, dass bei der Exekution nach Art. 242 ff EO immer das Gesamtrecht des Verpflichteten Exekutionsobjekt ist, wird der betreibende Gläubiger auch zur Ausübung dieses Gesamtrechtes ermächtigt, sofern dies der Liquidierung verwertbarer Aktiven dient. Die Aufzählung in Art. 244 Abs. 1 EO („Teilung oder die Einleitung des Auseinandersetzungsverfahrens zu begehren, Kündigungen vorzunehmen und die sonst zur Ausübung und Nutzbarmachung des gepfändeten Rechtes erforderlichen Erklärungen für den Verpflichteten abzugeben") ist bloss demonstrativ. Wenn im Antrag bzw der Ermächtigung durch das Gericht solche Einzelbefugnisse genannt werden, so dient dies dem Zweck, die jeweiligen Befugnisse des betreibenden Gläubigers verdeutlichend („insbesondere") hervorzuheben. Bei dieser Ermächtigung handelt es sich um einen Sonderfall der Überweisung zur Einziehung (vgl Oberhammer in Angst/Oberhammer, EO[3] § 333 EO  Rz 2; Heller/Berger/Stix III 2379; LGZ Wien ZBl 1937/500). Die zu den Rechtsfolgen der Überweisung zur Einziehung entwickelte Dogmatik kann daher zur Klärung von Zweifelsfragen der Ermächtigung nach Abs 1 mutatis mutandis herangezogen werden (vgl. Oberhammer in Angst/Oberhammer, EO[3] § 308 EO Rz 1 ff; 3 Ob 225/07 w ecolex 2008/232 = JBl 2008, 726 = RdW 2008/492).

Die Bestimmungen über die Exekution auf „andere Vermögensrechte" sind bewusst „offen" formuliert, um jedweden Zugriff auf verwertbare Vermögensaktiven des Schuldners zu ermöglichen. Dies gilt auch für die Bestimmung des Art. 244 Abs. 1 EO (vgl dazu Oberhammer, wobl 1997, 252 f), bei dem insbesondere im Hinblick auf die Auslegung von Exekutionsanträgen kein engherziger Formalismus zu pflegen ist.

Grundsätzlich sind die Rechte des ermächtigten betreibenden Gläubigers jenen des Verpflichteten inhaltsgleich (Heller/Berger/Stix III 2379; vgl 3 Ob 165/10 a SZ 2010/127 = ecolex 2011/20 = GesRZ 2011, 126 [Eckert]; RIS-Justiz RS0003934).

Der Umstand, dass die Pfändung iSv Art. 242 EO auch alle Nebenrechte des Verpflichteten, die ihm gegen einen etwaigen Drittschuldner zustehen, umfasst, wird hier noch wesentlich deutlicher als bei der Exekution nach Art. 237 ff EO, da sich dieser Umstand schon daraus ergibt, dass das Exekutionsobjekt bei dieser Exekutionsart immer das „Gesamtrecht" des Verpflichteten ist.

In einem zweiten Schritt hat es gemäss Art. 244 Abs. 2 EO zur Verwertung des auf diese Weise herangezogenen Vermögens zu kommen. Diese erfolgt in sinngemässer Anwendung der in der EO für den jeweiligen Vermögensgegenstand vorgesehenen Verwertungsart. Kommt es also zB zur Ausfolgung von beweglichen Sachen, so erfolgt die Verwertung gemäss Abs. 2 nach den Vorschriften der Fahrnisexekution. Entsteht dem Verpflichteten im Gefolge der Rechtsausübung durch den betreibenden Gläubiger eine Geldforderung, so greifen hier die Bestimmungen der Forderungsexekution usw.

Ungeklärt ist die Frage, wodurch, zu welchem Zeitpunkt und damit in welchem Rang das Pfändungspfandrecht des betreibenden Gläubigers an dem auf diese Weise herangezogenen Vermögen im Hinblick auf seine Befriedigung im Rahmen der Verwertung nach Art. 244 Abs. 2 EO entsteht. In diesem Zusammenhang wird so gut wie jede denkbare Meinung vertreten (vgl. Oberhammer in Angst/Oberhammer, EO[3] § 333 Rz 6 ff; Frauenberger in Burgstaller/Deixler-Hübner, EO § 333 Rz 3 ff; Heller/Berger/Stix III 2394 ff mwN).

Vieles spricht dafür, dass es nach der erfolgreichen Ausübung des Rechtes des Verpflichteten durch den betreibenden Gläubiger gemäss Art. 244 Abs. 1 EO zu keiner neuerlichen Pfändung der herangezogenen Aktiven zu kommen hat. Dies würde sich nicht zuletzt aus der systematischen Interpretation von Abs. 2 leg. cit. ergeben: Auch bei der Forderungsexekution (bei der sich etwa das Pfandrecht an der

Forderung ipso iure in ein solches an einem Gerichtserlag nach Art. 228 EO umwandelt, ohne dass es einer neuerlichen Pfändung bedarf) und bei der Exekution auf Herausgabeansprüche nach Art. 237 ff EO (bei der sich ebenfalls das Pfandrecht am Herausgabeanspruch ipso iure in ein Pfandrecht an der herausgegebenen Sache umwandelt) ist keine neuerliche Pfändung des Einziehungsrealisats vorgesehen. Vor allem die Parallelbestimmung des Art. 238 Abs. 2 EO stellt deutlich darauf ab, dass es nach der EO im Gefolge der erfolgreichen „Heranziehung" eines Aktivums durch Einziehung eines darauf gerichteten Anspruchs nur noch zu einer Verwertung, nicht aber zu einer neuerlichen Pfändung des Realisats kommt.

**9.2**  Vorliegend hat die Verwertung also – wie beantragt – dadurch zu geschehen, dass die betreibende Partei ermächtigt wird, die gepfändeten Rechte im Namen der verpflichteten Partei geltend zu machen und die erforderlichen Rechtshandlungen namens des Verpflichteten vorzunehmen (Art. 244 Abs. 1 EO). Dabei muss vom Gericht grundsätzlich keine Aufzählung einzelner in Betracht kommender Rechtshandlungen vorgenommen werden. Es genügt, wenn – wie vorliegend beantragt – der betreibende Gläubiger unter Anführung des gepfändeten Vermögensrechts zur Ausübung der dem Verpflichteten zustehenden Rechte bzw. dazu ermächtigt wird, die erforderlichen und mit der gegenständlichen Exekutionsbewilligung gepfändeten Gesamtrechtshandlungen namens des Verpflichteten vorzunehmen. Wie ausgeführt ist es nicht erforderlich, dass die Ausübung einzelner Befugnisse des Verpflichteten unmittelbar einen Vermögenswert nutzbar macht, solange und insoweit die konkrete Ausübung - wenn auch indirekt - darauf gerichtet ist, Vermögen des Verpflichteten der Zwangsvollstreckung zuzuführen.

Die betreibende Partei hat vorliegend gemäss Art. 244 Abs. 2 EO die Exekution des auf die Weise des Abs 2 leg.cit. herangezogenen Vermögens (das sind sämtliche denkbare Erlöse aus dem Trust) beantragt. Auch wenn – wie oben ausgeführt – vieles dafür spricht, dass das im Wege der Exekutionsbewilligung erlangte Pfandrecht auf das Realisat nach Art. 244 Abs. 2 EO durchschlägt bzw. sich das Pfändungspfandrecht am gepfändeten Recht mit der erfolgreichen

■   Seite 42   ■

„Heranziehung" von Aktiven iSv Abs. 2 leg. cit. in ein Pfändungspfandrecht an diesen Aktiven verwandelt, war dem Antrag der betreibenden Partei im Hinblick auf die verschiedenen, in Lehre und Rechtsprechung vertretenen – recht unterschiedlichen – Meinungen stattzugeben. Es soll jedenfalls für Schuldner und Dritte klar festgeschrieben sein, was vom Pfandrecht betroffen ist. Der Drittschuldner soll durch ein klares Zahlungsverbot gehindert sein, an den Verpflichteten zu leisten.

**9.3**   Dem Verwertungsantrag war daher vollinhaltlich stattzugeben. Die von der betreibenden Partei genannten Gestaltungsrechte und Rechtshandlungen des Verpflichteten, zu deren Ausübung die betreibende Partei ermächtigt werden soll, können allesamt übertragen werden und sind vermögensrechtlich zumindest mittelbar relevant. Alle sind verwertbar und vermögenswert. Die dem Verpflichteten mögliche Abberufung der bisherigen Treuhänderin und Bestellung neuer Treuhänder [Art. (1)(B) des Written Instrument], sein Recht, Ausschüttungen zu begehren [Letter of Wishes] oder seine Zustimmungsrechte [Art. 14.3 Declaration of Trust iVm. Art. (1)(A) des Written Instrument] sind allesamt geeignet, verwertbares Vermögen zu realisieren bzw. den Zugriff auf verwertbares Vermögen zu ermöglichen.

Wie schon der Oberste Gerichtshof in ON 72 (Erw. 7.4.3.) ausgeführt hat, ist vorliegend der Verpflichtete unter anderem auch berechtigt, sich selbst als Treuhänder einzusetzen, was gesetzlich zulässig ist (Art. 910 Abs. 5 iVm. 932a §40 Abs. 2 PGR).

Gemäss Art. 14.3 Declaration of Trust iVm. Art. (1)(A) des Written Instrument benötigt es für eine Vielzahl der (formell bestehenden) Rechte und Pflichten und Handlungen des Treuhänders die vorherige ausdrücklich Zustimmung des Protektors, und zwar insbesondere:

- für die Beendigung des Trusts durch den Trustee (Art. 3 Declaration of Trust),
- für die Verwaltung der Vermögenswerte des Trusts und der Erträgnisse daraus zugunsten der Begünstigten (Art. 5 Declaration of Trust),
- für die Bestimmung der Begünstigten (Art. 8 Declaration of Trust),

- für die Delegation sämtlicher Rechte des Trustees einschliesslich seiner Ermessensbefugnis (Art. 11 Declaration of Trust),
- für die Änderung von Bestimmungen der Treuhandurkunde (Art. 12 Declaration of Trust).

Die Ausübung der genannten Einzelrechte zusammen ist jedenfalls geeignet, verwertbares Vermögen zu realisieren: Durch die Ermächtigung kann die betreibende Partei erstens anstelle des Verpflichteten gegenüber dem Alpha Trust die Abberufung der bisherigen Treuhänderin des Alpha Trusts (CTX) und die Einsetzung einer von der betreibenden Partei bestimmten Person als Trustee des Alpha Trusts begehren, zweitens sodann vom (von der betreibenden Partei bestimmten) Trustee des Alpha Trusts eine Ausschüttung – jene des geschuldeten Betrages – an die verpflichtete Partei an eine von der betreibenden Partei zu bestimmende Zahlstelle begehren und drittens anstelle des Verpflichteten (in dessen Position als Protektor und Begünstigter) dieser Ausschüttung und ihrer Durchführung zustimmen.

Auch die von der betreibenden Partei alternative beantragte Variante, sie – auf Basis des Letter of Wishes – zu ermächtigen, eine Ausschüttung direkt an den Begünstigten zu begehren und zu genehmigen, stellt zweifellos ein vermögenswertes Recht dar, zumal die betreibende Partei auf diese Ausschüttung nach Art. 244 Abs. 2 EO exekutiv zugreifen kann.

Schliesslich ist auch die Ausübung der Rechte aus dem Letter of Wishes (Bestellung der betreibenden Partei als Begünstigte, Begehren und Genehmigung der Ausschüttung an diese) verwertbar und ermöglicht der betreibenden Partei den Zugriff auf ein verwertbares Vermögen.

**9.4** Die Einwendungen der verpflichteten Partei und der Drittschuldnerin wiederholen über weite Strecken das in den Rechtsmittelschriften im „Pfändungs-Verfahren" Vorgebrachte, was im gegenständlichen Verwertungsverfahren nicht mehr relevant ist und zu dem der Oberste Gerichtshof und der Staatsgerichtshof bereits viel und abschliessend ausgeführt und rechtskräftig entscheiden haben, sodass darauf nicht weiter einzugehen ist.

Der Verwertungsantrag ist rechtzeitig gestellt, ausreichend substantiiert und zweifellos zulässig. Im Sinne der zitierten Rechtsprechung des Obersten Gerichtshofs und des Staatsgerichtshofs sind die gepfändeten Gesamtrechte grundsätzlich verwertbar und sind dies – wie oben ausgeführt – auch die einzelnen Gestaltungsrechte und Handlungen, zu denen die betreibende Partei ermächtigt werden soll.

Wie der Oberste Gerichtshof auch bereits ausgeführt hat, würde selbst eine tatsächliche Ermessensbegünstigung der Verwertung der gepfändeten Rechte nicht entgegenstehen (ON 72, Erw 7.4.3., vgl. auch Erw. 7.6.4.). Die betreibende Partei weist zu Recht auch darauf hin, dass – selbst wenn man die Verwaltung formal anhand einer Ermessensausübung gestalten wollte – dies nichts daran ändern würde, dass aus dem Trustvermögen die titulierte Forderung der betreibenden Partei zu befriedigen sei.

Auch wenn die verpflichtete Partei unter Berufung auf die Recht-sprechung vorträgt, dass ein Abberufungsrecht lediglich der „Kontrolle und Durchsetzung der Pflichten des Treuhänders" dienen würde, müssen sie gleichzeitig einräumen, dass vorliegend das Recht des Protektors zur Bestellung und Abberufung des Treuhänders des Alpha Trusts „gemäss den Urkunden nicht an Voraussetzungen gebunden" sei. So gesehen steht dem Verpflichteten vorliegend schlicht und einfach – zumindest objektiv gesehen – das Recht der Bestellung und Abberufung der Treuhänder zu, ohne dass irgendeine Voraussetzung vorliegen muss oder der Verpflichtete Gründe angeben müsste. Aber auch wenn man die Treuurkunde subjektiv wie Stiftungsstatuten auslegen würde, kommt man schon bei Zusammen-schau mit dem Letter of Wishes zu keinem anderen Ergebnis, als dass der Verpflichtete sich die Kontrolle über das Treuhandvermögen sichern wollte – unter anderem mit der Kompetenz zur Abberufung des Treuhänders.

Wenn die verpflichtete Partei das „Verhältnismässigkeitsprinzip" anspricht und hierfür einen „ungeschriebenen Verfassungsgrundsatz" bemüht, ist sie auf Art. 9 EO zu verweisen, wo dieser Grundsatz Gesetzestext geworden ist. Demnach ist die gleichzeitige Anwendung mehrerer Exekutionsmittel gestattet. Nur wenn aus dem Exekutionsantrag offen-sichtlich hervorgeht, dass bereits eines oder mehrere der beantragten Exekutionsmittel zur Befriedigung des betreibenden Gläubigers hin-

reichen, *kann* die Bewilligung auf einzelne Exekutionsmittel beschränkt werden. Letzteres wird von der verpflichteten Partei gar nicht behauptet, geschweige denn bescheinigt.

Zum Vorbringen der verpflichteten Partei betreffend ihre rechtshilfeweise Einvernahme ist darauf zu verweisen, dass nach Art. 242 Abs. 2 EO die Art der Verwertung nach der Einvernahme unter anderem des Verpflichteten zu bestimmen ist. Damit ist eine Einvernahme nach Art. 34 EO gemeint, die mündlich oder durch die Aufforderung, eine schriftliche Stellungnahme abzugeben, geschehen kann. Welche Form das Gericht wählt, liegt in seinem freien Ermessen. Ausdrücklich sieht das Gesetz vor, dass die für die mündliche Verhandlung geltenden Vorschriften des Art. 38 EO, die vor allem die Führung des Protokolls betreffen, für die Einvernehmung nicht gelten. Es genügt vielmehr, das Ergebnis der Einvernehmung in einem kurzen Aktenvermerk festzuhalten (Art. 34 Abs. 1 EO).

Das Gericht hat vorliegend die verpflichtete Partei mit Beschluss vom 09.11.2018 (ON 80) aufgefordert, sich über den Verwertungsantrag der betreibenden Partei vom 24. Juli 2017 (ON 34) gemäss Art. 242 Abs. 2 iVm Art. 34 EO binnen 14 Tagen nach Zustellung dieses Beschlusses schriftlich zu äussern, ansonsten angenommen wird, dass sie diesem Antrag zustimmt (Art. 34 und Art. 35 Abs. 2 und 3 EO)". Die verpflichtete Partei hat sich auch geäussert, sogar zweimal ausführlich, und zwar mit Schriftsätzen vom 28.11.2018 (ON 88) und vom 20.12.2019 (ON 97). Weil beide Seiten die Abhaltung einer – im Gesetz nicht zwingend vorgesehenen – Tagsatzung (zu mündlichen Verhandlung) beantragt haben, hat das Gericht – zur Vermeidung eines Hin-und-Her von schriftlichen Stellungnahmen und ebensolchen Gegenstellungnahmen [auch im Sinne der Rechtsprechung zur Wahrung des rechtlichen Gehörs] – eine solche auch angeordnet, um abschliessend und bei gleichzeitiger Anwesenheit der Parteien über den Verwertungsantrag (kontradiktorisch) zu verhandeln.

Wie sich aus dem Art. 34 Abs. 3 EO ergibt, sind die Beweismittel im Exekutionsverfahren grundsätzlich nicht beschränkt. Ausser den Bescheinigungen und Beweisaufnahmen „nach den Vorschriften der Zivilprozeßordnung" stehen dem Gericht alle geeigneten Erhebungen zur

Seite 46

Verfügung. Die Vernehmung der Parteien oder Beteiligter ist – wie oben zu Art. 34 Abs. 1 EO ausgeführt – nicht zwingend zweiseitig und eine förmliche, unmittelbare Parteienvernehmung kommt nur dort in Frage, wo das Gesetz eine mündliche Verhandlung vorsieht (etwa Art. 140 Abs. 1 EO – Meistbotsverteilung oder Art. 290 Abs. 3 Bst. c EO – Einspruchs-verhandlung). Und im Falle des Art. 242 Abs. 2 EO sieht das Gesetz nur eine Einvernahme, nicht aber eine mündliche Verhandlung vor. Und die Einvernahme hat das Gericht schriftlich angeordnet. Die verpflichtete Partei hat auch entsprechend dem gerichtlichen Auftrag schriftlich Stellung genommen und wurde damit im Sinne des Art. 242 Abs. 2 iVm Art. 34 EO einvernommen. Für eine förmliche, unmittelbare oder gar rechtshilfeweise Einvernahme der verpflichteten Partei war und ist kein Raum und hatte die verpflichtete Partei „alle Zeit der Welt", ihre Behauptungen unter Beweis zu stellen (und hat die aufgetragene schriftlichen Einvernahme auch dazu benutzt).

Im Übrigen ist noch einmal auf die oben wiedergegebenen, die Einwendungen der verpflichteten Partei und der Drittschuldnerin erledigenden Ausführungen des Obersten Gerichtshofs und des Staatsgerichtshofs zu verweisen.

**9.5**  Die von der betreibende Partei im Verfahren über die Verwertung rechtzeitig und im Wesentlichen richtig (Beschlussgebühr fällt keine an und war nicht zuzusprechen; der Streitgenossenzuschlag für den Schriftsatz ON 105 und die Tagsatzung vom 18.02.2020 gebührt nicht) verzeichneten Kosten waren als weitere Exekutionskosten mit CHF 83'297.75 zu bestimmen.

Fürstliches Landgericht
Vaduz, 02.03.2020
Mag. Konrad Lanser
Fürstlicher Landrichter

Für die Richtigkeit der Ausfertigung

Iris Feuerstein



Seite 47

## Rechtsmittel

Gegen diesen Beschluss ist binnen der unerstreckbaren Frist von 14 Tagen ab Zustellung das Rechtsmittel des Rekurses an das Fürstliche Obergericht, Vaduz, zulässig, Der Rekurs ist schriftlich in zweifacher Ausfertigung beim Fürstlichen Landgericht in Vaduz einzubringen, kann aber auch mündlich zu Protokoll erklärt werden. Er hat eine bestimmte Erklärung, inwieweit der Beschluss angefochten wird, die ebenso bestimmte kurze Bezeichnung der Gründe der Anfechtung (Rekursgründe), das tatsächliche Vorbringen und die Beweismittel, durch welche die Wahrheit der Rekursgründe erwiesen werden kann, und die Erklärung, ob die Aufhebung oder Abänderung des Beschlusses und gegebenenfalls welche beantragt werde (Rekursantrag) zu enthalten.